1
Brian Hennessy, State Bar No. 226721
BHennessy@perkinscoie.com
2
PERKINS COIE LLP
3150 Porter Drive
3
Palo Alto, CA  94304-1212
Telephone: 650.838.4300
4
Facsimile: 650.838.4350

5
Attorneys for Plaintiff
FACEBOOK, INC.
6

ORIGINAL FILED

ADR

JUL 2 2 2011

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

FACEBOOK, INC., a Delaware corporation,

Plaintiff,

v.

CYBER2MEDIA, INC., DANIEL
NEGARI, CLEANSER
PRODUCTS, COUNTER
BALANCE ENTERPRISES LTD.,
FB PROMOTIONS/FREEBIE
PROMOS, MACKROONER LTD.
INC., NEWGATE SERVICES LTD.
INC., PIONEER ENTERPRISES
LTD., RABBIT GOGO MEDIA
LLC, SMTM ENTERPRISES LTD.,
YOURTICK, ZILT, JACOB
DANIELS, JERRY HUI, RYAN
JOHNSON, ERIC JORDAN,
KARRIE-LEE KARREMAN, JUNE
KIMCHI, TIM MEYERS, ANKIT
PANDEY, S. PACE, ELISE PETRI,
MARK RISI, JOHN SOUZA,
MICHAEL SUGGS, and
DOES 1-119,

Defendants.

Case No. _____ CV11-03619 PJH

**COMPLAINT FOR:**

1. **CYBERSQUATTING AND
   CONTRIBUTORY CYBERSQUATTING
   UNDER 15 U.S.C. § 1125(d);**

2. **TRADEMARK INFRINGEMENT AND
   CONTRIBUTORY TRADEMARK
   INFRINGEMENT UNDER 15 U.S.C. § 1114;**

3. **FALSE DESIGNATION OF ORIGIN AND
   CONTRIBUTORY FALSE DESIGNATION
   OF ORIGIN UNDER 15 U.S.C. § 1125(a);**

4. **TRADEMARK DILUTION AND
   CONTRIBUTORY TRADEMARK
   DILUTION UNDER 15 U.S.C. § 1125(c);**

5. **BREACH OF CONTRACT; AND**

6. **TORTIOUS INTERFERENCE WITH
   PROSPECTIVE ECONOMIC ADVANTAGE**

**DEMAND FOR JURY TRIAL**

For its Complaint, Facebook, Inc. ("Facebook") alleges as follows:

LEGAL21126168.3

-1-

Case No. _____

COMPLAINT

## I.    INTRODUCTION

1.      Defendants are typosquatters.  They exploit and profit from Internet domain names that are confusingly similar to Facebook's famous and distinctive trademark, **FACEBOOK**, to trick Facebook users and potential users into visiting Defendants' websites.  Those websites, in turn, misappropriate Facebook's trademarks and use other deceptive tactics to suggest, falsely, that the websites and the commercial activities carried on at those websites are connected to Facebook.  Defendants make money by luring unsuspecting consumers into divulging personal information on Defendants' websites, viewing and clicking on advertisements placed on Defendants' websites, and buying goods and services sold on Defendants' websites.  Defendants' schemes succeed largely because consumers are deceived into believing they are dealing with Facebook or entities affiliated with Facebook.

2.      Defendants' typosquatter schemes infringe on Facebook's famous and distinctive trademarks (the "Facebook marks" or "Facebook's marks") and confuse the consuming public with respect to whether Defendants and their commercial activities are associated with Facebook. Defendants' schemes also diminish the goodwill associated with Facebook and its marks, injure Facebook's reputation, breach enforceable agreements between Defendants and Facebook, interfere with Facebook's business, and unjustly enrich Defendants.

3.      Facebook therefore seeks an order cancelling Defendants' rights in their typosquatter domain names or transferring those typosquatter domain names to Facebook, awarding Facebook damages, and providing other relief.

## II.    PARTIES

4.      Plaintiff Facebook is a Delaware corporation with its principal place of business in Palo Alto, California.

5.      Defendant Cyber2Media, Inc. is a California corporation with its principal place of business in Beverly Hills, California.  Many Internet domain names involved in Defendants' typosquatter schemes are hosted on computer servers owned or controlled by Defendant Cyber2Media, Inc. or previously owned or controlled by Defendant Cyber2Media, Inc.

6.      Defendant Daniel Negari is a resident of California and a registered Facebook user.  On information and belief, Defendant Negari has at all relevant times served as President of Defendant Cyber2Media, Inc.

7.      Each Defendant identified in Exhibit A registered, owns, or operates corresponding Internet domain names that are also identified in Exhibit A and are incorporated into this Complaint as if each Defendant, address, and associated domain name was listed in a separate subparagraph.  The domain names identified in Exhibit A are or have been involved in Defendants' typosquatter schemes.  Facebook refers to the Defendants identified in Exhibit A as the "Additional Named Defendants."

8.      The Internet domain names identified in Exhibit B also are or have been involved in Defendants' typosquatter schemes.  The individuals or corporations who registered, own, or operate the domain names identified in Exhibit B have obscured their true identities by using privacy-protection services and other techniques.  Facebook refers to those individuals or corporations as the "Doe Defendants."  Facebook will seek the identities of the Doe Defendants through discovery and amend this Complaint when their identities become known.

### III.     JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over the claims arising under federal law pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because Facebook alleges violations of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), (c), (d).

10.     This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367 because the state-law claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over each of the Defendants because each Defendant, or agents for each Defendant, agreed to the personal jurisdiction of the state and federal courts located in Santa Clara County, California, by agreeing to Facebook's terms of

service, which Facebook refers to as its Statement of Rights and Responsibilities ("Statement"). *See* Exhibit C.

12.     In addition or alternatively, this Court has personal jurisdiction over each of the Defendants because Defendants' unlawful activities are targeted at Facebook, which Defendants know is headquartered in California; because Defendants conduct substantial, continuous, and systematic business within this district; because Defendants engaged in acts or omissions causing injury within this district; because Defendants engaged in acts outside this district causing injury within this district; and because the claims alleged in this Complaint arise out of or relate to Defendants' forum-related activities.

13.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted in this lawsuit occurred in this district and a substantial part of the property that is the subject of this lawsuit is situated in this district.

## IV.     INTRADISTRICT ASSIGNMENT

14.     Assignment to the San Jose Division of this Court is appropriate under Local Rule 3-2 because the claims asserted herein arose in Santa Clara County. Facebook is headquartered in that county and has servers located at several locations in that county.

## V.     FACTS AND BACKGROUND

### A.     Facebook and Facebook's Services

15.     Founded in February 2004, Facebook is a free online network that helps people connect and share with their friends, family, and the world around them. The company develops and provides online networking services that facilitate the sharing of information through the "social graph"—the digital mapping of people's real-world social connections. Through Facebook's website, the Facebook Platform, Social Plugins, and other tools, hundreds of millions of Facebook users enjoy personalized and relevant Internet experiences. As of the filing of this Complaint, more than 750 million active Facebook users spend more than 700 billion minutes per month on http://www.facebook.com, making Facebook's website one of the most trafficked websites in the United States. More than 150 million Facebook users also engage with Facebook

through external, third-party websites every month.  And more than one million websites have implemented tools made available by Facebook that engage users and make their websites more social and personalized.  Through Facebook, users can interact with more than 900 million objects (including individual and community webpages, groups, and events) and 30 billion pieces of content (including web links, news stories, blog posts, notes, and photo albums).

16.     Facebook allows parties to use approved methods to advertise and promote their goods and services on Facebook's website.

17.     Facebook displays advertisements on its website in a way that allows Facebook users to view those advertisements and to click on them to learn more about the underlying goods or services.

18.     Facebook derives income primarily from its advertising services; it operates its services without charge to users.

**B.     Facebook's Marks**

19.     Facebook is the owner of the entire right, title, and interest in and to a number of trademarks and service marks, including the following representative marks, applications, and registrations, for which Facebook owns federal applications or registrations covering a wide variety of goods and services:

- **FACEBOOK** / Registrations: Reg. No. 3801147, 3881770.  Pending Application: Serial Number 85147898.

-  / Pending Applications: Serial Numbers 77896325, 77896323, 77896315.

-  / Registrations: Reg. No. 3934743.

-  / Pending Applications: Serial Numbers 85020073, 85020071, 85020068, 85020066, 85020064, 85020062, 85020058.

20.     Attached to this Complaint as Exhibit D is a true and correct copy of representative examples of the United States Patent and Trademark Office printouts of the online status pages for these marks and other marks. All noted registrations and applications in Exhibit D are valid, subsisting, unrevoked, and uncancelled.

21.     Facebook has continuously used its marks in interstate commerce in the United States in connection with its online networking services since 2004.

22.     Facebook's marks are highly distinctive with regard to a wide variety of services, including online networking services and advertising services.

23.     As a result of Facebook's use of its marks worldwide, the prolific presence of Facebook's marks on third-party websites, the continuous and unsolicited media coverage of Facebook, the high degree of consumer recognition of Facebook's marks, and the hundreds of millions of customers who regularly use and enjoy Facebook's services, Facebook's marks are famous within the meaning of 15 U.S.C. § 1125(c).

24.     Facebook devotes significant resources to protecting its marks.

**C.     Facebook's Statement of Rights and Responsibilities**

25.     To access Facebook information and features available to Facebook users, a user must register for a Facebook account and agree to the terms and conditions contained in Facebook's Statement, a copy of which is attached as Exhibit C to this Complaint.

26.     Facebook's Statement is binding on and enforceable against Facebook users and others who interact with Facebook.

27.     Facebook's Statement prohibits certain conduct, including, but not limited to, misleading Facebook users, using Facebook's marks or any confusingly similar marks without Facebook's written permission, and collecting information from Facebook users without making clear that Facebook is not the one collecting the users' information.

**D.     Defendants' Unlawful Conduct**

28.     On information and belief, Cyber2Media, Inc., Daniel Negari, the Additional Named Defendants, the Doe Defendants, and unknown agents, affiliates, and co-conspirators of those defendants (collectively, "Defendants") are currently engaged in or have in the past

engaged in schemes to exploit and profit from Internet domain names that are confusingly similar to Facebook's famous and distinctive mark, **FACEBOOK**.

29.     As used in this Complaint, "domain name" means a string of alphanumeric characters used to identify a specific website on the Internet.  For example, the domain name for Facebook's website is facebook.com.

30.     As used in this Complaint, "typosquatter domain name" means a domain name that is confusingly similar to a protected mark.  A typosquatter domain name may be confusingly similar to a protected mark either because it incorporates the protected mark (e.g., "facebooki.com") or because it is an intentionally misspelled or corrupted version of the protected mark that is similar to the protected mark in sight, sound, and meaning (e.g., "faceboook.com"). Defendants are or have been registrants, owners, or operators of typosquatter domain names and/or have profited from typosquatter domain names that are confusingly similar to Facebook's famous and distinctive mark, **FACEBOOK**.

31.     As used in this Complaint, "landing website" means a website to which consumers are directed when they type typosquatter domain names into their web browsers.  Defendants are or have been registrants, owners, or operators of landing websites and/or have profited from landing websites.

32.     As described more fully below, Defendants use or have used their typosquatter domain names and landing websites to divert consumers from Facebook's online location and to maximize their profits by confusing consumers as to the source and affiliation of Defendants' websites and the commercial activities carried on at those websites.

**E.     Overview of Defendants' Typosquatter Schemes**

33.     To launch a typosquatter scheme, Defendants first purchase registration rights for a typosquatter domain name.

34.     Next, Defendants create a typosquatter website to which consumers are directed when consumers type the typosquatter domain name into their web browsers.  The typosquatter website captures consumers who (i) accidentally misspell Facebook's domain name or

(ii) mistakenly assume, because the typosquatter website's domain name is confusingly similar to Facebook's domain name, that the typosquatter website is connected to or approved by Facebook.

35.     Usually, the typosquatter website immediately redirects consumers—without any notification or explanation—to a landing website.

36.     The landing website typically includes advertisements, promotions, and/or offers for goods and services, some of which are similar in kind and appearance to legitimate content and third-party advertisements on Facebook's website.

37.     In many cases, the landing website is designed to confuse consumers as to the source and sponsorship of the landing website and the commercial activities carried on there. For example, the landing website often misappropriates one or more of Facebook's marks. It may also incorporate colors and design elements from Facebook's website and misleading text or pretextual "surveys" about online networking.

38.     Visitors to Defendants' landing websites are invited to view or click on one or more of the advertisements, promotions, or offers displayed there. They are then led through a chain of websites designed to lure them into divulging personal information, viewing or clicking on additional advertisements, or purchasing goods and services.

39.     On information and belief, Defendants receive payment each time a consumer visits one of the Defendants' websites, clicks on one of the offers or advertisements on those websites, buys goods or services, and/or divulges personal information.

40.     Confusion is the essence of Defendants' schemes. Defendants rely on consumers' mistakes or confusion to generate traffic to Defendants' websites. Defendants then compound and prolong consumers' confusion by misappropriating Facebook's marks and using other deceptive tactics to suggest, falsely, that Defendants and their commercial activities are connected to Facebook.

41.     As a result, consumers impute the fame and goodwill associated with Facebook and Facebook's marks to Defendants' websites and Defendants' commercial activities. Consumers therefore linger longer on Defendants' websites, view and click on more offers and

advertisements, purchase more goods and services, divulge more personal information—and increase Defendants' profits.

42.     On information and belief, in addition to engaging in their own typosquatter schemes, Defendants actively and intentionally induce others to engage in identical or similar schemes.

43.     On information and belief, Defendants participate in and induce others to participate in the specific schemes described below, substantially similar schemes, or both, or have engaged in such conduct in the past.

**F.      Example 1: Facebooki.com**

44.     One of Defendants' typosquatter domain names is facebooki.com.

45.     The facebooki.com domain name and the http://www.facebooki.com website use the **FACEBOOK** mark to suggest that the facebooki.com domain name and the http://www.facebooki.com website are connected to or approved by Facebook.

46.     If a consumer typed "facebooki.com" into his web browser on April 5, 2011, his browser would have been redirected immediately to an intermediate landing website, http://1939.com, and then to the landing website http://socialrewardsurvey.com/.  A true and correct copy of the http://socialrewardsurvey.com/ landing website as it appeared on April 5, 2011 is attached as Exhibit E.

47.     The domain name for the http://socialrewardsurvey.com/ landing website uses the term "social"—a term commonly associated with Facebook—to suggest that the http://socialrewardsurvey.com/ landing website is connected to or approved by Facebook.

48.     At the time Exhibit E was created, the landing website http://socialrewardsurvey.com/ also used distinctive colors, fonts, and other design elements used by Facebook's website to suggest that it was connected to or approved by Facebook.

49.     The landing website http://socialrewardsurvey.com/ also used text to deceive the consumer into thinking that he had arrived at a website connected to or approved by Facebook. At the time Exhibit E was created, text on the landing website stated:

"To mark our 6th anniversary of operation, we've decided to conduct a short survey of our users. You've been selected from the Seattle region to take part. This will only take 30 seconds of your time and will enhance user experience [sic]. Upon completion you will have the opportunity to get a Macbook Air, Apple iPhone 4, or the iPad 2."

Exhibit E (emphasis added).[1]

50.    In fact, however, Facebook has never had any connection to facebooki.com, http://www.facebooki.com, http://1939.com, or http://socialrewardsurvey.com/.

51.    Below the text described in paragraph 49 was a button labeled "Start Now." That button used colors and other design elements intended to mimic buttons used on Facebook's website. *See* Exhibit E.

52.    If the consumer clicked on the "Start Now" button, he was asked to answer questions about his gender and his use of online networking websites. *See* Exhibits F, G, H. By suggesting that the landing website actually pertained to online networking, the survey further suggested that the landing website was connected to or approved by Facebook.

53.    After answering the survey questions, the consumer encountered a webpage with the following text: "Thank you for your input. Participation is required for your opportunity to get an exclusive reward." Below that text were three advertisements: one titled "Macbook" (and including an image of a Macbook); one titled "iPhone 4" (and including an image of an iPhone); and one titled "iPad 2" (and including an image of an iPad). Each box included a button labeled "Select." *See* Exhibit I.

54.    The advertisements described in paragraph 53 were similar in kind and appearance to content and third-party advertisements Facebook users might encounter while using the Facebook website, which increased the likelihood of consumer confusion.

55.    The webpage displaying the advertisements described in paragraph 53 also used colors and other design elements to suggest that Facebook endorsed, approved, or was otherwise associated with Defendants' commercial activities. *See* Exhibit I.

[1] At the time Exhibit E was created, Facebook had been in existence for seven years, not six years. But the landing website's reference to "our 6th anniversary of operation" was clearly intended to suggest a connection between the landing website and Facebook.

56.     In fact, however, Facebook has never had any connection to the commercial activities carried on at http://socialrewardsurvey.com/.

57.     If the consumer clicked on the "Select" button in the box titled "Macbook," he encountered a webpage with the following text: "You selected the Macbook Air.  Thank you for your response.  Please enter your information to continue."  Below this text the consumer could enter a cellular telephone number and email address, and then click on a button labeled "Validate" to submit his information.  This webpage also used colors and other design elements to suggest that Facebook or an affiliate or agent of Facebook was the one requesting and collecting the information.  *See* Exhibit J.

58.     The consumer encountered a substantially similar webpage if he selected the "iPhone 4" option or the "iPad 2" option.  *See* Exhibits K, L.

**G.     Example 2: Faceboook.com**

59.     Another of Defendants' typosquatter domain names is faceboook.com.

60.     The faceboook.com domain name is confusingly similar to Facebook's famous and distinctive mark, **FACEBOOK**, and is intended to suggest that the faceboook.com domain name and the http://www.faceboook.com website are connected to or approved by Facebook.

61.     If a consumer typed "faceboook.com" into her web browser on June 6, 2011, her browser would have been redirected immediately to an intermediate landing website, http://1939.com, and then to the landing website http://socialsurvey2011.com/.  A true and correct copy of the http://socialsurvey2011.com/ landing website as it appeared on June 6, 2011 is attached as Exhibits M and N.

62.     The http://socialsurvey2011.com/ landing website prominently displayed the **FACEBOOK** mark in the text of the landing website to suggest that the landing website and the commercial activities carried on at the landing website were connected to or approved by Facebook.  *See* Exhibit N.

63.     The http://socialsurvey2011.com/ landing website also used colors and other design elements to suggest that the landing website and the commercial activities carried on at the landing website were connected to or approved by Facebook.  For example, the

http://socialsurvey2011.com/ landing website prominently displayed Facebook's well-known **LIKE Icon** (a hand in the "thumbs-up" position). The landing website also incorporated distinctive shades of blue and a blue banner at the top of the webpage, both of which were intended to suggest an association with Facebook. *See* Exhibit N.

64. In fact, however, Facebook has never had any connection to faceboook.com, http://www.faceboook.com, http://1939.com, or http://socialsurvey2011.com/.

**H.     Harm to Facebook from Defendants' Conduct**

65. Defendants' typosquatter schemes infringe on Facebook's famous and distinctive marks, confuse the consuming public, diminish the goodwill associated with Facebook and its marks, injure Facebook's reputation, breach enforceable agreements between Defendants and Facebook, interfere with Facebook's business, and unjustly enrich Defendants.

66. As a result of Defendants' typosquatter schemes, the consuming public has been and is likely to be confused with respect to whether Facebook is affiliated, connected, or associated with Defendants and Defendants' websites.

67. In addition, the consuming public has been and is likely to be confused as to whether Facebook is the source of Defendants' offers, goods, and services, and as to whether Facebook sponsors and approves Defendants' commercial activities.

68. Facebook's distinctive and famous marks have been diluted by blurring and diluted by tarnishment as a result of Defendants' typosquatter schemes.

69. Facebook has suffered and continues to suffer significant harm to its reputation and goodwill, including the goodwill associated with its marks, as a result of Defendants' typosquatter schemes.

70. Facebook has suffered substantial damages as a result of Defendants' conduct, including damages from reduced use of Facebook's website, damages to the reputation and goodwill associated with Facebook's marks, costs to investigate and combat Defendants' typosquatter schemes, and costs to respond to consumers' complaints and confusion about Defendants' typosquatter schemes.

1

## VI.   CLAIMS FOR RELIEF

2

### FIRST CAUSE OF ACTION

3

### CYBERSQUATTING AND CONTRIBUTORY CYBERSQUATTING
### 15 U.S.C. § 1125(d)

4

71.    Facebook repeats the allegations above as if fully set forth herein.

5

72.    Facebook owns the Facebook marks referenced in paragraph 19 above, including

6

numerous federal trademark applications and registrations for the Facebook marks.

7

73.    Facebook's marks are famous and highly distinctive with regard to a variety of

8

services, including online networking services and advertising services.

9

74.    The distinctive quality of Facebook's marks is of enormous value to Facebook.

10

75.    Facebook began using its distinctive and famous marks prior to Defendants'

11

unauthorized and unlawful activities.

12

76.    Defendants have registered, trafficked in, and used multiple typosquatter domain

13

names that are confusingly similar to and dilutive of Facebook's marks knowing that those

14

typosquatter domain names are confusingly similar to and dilutive of Facebook's marks.

15

77.    Defendants registered their typosquatter domain names with a bad-faith intent to

16

profit from the fame and goodwill associated with Facebook and Facebook's marks.

17

78.    Defendants engage in the conduct described in this Complaint without Facebook's

18

consent or authorization.

19

79.    Defendants intend to and do divert consumers from Facebook's online location to

20

websites that harm the goodwill represented by Facebook's marks by creating a likelihood of

21

confusion as to the source, sponsorship, affiliation, or endorsement of Defendants' websites.

22

80.    Defendants' websites harm Facebook's reputation and the goodwill associated

23

with Facebook's marks by causing consumers to associate Facebook with the negative qualities of

24

Defendants' websites, including, but not limited to, the confusing and deceptive manner in which

25

those websites generate Internet traffic, the confusing and deceptive content of those websites, the

26

misleading nature of the commercial activities carried on at those websites, the shoddy design of

27

28

1    those websites, the unreliable functionality of those websites, and the ephemeral nature of those

2    websites.

3         81.    Defendants engage in their typosquatter schemes for commercial gain.

4         82.    On information and belief, Defendants have provided material and misleading

5    contact information when registering their typosquatter domain names, failed to maintain accurate

6    contact information, and engaged in a pattern of such conduct.

7         83.    On information and belief, Defendants have registered or acquired multiple

8    domain names knowing those domain names were identical or confusingly similar to others'

9    marks that were distinctive and famous at the time Defendants registered or acquired their domain

10   names.

11        84.    On information and belief, Defendants have induced and encouraged others to

12   engage in the same conduct or substantially similar conduct and, in addition or in the alternative,

13   have provided services or consideration to others with knowledge or reason to know that they

14   were engaged in such conduct.

15        85.    Defendants' conduct has caused irreparable and incalculable harm and injury to

16   Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which

17   Facebook has no adequate remedy at law.

18        86.    Defendants' conduct constitutes a knowing and willful violation of Facebook's

19   rights under 15 U.S.C. § 1125(d).

20        87.    Facebook is entitled to injunctive relief against Defendants, as well as all other

21   remedies available under the Lanham Act, including, but not limited to, cancellation of

22   Defendants' rights in their typosquatter domain names or transfer of those typosquatter domain

23   names to Facebook, damages in an amount to be proven at trial, statutory penalties, disgorgement

24   of Defendants' profits, and costs and attorneys' fees.

25

26

27

28

## SECOND CAUSE OF ACTION

### TRADEMARK INFRINGEMENT AND
### CONTRIBUTORY TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114

88.     Facebook repeats the allegations above as if fully set forth herein.

89.     Defendants and Facebook offer their services through the same channel of trade, the Internet.

90.     Defendants and Facebook offer related goods and services in the form of advertising services.

91.     In connection with their typosquatter schemes, Defendants use and display Facebook's marks, and words, terms, names, symbols, and devices that are substantially similar to Facebook's marks, in commerce, for commercial purposes, and in connection with the advertising, distribution, and sale of goods and services.

92.     Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants and their websites with Facebook.

93.     Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to whether Facebook is the source of Defendants' goods, services, and commercial activities, and as to whether Facebook approves and sponsors Defendants' goods, services, and commercial activities.

94.     Because of the likelihood of confusion caused by Defendants' conduct, any defects or faults in Defendants' websites and commercial activities injure Facebook's reputation and the fame and goodwill associated with Facebook and Facebook's marks.

95.     Defendants engage in the conduct described in this Complaint without Facebook's consent or authorization.

96.     Defendants engage in the conduct described in this Complaint with knowledge of the fame and goodwill associated with Facebook and Facebook's marks and with an intent to trade off that fame and goodwill.

97.     On information and belief, Defendants have induced and encouraged others to engage in the same conduct or substantially similar conduct and, in addition or in the alternative, have provided services or consideration to others with knowledge or reason to know that they were engaged in infringing conduct.

98.     Defendants' conduct has caused irreparable and incalculable harm and injury to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

99.     Defendants' conduct constitutes a knowing and willful violation of Facebook's rights under 15 U.S.C. § 1114.

100.     Defendants' conduct is deliberate, willful, fraudulent, and without any extenuating circumstances, and is an exceptional case within the meaning of 15 U.S.C. § 1117.

101.     Facebook is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

## THIRD CAUSE OF ACTION

### FALSE DESIGNATION OF ORIGIN AND
### CONTRIBUTORY FALSE DESIGNATION OF ORIGIN
### 15 U.S.C. § 1125(a)

102.     Facebook repeats the allegations above as if fully set forth herein.

103.     Defendants and Facebook offer their services through the same channel of trade, the Internet.

104.     Defendants and Facebook offer related goods and services in the form of advertising services.

105.     In connection with their typosquatter schemes, Defendants use and display Facebook's marks, and words, terms, names, symbols, and devices that are substantially similar to Facebook's marks, in commerce, for commercial purposes, and in connection with the advertising, distribution, and sale of goods and services.

106.   Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants and their websites with Facebook.

107.   Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to whether Facebook is the source of Defendants' goods, services, and commercial activities, and as to whether Facebook approves and sponsors Defendants' goods, services, and commercial activities.

108.   Because of the likelihood of confusion caused by Defendants' conduct, any defects or faults in Defendants' websites and commercial activities injure Facebook's reputation and the fame and goodwill associated with Facebook and Facebook's marks.

109.   Defendants engage in the conduct described in this Complaint without Facebook's consent or authorization.

110.   Defendants engage in the conduct described in this Complaint with knowledge of the fame and goodwill associated with Facebook and Facebook's marks and with an intent to trade off that fame and goodwill.

111.   On information and belief, Defendants have induced and encouraged others to engage in the same conduct or substantially similar conduct and, in addition or in the alternative, have provided services or consideration to others with knowledge or reason to know that they were engaged in infringing conduct.

112.   Defendants' conduct has caused irreparable and incalculable harm and injury to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

113.   Defendants' conduct constitutes a knowing and willful violation of Facebook's rights under 15 U.S.C. § 1125(a).

114.   Defendants' conduct is deliberate, willful, fraudulent, and without any extenuating circumstances, and is an exceptional case within the meaning of 15 U.S.C. § 1117.

115.   Facebook is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to

1    be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and

2    attorneys' fees.

3
### FOURTH CAUSE OF ACTION
4
### TRADEMARK DILUTION AND CONTRIBUTORY TRADEMARK DILUTION
### 15 U.S.C. § 1125(c)
5

6       116.    Facebook repeats the allegations above as if fully set forth herein.

7       117.    As a result of enormous publicity and Facebook's strong and loyal user base,

8    Facebook's marks are widely recognized by the general public of the United States as a

9    designation of Facebook's services, and they are famous.

10      118.    Facebook's marks became famous before Defendants began operating their

11   typosquatting schemes.

12      119.    In connection with their typosquatter schemes, Defendants use and display

13   Facebook's marks, and words, terms, names, symbols, and devices that are substantially similar

14   to Facebook's marks, in commerce, for commercial purposes, and in connection with the

15   advertising, distribution, and sale of goods and services.

16      120.    Defendants' conduct causes dilution by blurring of Facebook's marks within the

17   meaning of 15 U.S.C. § 1125(c)(2)(B) because those schemes are likely to cause an association

18   with Facebook arising from the similarity of the marks that impairs the distinctiveness of

19   Facebook's marks and weakens the connection in the public's mind between Facebook's marks

20   and Facebook's services.

21      121.    Defendants' typosquatter schemes also cause dilution by tarnishment of

22   Facebook's marks within the meaning of 15 U.S.C. § 1125(c)(2)(C) because those schemes cause

23   consumers to associate Facebook with the negative qualities of Defendants' websites, including,

24   but not limited to, the confusing and deceptive manner in which those websites generate Internet

25   traffic, the confusing and deceptive content of those websites, the misleading nature of the

26   commercial activities carried on at those websites, the shoddy design of those websites, the

27   unreliable functionality of those websites, and the ephemeral nature of those websites.  That

28   association harms Facebook's reputation.

LEGAL21126168 3                                   **-18-**                        Case No. _____
                                              COMPLAINT

122.   Defendants intend to create an association with Facebook's marks and to trade on the widespread recognition of Facebook's marks by using marks that are identical to or substantially similar to Facebook's marks.

123.   Defendants' unauthorized use of Facebook's marks and words, terms, and names that are substantially similar to Facebook's marks was achieved with notice and full knowledge that such use was not authorized or licensed by Facebook.  On information and belief, Defendants willfully intended to harm and trade on the recognition of Facebook's marks.

124.   On information and belief, Defendants have induced and encouraged others to engage in the same conduct or substantially similar conduct and, in addition or in the alternative, have provided services or consideration to others with knowledge or reason to know that they were engaged in infringing conduct.

125.   Defendants' conduct has caused irreparable and incalculable harm and injury to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

126.   Defendants' conduct constitutes a knowing and willful violation of Facebook's rights under 15 U.S.C. § 1125(c).

127.   Defendants' conduct is deliberate, willful, fraudulent, and without any extenuating circumstances, and is an exceptional case within the meaning of 15 U.S.C. § 1117.

128.   Facebook is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

**FIFTH CAUSE OF ACTION**

**BREACH OF CONTRACT**
**(AGAINST DEFENDANTS WHO ARE ALSO FACEBOOK USERS)**

129.   Facebook repeats the allegations above as if fully set forth herein.

130.   Use of Facebook's website and services is governed by Facebook's Statement.

131.    At all times relevant to this dispute, users and others who interact with Facebook have been required to agree to and abide by Facebook's Statement in order to access Facebook's website and services.

132.    On information and belief, Defendants or Defendants' agents agreed to Facebook's Statement.  Facebook's Statement is therefore binding on Defendants.

133.    Facebook has performed all conditions, covenants, and promises required of it in accordance with its Statement.

134.    In connection with Defendants' typosquatter schemes, Defendants have knowingly, willfully, repeatedly, and systematically breached Facebook's Statement.

135.    Defendants' breaches include, but are not limited to, misleading Facebook users, using Facebook's marks or confusingly similar marks without Facebook's written permission, improperly collecting information from Facebook users, and registering, using, and otherwise trafficking in typosquatter domain names.

136.    Defendants' breaches of Facebook's Statement directly and proximately caused and continue to cause Facebook to suffer substantial damages in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

#### TORTIOUS INTERFERENCE WITH
#### PROSPECTIVE ECONOMIC ADVANTAGE

137.    Facebook repeats the allegations above as if fully set forth herein.

138.    Facebook intends and is likely to derive future economic benefit from Facebook users and potential Facebook users.

139.    On information and belief, Defendants knew of Facebook's reasonable expectations of future economic benefit from Facebook users and potential Facebook users.

140.    Absent Defendants' intentional diverting of Facebook users and potential users from Facebook's online location, it is reasonably certain that more consumers would have used Facebook's website and Facebook would have thereby gained an economic benefit.

141.    The conduct by which Defendants interfered with Facebook's prospective economic advantage is independently wrongful, as described in this Complaint.

142.    Defendants' conduct proximately caused Facebook to suffer substantial damages in an amount to be proven at trial.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Facebook prays for the following relief:

A.    For injunctive relief, as follows:

1.    An order permanently enjoining and restraining all Defendants from engaging in any infringing acts involving Facebook's marks;

2.    An order permanently enjoining and restraining all Defendants from engaging in any unlawful, misleading, deceptive, or malicious activities directed at or relating to the Facebook network, Facebook users, or potential Facebook users;

3.    An order permanently enjoining and restraining all Defendants from engaging in any activity that violates Facebook's Statement; and

4.    An order permanently enjoining and restraining all Defendants from interfering in any way with Facebook's business.

B.    An order cancelling the registrations for Defendants' typosquatter domain names or transferring ownership of Defendants' typosquatter domain names to Facebook.

C.    An order requiring Defendants to account for, hold in constructive trust, pay over to Facebook, and disgorge all profits derived from their unlawful conduct.

D.    An award to Facebook of damages, including, but not limited to, compensatory damages, statutory damages (including up to $100,000 for each infringing domain name), aggravated and/or treble damages, and punitive damages, in an amount to be proven at trial.

E.    An award to Facebook of reasonable costs, including attorneys' fees.

F.    An award to Facebook of pre- and post-judgment interest.

G.    An award to Facebook of other relief as this Court may deem just and proper.

DATED:  July 21, 2011

PERKINS COIE LLP

By: _____

Attorneys for Plaintiff
FACEBOOK, INC.

-22-

COMPLAINT

1

## JURY DEMAND

2      Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff Facebook, Inc. demands a trial

3  by jury as to all issues so triable in this action.

4

5  DATED:  July **21**, 2011                          **PERKINS COIE** LLP

6

7                                                     By: _____

8
                                                     Attorneys for Plaintiff
9                                                     FACEBOOK, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# ADDITIONAL NAMED DEFENDANTS

|   | DEFENDANT | ADDRESS | DOMAIN(S) |
|---|---|---|---|
| 1. | **Cleanser Products** | Ipasa Building, 3rd Floor<br>41st Street, Bella Vista District<br>Panama City<br>Panamá | socialrewardsurvey.com |
| 2. | **Counter Balance Enterprises Ltd.** | GMM Grammy Place,<br>Suite B4 15th Floor<br>50 Sukhumvit 21 Asoke Road<br>Klongtoey Nua<br>Bangkok, Wattana  101110<br>Thailand | facebobk.com |
| | | | facemook.com |
| 3. | **FB Promotions/ Freebie Promos** | 2778 Broad Street<br>Austell, GA  30106<br>United States | facebooik.com |
| | | | facebgook.com |
| | | | faceboak.com |
| | | | faceboop.com |
| | | | fbpromotions.com |
| | | | wwwfacbeok.com |
| | | | wwwfaccbook.com |
| | | | wwwfacceook.com |
| | | | wwwfaceb0ok.com |
| | | | wwwfacebkook.com |
| | | | wwwfacebnook.com |
| | | | wwwfacebo0k.com |
| | | | wwwfaceboobs.com |
| | | | wwwfacebooi.com |
| | | | wwwfaceboor.com |
| | | | wwwfacecbook.com |
| | | | wwwfacefook.com |
| | | | wwwfacelook.com |
| | | | facecbook.com |

| 4. | **Mackrooner Ltd. Inc.** | Albrook Park, Tower 4, Apt. 306 Albrook, Ancon District Panama City Panamá | ffacebook.com |
|----|----|----|----|
| 5. | **Newgate Services Ltd. Inc.** | Calle Las Magnolias Casa 248-B, Albrook Panama City Panamá | wwwrfacebook.com |
| 6. | **Pioneer Enterprises Ltd.** | Box 2296 St. Johns Antigua | facebokook.com<br>faceboocklogin.com<br>zh-facebook.com |
| 7. | **Rabbit GoGo Media, LLC** | 2519 Briers North Dr. Atlanta, GA  30360 United States | facetook.com |
| 8. | **SMTM Enterprises Ltd.** | Calle Muir PH Canal View, Torre A APTO 4-A, Clayton Panama City Panamá | faceboobok.com<br>faboock.com<br>facebokbook.com<br>fcaebbok.com |
| 9. | **YourTick** | Unit 1503 Island Beverley Causeway Bay, NA 000000 Hong Kong | wwwfacebookde.com |
| 10. | **Zilt** | 17 Buchanan Gardens St. Leonards on Sea Hastings, East Sussex TN38 0GA United Kingdom | facebook-birthday.com |
| 11. | **Jacob Daniels** | 1447 Bishop St. Lawrence, KS  66045 United States | de-defacebook.com<br>facebgok.com<br>fbacebook.com |
| 12. | **Jerry Hui** | Liabary Road 12 Hong Kong | facebobook.com |
| 13. | **Ryan Johnson** | 38548 Oasis Road Lindstrom, MN  55045 United States | acebookfriends.com<br>advertisingfacebooknow.com<br>bestfacebookcash.com |

2

| | | | bestfacebookfans.com |
|---|---|---|---|
| | | | bestfacebookmarketing.com |
| | | | buyfacebookfansonline.com |
| | | | buyfacebookfanssite.com |
| | | | buyfbfansnow.com |
| | | | buyfbfansonline.com |
| | | | coloradofacebook.com |
| | | | facebookbff.com |
| | | | facebookbulletins.com |
| | | | facebookcashsite.com |
| | | | facebookeffects.com |
| | | | facebookenthusiasts.com |
| | | | facebookmoneydirect.com |
| | | | facebookmoneyworld.com |
| | | | facebookpublicity.com |
| | | | facebookresultsnow.com |
| | | | fbadvertisingresults.com |
| | | | fbadvertisingresultsnow.com |
| | | | fbresultstoday.com |
| | | | findfbfriends.com |
| | | | freefbfans.com |
| | | | freefblikes.com |
| | | | getfblikesnow.com |
| | | | greatfacebookgames.com |
| | | | newfacebookmarketing.com |
| | | | thefacebookcash.com |
| | | | thefacebookmarketing.com |
| | | | thefbgamecheats.com |
| | | | superfacebookcash.com |
| | | | yourfacebookcash.com |

3

| 14. | Eric Jordan | 829 Morningcreek Dr.<br>Kennesaw, GA  30152<br>United States | appsfaceboik.com |
| --- | --- | --- | --- |
| | | | appsfacebok.com |
| | | | dacecbook.com |
| | | | facebllp.com |
| | | | faceboiki.com |
| | | | facebooik.org |
| | | | facebookloginfarmville.biz |
| | | | facebookloginfarmville.info |
| | | | facebookloginfarmville.net |
| | | | facebookloginfarmville.org |
| | | | facebookloginfarmville.us |
| | | | facebool.info |
| | | | facecboik.com |
| | | | facecbook.info |
| | | | favenool.com |
| | | | fdacebook.info |
| | | | fscenook.com |
| | | | newfaceboik.com |
| | | | newfacebooik.com |
| | | | wwfacebool.com |
| | | | wwfaceboook.com |
| | | | wwwfacehook.com |
| | | | wwwfavenook.com |
| | | | wwwvacebook.com |
| 15. | Karrie-Lee Karreman | 1917 West 4th Avenue, Suite 279<br>Vancouver, British Columbia<br>Canada | yourfacebooksurvey.com |
| 16. | June Kimchi | 1812-8100 Calle Coahuila<br>Tijuana BC 22100<br>Mexico | faecbook.com |
| | | | facevook.com |

4

| 17. | **Tim Meyers** | Fischertwiete 2-4<br>Hamburg, 20095<br>Germany | faceboook.de |
|-----|----------------|-------------------------------------------------|--------------|
| 18. | **Ankit Pandey** | A-1000 Colony Mayur Vihar-3<br>New Delhi, Delhi 110096<br>India | facebookpeople.info |
| | | | betafacebook.info |
| | | | fbchat.info |
| | | | facebookgirl.info |
| | | | photosonfacebook.info |
| 19. | **S. Pace** | 4700 Nantucket Ct.<br>Flower Mound, TX  75022<br>United States | facebookbook.com |
| 20. | **Elise Petri** | 101-1001 W. Broadway, Suite 765<br>Vancouver, British Columbia<br>V6H-4E4<br>Canada | consumersrewardsolutions.com |
| 21. | **Mark Risi** | 390-8500 Leslie St.<br>Thornhill, Ontario L3T 7M8<br>Canada | facebookcoim.com |
| | | | facebiil.com |
| | | | freefacebookads.net |
| | | | freefacebookads.org |
| | | | fbcash2.net |
| | | | fbcash2.org |
| 22. | **John Souza** | 13010 Morris Road, 6th Floor<br>Alpharetta, GA  30004<br>United States | facebookmarketingforresults.com |
| 23. | **Michael Suggs** | 1993 Kenwood Pl.<br>Smyrna, GA  30082<br>United States | fsacebok.com |
| | | | fecabo.com |
| | | | afcbook.com |

LEGAL21358103.1

# Exhibit B

# DOE DEFENDANTS' DOMAIN NAMES

## TABLE 1: Typosquatter domain names

| | |
|---|---|
| 1. | acebok.com |
| 2. | acebook.com |
| 3. | acfebook.com |
| 4. | bestfacebookemail.com |
| 5. | bestfacebooksearch.com |
| 6. | bestfacebookstock.com |
| 7. | chatfacebook.com |
| 8. | cheapfacebook.com |
| 9. | dfacecbook.com |
| 10. | eacebook.com |
| 11. | faacebok.com |
| 12. | facaebook.com |
| 13. | facbebook.com |
| 14. | faccebok.com |
| 15. | faccebook.com |
| 16. | faccebookk.com |
| 17. | faccebooklogin.com |
| 18. | facdbook.com |
| 19. | facdebook.com |
| 20. | facebbbook.com |
| 21. | facebboook.com |
| 22. | facebcook.com |
| 23. | facebocks.com |
| 24. | faceboik.com |
| 25. | facebokcasino.com |
| 26. | facebokk.com |
| 27. | faceboko.com |
| 28. | facebokok.com |

| 29. | facebolk.com |
|-----|--------------|
| 30. | faceboob.com |
| 31. | faceboobk.com |
| 32. | facebooc.com |
| 33. | faceboock.com |
| 34. | facebood.com |
| 35. | faceboof.com |
| 36. | facebooi.com |
| 37. | facebooich.com |
| 38. | facebooick.com |
| 39. | facebooiik.com |
| 40. | facebooj.com |
| 41. | faceboojk.com |
| 42. | facebook.cm |
| 43. | facebook--ads--manager.info |
| 44. | facebookat.com |
| 45. | facebookcredets.com |
| 46. | facebookde.com |
| 47. | facebookfever.com |
| 48. | facebookfreezer.com |
| 49. | facebooki.com |
| 50. | facebookkcredits.com |
| 51. | facebookloggin.com |
| 52. | facebooklogiin.com |
| 53. | facebookloogin.com |
| 54. | facebookunblocker.com |
| 55. | facebool.com |
| 56. | facebooll.com |
| 57. | faceboom.com |
| 58. | faceboon.com |
| 59. | faceboook.com |

2

| 60. | faceboos.com |
|-----|--------------|
| 61. | facebooth.com |
| 62. | faceboow.com |
| 63. | faceboox.com |
| 64. | facebopk.com |
| 65. | facecboock.com |
| 66. | facecbookk.com |
| 67. | faceebook.com |
| 68. | faceecbook.com |
| 69. | faceqbook.com |
| 70. | facfacebook.com |
| 71. | facfebook.com |
| 72. | fackebook.com |
| 73. | facerbook.com |
| 74. | facrebook.com |
| 75. | facvebook.com |
| 76. | facwebook.com |
| 77. | facxebook.com |
| 78. | fadebook.com |
| 79. | faebookc.com |
| 80. | faeebook.com |
| 81. | fafacebook.com |
| 82. | faseboock.com |
| 83. | faseboot.com |
| 84. | favebook.com |
| 85. | faxcebook.com |
| 86. | faxebook.com |
| 87. | fqacebook.com |
| 88. | fqcebook.com |
| 89. | fscebook.com |
| 90. | gacebook.com |

3

| 91.  | httpfacebook.com        |
|------|-------------------------|
| 92.  | lfacebook.com           |
| 93.  | myfacebook.com          |
| 94.  | rfacebook.com           |
| 95.  | thefacebookemail.com    |
| 96.  | thefacebooksearch.com   |
| 97.  | thefacebookstock.com    |
| 98.  | thrfacebook.com         |
| 99.  | wwwfacebok.com          |
| 100. | www-facebook.com        |
| 101. | wwwfaeebook.com         |
| 102. | yourfacebookemail.com   |
| 103. | yourfacebooksearch.com  |
| 104. | yourfacebookstock.com   |

4

**TABLE 2: Landing website domain names**

| 105. | 1939.com |
|------|----------|
| 106. | com-asp.com |
| 107. | com-lucky-winner.com |
| 108. | complimentarygiftcards.com |
| 109. | com-prize-winner.com |
| 110. | com-random-winner.com |
| 111. | com-todays-winner.com |
| 112. | com-winning-survey.com |
| 113. | coolpremiums.com |
| 114. | socialrewardcenter.com |
| 115. | socialrewardpanel.com |
| 116. | socialsurvey2011.com |
| 117. | social.worldrewardcenter.com |
| 118. | surveyrewards2011.info |
| 119. | yoursurveyspot.com |

LEGAL213581952

# Exhibit C



This agreement was written in English (US). To the extent any translated version of this agreement conflicts with the English version, the English version controls. Please note that Section 16 contains certain changes to the general terms for users outside the United States.

Date of Last Revision: October 4, 2010.

**Statement of Rights and Responsibilities**

This Statement of Rights and Responsibilities ("Statement") derives from the Facebook Principles, and governs our relationship with users and others who interact with Facebook. By using or accessing Facebook, you agree to this Statement.

1. **Privacy**

   Your privacy is very important to us. We designed our Privacy Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Privacy Policy, and to use it to help make informed decisions.

2. **Sharing Your Content and Information**

   You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings. In addition:
   1. For content that is covered by intellectual property rights, like photos and videos ("IP content"), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook ("IP License"). This IP License ends when you delete your IP content or your account unless your content has been shared with others, and they have not deleted it.
   2. When you delete IP content, it is deleted in a manner similar to emptying the recycle bin on a computer. However, you understand that removed content may persist in backup copies for a reasonable period of time (but will not be available to others).
   3. When you use an application, your content and information is shared with the application. We require applications to respect your privacy, and your agreement with that application will control how the application can use, store, and transfer that content and information. (To learn more about Platform, read our Privacy Policy and Platform Page.)
   4. When you publish content or information using the "everyone" setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture).
   5. We always appreciate your feedback or other suggestions about Facebook, but you understand that we may use them without any obligation to compensate you for them (just as you have no obligation to offer them).

3. **Safety**

   We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to do that, which includes the following commitments:
   1. You will not send or otherwise post unauthorized commercial communications (such as spam) on Facebook.
   2. You will not collect users' content or information, or otherwise access Facebook, using automated means (such as harvesting bots, robots, spiders, or scrapers) without our permission.
   3. You will not engage in unlawful multi-level marketing, such as a pyramid scheme, on Facebook.
   4. You will not upload viruses or other malicious code.
   5. You will not solicit login information or access an account belonging to someone else.
   6. You will not bully, intimidate, or harass any user.
   7. You will not post content that: is hateful, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence.
   8. You will not develop or operate a third-party application containing alcohol-related or other mature content (including advertisements) without appropriate age-based restrictions.
   9. You will follow our Promotions Guidelines and all applicable laws if you publicize or offer any contest, giveaway, or sweepstakes ("promotion") on Facebook.
   10. You will not use Facebook to do anything unlawful, misleading, malicious, or discriminatory.
   11. You will not do anything that could disable, overburden, or impair the proper working of Facebook, such as a denial of service attack.
   12. You will not facilitate or encourage any violations of this Statement.

4. **Registration and Account Security**

   Facebook users provide their real names and information, and we need your help to keep it that way. Here are some commitments you make to us relating to registering and maintaining the security of your account:
   1. You will not provide any false personal information on Facebook, or create an account for anyone other than yourself without permission.
   2. You will not create more than one personal profile.
   3. If we disable your account, you will not create another one without our permission.
   4. You will not use your personal profile for your own commercial gain (such as selling your status update to an advertiser).
   5. You will not use Facebook if you are under 13.
   6. You will not use Facebook if you are a convicted sex offender.
   7. You will keep your contact information accurate and up-to-date.
   8. You will not share your password, (or in the case of developers, your secret key), let anyone else access your account, or do anything else that might jeopardize the security of your account.
   9. You will not transfer your account (including any page or application you administer) to anyone without first getting our written permission.
   10. If you select a username for your account we reserve the right to remove or reclaim it if we believe appropriate (such as when a trademark owner complains about a username that does not closely relate to a user's actual name).

5. **Protecting Other People's Rights**

   We respect other people's rights, and expect you to do the same.
   1. You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.
   2. We can remove any content or information you post on Facebook if we believe that it violates this Statement.
   3. We will provide you with tools to help you protect your intellectual property rights. To learn more, visit our How to Report Claims of Intellectual Property Infringement page.
   4. If we remove your content for infringing someone else's copyright, and you believe we removed it by mistake, we will provide you with an opportunity to appeal.
   5. If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate.
   6. You will not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Wall and 32665), or any confusingly similar marks, without our written permission.
   7. If you collect information from users, you will: obtain their consent, make it clear you (and not Facebook) are the one collecting their information, and post a privacy policy explaining what information you collect and how you will use it.
   8. You will not post anyone's identification documents or sensitive financial information on Facebook.
   9. You will not tag users or send email invitations to non-users without their consent.

6. **Mobile**
   1. We currently provide our mobile services for free, but please be aware that your carrier's normal rates and fees, such as text messaging fees, will still apply.
   2. In the event you change or deactivate your mobile telephone number, you will update your account information on Facebook within 48 hours to ensure that your messages are not sent to the person who acquires your old number.
   3. You provide all rights necessary to enable users to sync (including through an application) their contact lists with any basic information and contact information that is visible to them on Facebook, as well as your name and profile picture.

7. **Payments and Deals**
   1. If you make a payment on Facebook or use Facebook Credits, you agree to our Payments Terms.
   2. If purchase a Deal, you agree to our Deals Terms.

3. If you provide a Deal or partner with us to provide a Deal, you agree to the Merchant Deal Terms in addition to any other agreements you may have with us.

**8. Special Provisions Applicable to Share Links**

If you include our Share Link button on your website, the following additional terms apply to you:
1. We give you permission to use Facebook's Share Link button so that users can post links or content from your website on Facebook.
2. You give us permission to use and allow others to use such links and content on Facebook.
3. You will not place a Share Link button on any page containing content that would violate this Statement if posted on Facebook.

**9. Special Provisions Applicable to Developers/Operators of Applications and Websites**

If you are a developer or operator of a Platform application or website, the following additional terms apply to you:
1. You are responsible for your application and its content and all uses you make of Platform. This includes ensuring your application or use of Platform meets our Facebook Platform Policies and our Advertising Guidelines.
2. Your access to and use of data you receive from Facebook, will be limited as follows:
   1. You will only request data you need to operate your application.
   2. You will have a privacy policy that tells users what user data you are going to use and how you will use, display, share, or transfer that data and you will include your privacy policy URL in the Developer Application.
   3. You will not use, display, share, or transfer a user's data in a manner inconsistent with your privacy policy.
   4. You will delete all data you receive from us concerning a user if the user asks you to do so, and will provide a mechanism for users to make such a request.
   5. You will not include data you receive from us concerning a user in any advertising creative.
   6. You will not directly or indirectly transfer any data you receive from us to (or use such data in connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use.
   7. You will not sell user data. If you are acquired by or merge with a third party, you can continue to use user data within your application, but you cannot transfer user data outside of your application.
   8. We can require you to delete user data if you use it in a way that we determine is inconsistent with users' expectations.
   9. We can limit your access to data.
   10. You will comply with all other restrictions contained in our Facebook Platform Policies.
3. You will not give us information that you independently collect from a user or a user's content without that user's consent.
4. You will make it easy for users to remove or disconnect from your application.
5. You will make it easy for users to contact you. We can also share your email address with users and others claiming that you have infringed or otherwise violated their rights.
6. You will provide customer support for your application.
7. You will not show third party ads or web search boxes on Facebook.
8. We give you all rights necessary to use the code, APIs, data, and tools you receive from us.
9. You will not sell, transfer, or sublicense our code, APIs, or tools to anyone.
10. You will not misrepresent your relationship with Facebook to others.
11. You may use the logos we make available to developers or issue a press release or other public statement so long as you follow our Facebook Platform Policies.
12. We can issue a press release describing our relationship with you.
13. You will comply with all applicable laws. In particular you will (if applicable):
   1. have a policy for removing infringing content and terminating repeat infringers that complies with the Digital Millennium Copyright Act.
   2. comply with the Video Privacy Protection Act ("VPPA"), and obtain any opt-in consent necessary from users so that user data subject to the VPPA may be shared on Facebook. You represent that any disclosure to us will not be incidental to the ordinary course of your business.
14. We do not guarantee that Platform will always be free.
15. You give us all rights necessary to enable your application to work with Facebook, including the right to incorporate content and information you provide to us into streams, profiles, and user action stories.
16. You give us the right to link to or frame your application, and place content, including ads, around your application.
17. We can analyze your application, content, and data for any purpose, including commercial (such as for targeting the delivery of advertisements and indexing content for search).
18. To ensure your application is safe for users, we can audit it.
19. We can create applications that offer similar features and services to, or otherwise compete with, your application.

**10. About Advertisements and Other Commercial Content Served or Enhanced by Facebook**

Our goal is to deliver ads that are not only valuable to advertisers, but also valuable to you. In order to do that, you agree to the following:
1. You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place.
2. We do not give your content or information to advertisers without your consent.
3. You understand that we may not always identify paid services and communications as such.

**11. Special Provisions Applicable to Advertisers**

You can target your specific audience by buying ads on Facebook or our publisher network. The following additional terms apply to you if you place an order through our online advertising portal ("Order"):
1. When you place an Order, you will tell us the type of advertising you want to buy, the amount you want to spend, and your bid. If we accept your Order, we will deliver your ads as inventory becomes available. When serving your ad, we do our best to deliver the ads to the audience you specify, although we cannot guarantee in every instance that your ad will reach its intended target.
2. In instances where we believe doing so will enhance the effectiveness of your advertising campaign, we may broaden the targeting criteria you specify.
3. You will pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms.
4. Your ads will comply with our Advertising Guidelines.
5. We will determine the size, placement, and positioning of your ads.
6. We do not guarantee the activity that your ads will receive, such as the number of clicks you will get.
7. We cannot control how people interact with your ads, and are not responsible for click fraud or other improper actions that affect the cost of running ads. We do, however, have systems to detect and filter certain suspicious activity, learn more here.
8. You can cancel your Order at any time through our online portal, but it may take up to 24 hours before the ad stops running. You are responsible for paying for those ads.
9. Our license to run your ad will end when we have completed your Order. You understand, however, that if users have interacted with your ad, your ad may remain until the users delete it.
10. We can use your ads and related content and information for marketing or promotional purposes.
11. You will not issue any press release or make public statements about your relationship with Facebook without written permission.
12. We may reject or remove any ad for any reason.
13. If you are placing ads on someone else's behalf, we need to make sure you have permission to place those ads, including the following:
   1. You warrant that you have the legal authority to bind the advertiser to this Statement.
   2. You agree that if the advertiser you represent violates this Statement, we may hold you responsible for that violation.

**12. Special Provisions Applicable to Pages**

If you create or administer a Page on Facebook, you agree to our Pages Terms.

**13. Amendments**

1. We can change this Statement if we provide you notice (by posting the change on the Facebook Site Governance Page) and an opportunity to comment. To get notice of any future changes to this Statement, visit our Facebook Site Governance Page and become a fan.
2. For changes to sections 7, 8, 9, and 11 (sections relating to payments, application developers, website operators, and advertisers), we will give you a minimum of three days notice. For all other changes we will give you a minimum of seven days notice. All such comments must be made on the Facebook Site Governance Page.
3. If more than 7,000 users comment on the proposed change, we will also give you the opportunity to participate in a vote in which you will be provided alternatives. The vote shall be binding on us if more than 30% of all active registered users as of the date of the notice vote.
4. We can make changes for legal or administrative reasons, or to correct an inaccurate statement, upon notice without opportunity to comment.

**14. Termination**

If you violate the letter or spirit of this Statement, or otherwise create risk or possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall

terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 8.2, 9.1-9.3, 9.9, 9.10, 9.13, 9.15, 9.18, 10.3, 11.2, 11.5, 11.6, 11.9, 11.12, 11.13, and 14-18.

15. **Disputes**
    1. You will resolve any claim, cause of action or dispute ("claim") you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.
    2. If anyone brings a claim against us related to your actions, content or information on Facebook, you will indemnify and hold us harmless from and against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related to such claim.
    3. WE TRY TO KEEP FACEBOOK UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK "AS IS" WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL BE SAFE OR SECURE. FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES, AND YOU RELEASE US, OUR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR." WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR OTHER CONSEQUENTIAL, SPECIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS STATEMENT OR FACEBOOK, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY ARISING OUT OF THIS STATEMENT OR FACEBOOK WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. APPLICABLE LAW MAY NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY OR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN SUCH CASES, FACEBOOK'S LIABILITY WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

16. **Special Provisions Applicable to Users Outside the United States**

    We strive to create a global community with consistent standards for everyone, but we also strive to respect local laws. The following provisions apply to users outside the United States:
    1. You consent to having your personal data transferred to and processed on the United States.
    2. If you are located in a country embargoed by the United States, or are on the U.S. Treasury Department's list of Specially Designated Nationals you will not engage in commercial activities on Facebook (such as advertising or payments) or operate a Platform application or website.
    3. Certain specific terms that apply only for German users are available here.

17. **Definitions**
    1. By "Facebook" we mean the features and services we make available, including through (a) our website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the like button, the share button and other similar offerings and (d) other media, software (such as a toolbar), devices, or networks now existing or later developed.
    2. By "Platform" we mean a set of APIs and services that enable others, including application developers and website operators, to retrieve data from Facebook or provide data to us.
    3. By "information" we mean facts and other information about you, including actions you take.
    4. By "content" we mean anything you post on Facebook that would not be included in the definition of "information."
    5. By "data" we mean content and information that third parties can retrieve from Facebook or provide to Facebook through Platform.
    6. By "post" we mean post on Facebook or otherwise make available to us (such as by using an application).
    7. By "use" we mean use, copy, publicly perform or display, distribute, modify, translate, and create derivative works of.
    8. By "active registered user" we mean a user who has logged into Facebook at least once in the previous 30 days.
    9. By "application" we mean any application or website that uses or accesses Platform, as well as anything else that receives or has received data from us. If you no longer access Platform but have not deleted all data from us, the term application will apply until you delete the data.

18. **Other**
    1. If you are a resident of or have your principal place of business in the US or Canada, this Statement is an agreement between you and Facebook, Inc. Otherwise, this Statement is an agreement between you and Facebook Ireland Limited. References to "us," "we," and "our" mean either Facebook, Inc. or Facebook Ireland Limited, as appropriate.
    2. This Statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements.
    3. If any portion of this Statement is found to be unenforceable, the remaining portion will remain in full force and effect.
    4. If we fail to enforce any of this Statement, it will not be considered a waiver.
    5. Any amendment to or waiver of this Statement must be made in writing and signed by us.
    6. You will not transfer any of your rights or obligations under this Statement to anyone else without our consent.
    7. All of our rights and obligations under this Statement are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.
    8. Nothing in this Statement shall prevent us from complying with the law.
    9. This Statement does not confer any third party beneficiary rights.
    10. You will comply with all applicable laws when using or accessing Facebook.

**You may also want to review the following documents:**

- Privacy Policy: The Privacy Policy is designed to help you understand how we collect and use information.
- Payment Terms: These additional terms apply to all payments made on or through Facebook.
- Platform Page: This page helps you better understand what happens when you use a third-party application or use Facebook Connect, including how they may access and use your data.
- Facebook Platform Policies: These guidelines outline the policies that apply to applications, including Connect sites.
- Advertising Guidelines: These guidelines outline the policies that apply to advertisements placed on Facebook.
- Promotions Guidelines: These guidelines outline the policies that apply if you have obtained written pre-approval from us to offer contests, sweepstakes, and other types of promotions on Facebook.
- How to Report Claims of Intellectual Property Infringement
- How to Appeal Claims of Copyright Infringement
- Pages Terms

- **To access the Statement of Rights and Responsibilities in several different languages, change the language setting for your Facebook session by clicking on the language link in the left corner of most pages. If the Statement is not available in the language you select, we will default to the English version.**

Facebook © 2011 · English (US)                      Mobile · Find Friends · Badges · People · Pages · About · Advertising · Create a Page · Developers · Careers · Privacy · Terms · Help