1   Ryan Spear, Wash. Bar No. 39974 (pro hac vice)
    RSpear@perkinscoie.com
2   PERKINS COIE LLP
    1201 Third Avenue
3   Suite 4800
    Seattle, WA  98101-3099
4   Telephone: 206.359.8000
    Facsimile: 206.359.9000
5
    Brian Hennessy, State Bar No. 226721
6   BHennessy@perkinscoie.com
    PERKINS COIE LLP
7   3150 Porter Drive
    Palo Alto, CA  94304-1212
8   Telephone: 650.838.4300
    Facsimile: 650.838.4350
9
    Attorneys for Plaintiff
10  FACEBOOK, INC.

11                  **UNITED STATES DISTRICT COURT**

12                 **NORTHERN DISTRICT OF CALIFORNIA**

13                        **OAKLAND DIVISION**

14
    FACEBOOK, INC., a Delaware corporation,          Case No. 4:11-cv-03619-PJH
15
16                  Plaintiff,                        **FIRST AMENDED COMPLAINT
                                                      FOR:**
17          v.
                                                      1.  **CYBERSQUATTING AND
18  CYBER2MEDIA, INC., DANIEL NEGARI,                     CONTRIBUTORY
    BANANA ADS LLC, MICHAEL NAVARINI,                     CYBERSQUATTING UNDER
19  CENTRIZ.COM, CLEANSER PRODUCTS,                       15 U.S.C. § 1125(d);
    COUNTER BALANCE ENTERPRISES LTD.,
20  FB PROMOTIONS/FREEBIE PROMOS,                     2.  **TRADEMARK INFRINGEMENT
    GILEND API, INTERCONTINENTAL                          AND CONTRIBUTORY
21  DOMAIN, INC., MACKROONER LTD. INC.,                   TRADEMARK INFRINGEMENT
    NEWGATE SERVICES LTD.                                 UNDER 15 U.S.C. § 1114;
22  INC./SMTM ENTERPRISES LTD., PIONEER
    ENTERPRISES LTD., PPX.COM, PRICEMAC               3.  **FALSE DESIGNATION OF
23  CONSULTANCY, RABBIT GOGO MEDIA                        ORIGIN AND CONTRIBUTORY
    LLC, STORMWEST CORP., TOMATO INC.,                    FALSE DESIGNATION OF
24  XENG HOLDINGS, YOURTICK, ZILT, PAUL                   ORIGIN UNDER
    BAKER, MATT BARLOW, BHARAT,                           15 U.S.C. § 1125(a);
25  REGGIE BUSH, UWE DACHMANN, SAM
    DENNIS, XIANG WANG DUAN, GREGORY                  4.  **TRADEMARK DILUTION AND
26  HENSHAW, SU FEN HUANG, ZHI BING                       CONTRIBUTORY
    HUANG, JERRY HUI, ERIC JORDAN,                        TRADEMARK DILUTION
27                                                        UNDER 15 U.S.C. § 1125(c);**
    KARRIE-LEE KARREMAN, JUNE KIMCHI,
28                                                    5.  **BREACH OF CONTRACT; AND**

                                          -1-        FIRST AMENDED COMPLAINT
                      Case No. 4:11-cv-03619-PJH

LOUIS KRASENICS, YUE LI, BOB
MACARON, TIM MEYERS, ANKIT PANDEY,
STANLEY LORIN PACE, ELISE PETRI,
MARK RISI, N.A. SANJAY, WANG
SHAOPENG, JOHN SOUZA, MICHAEL
SUGGS, and DOES 1-45,

Defendants.

**6. TORTIOUS INTERFERENCE
WITH PROSPECTIVE
ECONOMIC ADVANTAGE**

**[DEMAND FOR JURY TRIAL, SEE
LOCAL RULE 3-6]**

For its First Amended Complaint, Facebook, Inc. ("Facebook") alleges as follows:

## I.   INTRODUCTION

1.     Defendants are typosquatters. They exploit and profit from Internet domain names that are confusingly similar to Facebook's famous and distinctive trademark, **FACEBOOK**, to trick Facebook users and potential users into visiting Defendants' websites. Those websites, in turn, misappropriate Facebook's trademarks and use other deceptive tactics to suggest, falsely, that the websites and the commercial activities carried on at those websites are connected to Facebook. Defendants make money by luring unsuspecting consumers into divulging personal information on Defendants' websites, viewing and clicking on advertisements placed on Defendants' websites, and buying goods and services sold on Defendants' websites. Defendants' schemes succeed largely because consumers are deceived into believing they are dealing with Facebook or entities affiliated with Facebook.

2.     Defendants' typosquatter schemes infringe on Facebook's famous and distinctive trademarks (the "Facebook marks" or "Facebook's marks") and confuse the consuming public with respect to whether Defendants and their commercial activities are associated with Facebook. Defendants' schemes also diminish the goodwill associated with Facebook and its marks, injure Facebook's reputation, breach enforceable agreements between Defendants and Facebook, interfere with Facebook's business, and unjustly enrich Defendants.

3.     Facebook therefore seeks an order cancelling Defendants' rights in their typosquatter domain names or transferring those typosquatter domain names to Facebook, awarding Facebook damages, and providing other relief.

## II.      DEFINITIONS

As used in this First Amended Complaint:

4.      "Internet domain name" or "domain name" means a string of alphanumeric characters used to identify a specific website on the Internet. For example, the domain name for Facebook's website is facebook.com.

5.      "Typosquatter domain name" means a domain name that is confusingly similar to a protected mark. A typosquatter domain name may be confusingly similar to a protected mark either because it incorporates the protected mark (e.g., "facebooki.com") or because it is an intentionally misspelled or corrupted version of the protected mark that is similar to the protected mark in sight, sound, and meaning (e.g., "faceboook.com").

6.      "Landing website" means a website to which a consumer is redirected when she types a typosquatter domain name into her web browser or clicks on a link that directs her web browser to a webpage associated with a typosquatter domain name.

7.      "Whois records" means publicly available records that provide information about domain names. Among other things, the Whois record for a particular domain name typically indicates who owns the domain name and which computer server hosts (i.e., makes available to Internet users) content available at that domain name.

8.      "Privacy-protection service" means a service that, for a fee, will place its name and contact information on the Whois record for a particular domain name in lieu of the name and contact information of the domain name's actual owner. The purpose of using a privacy-protection service is to conceal the true identity of an owner of a domain name.

9.      "Defendants" means all of the individuals or corporations described in subsections III.B to III.D, including Cyber2Media, Inc., Daniel Negari, Banana Ads LLC, Michael Navarini, the Additional Named Defendants, and the Doe Defendants.

### III.   PARTIES

**A.     Plaintiff**

10.     Plaintiff Facebook is a Delaware corporation with its principal place of business in Palo Alto, California.

**B.     Cyber2Media, Inc. and Daniel Negari**

11.     Defendant Cyber2Media, Inc. ("Cyber2Media") is a California corporation with its principal place of business in Beverly Hills, California.

12.     Defendant Daniel Negari ("Negari") is a resident of California and a registered Facebook user. On information and belief, Negari has at all relevant times served as President of Cyber2Media. He is responsible for and authorizes all actions of Cyber2Media.

**C.     Banana Ads LLC and Michael Navarini**

13.     Defendant Banana Ads LLC ("Banana Ads") is a California corporation with its principal place of business in Pleasanton, California.

14.     Defendant Michael Navarini ("Navarini") is a resident of California and a registered Facebook user. On information and belief, Navarini has at all relevant times served as President or chief executive officer of Banana Ads. He is responsible for and authorizes all actions of Banana Ads.

**D.     The Additional Named Defendants and the Doe Defendants**

15.     Each Defendant identified in Exhibit A registered, owns, or operates corresponding Internet domain names that are also identified in Exhibit A and are incorporated into this First Amended Complaint as if each Defendant, address, and corresponding domain name was listed in a separate subparagraph. Facebook refers to the individuals or corporations identified in Exhibit A as the "Additional Named Defendants."

16.     The Internet domain names identified in Exhibit A are being used or have been used by the Additional Named Defendants to engage in and profit from typosquatter schemes similar or identical to the schemes described in subsections V.D to V.G, below.

17.     The Internet domain names identified in Exhibit B are being used or have been used by unknown individuals or corporations to engage in and profit from typosquatter schemes similar or identical to the schemes described in subsections V.D to V.G, below.

18.     The individuals or corporations who registered, owned, or operated the domain names identified in Exhibit B during the relevant time period have successfully concealed their true identities from Facebook by using privacy-protection services or providing inaccurate or incomplete contact information to their domain name registrars and/or Internet service providers. Facebook therefore refers to those individuals or corporations as the "Doe Defendants."

19.     Facebook will seek the identities of the Doe Defendants through discovery and amend this First Amended Complaint when their identities become known.

## IV.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over the claims arising under federal law pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because Facebook alleges violations of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), (c), (d).

21.     This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367 because the state-law claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

22.     This Court has personal jurisdiction over each of the Defendants because each Defendant, or agents for each Defendant, agreed to the personal jurisdiction of the state and federal courts located in Santa Clara County, California, by agreeing to the forum-selection clause in Facebook's terms of service, which Facebook refers to as its Statement of Rights and Responsibilities ("Statement"). *See* Exhibit C.

23.     In addition or alternatively, this Court has personal jurisdiction over each of the Defendants because Defendants' unlawful activities are targeted at Facebook, which Defendants know is headquartered in California; because Defendants conduct substantial, continuous, and systematic business within this district; because Defendants engaged in acts or omissions causing

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

injury within this district; because Defendants engaged in acts outside this district causing injury within this district; and because the claims alleged in this First Amended Complaint arise out of or relate to Defendants' forum-related activities.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted in this lawsuit occurred in this district and a substantial part of the property that is the subject of this lawsuit is situated in this district.

## V.     FACTS

### A.     Facebook and Facebook's Services

25.     Founded in February 2004, Facebook is a free online network that helps people connect and share with their friends, family, and the world around them. The company develops and provides online networking services that facilitate the sharing of information through the "social graph"—the digital mapping of people's real-world social connections. Through Facebook's website, the Facebook Platform, Social Plugins, and other tools, hundreds of millions of Facebook users enjoy personalized and relevant Internet experiences. As of the filing of this First Amended Complaint, more than 800 million active Facebook users spend more than 700 billion minutes per month on http://www.facebook.com, making Facebook's website one of the most trafficked websites in the United States. More than 150 million Facebook users also engage with Facebook through external, third-party websites every month. And more than one million websites have implemented tools made available by Facebook that engage users and make their websites more social and personalized. Through Facebook, users can interact with more than 900 million objects (including individual and community webpages, groups, and events) and 30 billion pieces of content (including web links, news stories, blog posts, notes, and photo albums).

26.     Facebook allows parties to use approved methods to advertise and promote their goods and services on Facebook's website.

27.     Facebook displays advertisements on its website in a way that allows Facebook users to view those advertisements and to click on them to learn more about the underlying goods or services.

28.     Facebook derives income primarily from its advertising services; it operates its services without charge to users.

29.     Facebook is the owner of the entire right, title, and interest in and to a number of trademarks and service marks, including the following representative marks, applications, and registrations, for which Facebook owns federal applications or registrations covering a wide variety of goods and services:

- **FACEBOOK** / Registrations: Reg. No. 3801147, 3881770. Pending Application: Serial Number 85147898.

-  / Pending Applications: Serial Numbers 77896325, 77896323, 77896315.

-  / Registrations: Reg. No. 3934743.

-  / Pending Applications: Serial Numbers 85020073, 85020071, 85020068, 85020066, 85020064, 85020062, 85020058.

30.     Attached to this First Amended Complaint as Exhibit D is a true and correct copy of representative examples of the United States Patent and Trademark Office printouts of the online status pages for these marks and other marks. All noted registrations and applications in Exhibit D are valid, subsisting, unrevoked, and uncancelled.

31.     Facebook has continuously used its marks in interstate commerce in the United States in connection with its online networking services since 2004.

32.     Facebook's marks are highly distinctive with regard to a wide variety of services, including online networking services and advertising services.

33.     As a result of Facebook's use of its marks worldwide, the prolific presence of Facebook's marks on third-party websites, the continuous and unsolicited media coverage of Facebook, the high degree of consumer recognition of Facebook's marks, and the hundreds of

-7-

1   millions of customers who regularly use and enjoy Facebook's services, Facebook's marks are

2   famous within the meaning of 15 U.S.C. § 1125(c).

3          34.     Facebook devotes significant resources to protecting its marks.

4   **B.     Facebook's Statement of Rights and Responsibilities**

5          35.     To access Facebook information and features available to Facebook users, a user

6   must register for a Facebook account and agree to the terms and conditions contained in

7   Facebook's Statement, a copy of which is attached as Exhibit C to this First Amended Complaint.

8   Facebook's Statement is binding on and enforceable against Facebook users and others who

9   interact with Facebook.

10         36.     Facebook's Statement prohibits certain conduct, including, but not limited to,

11  misleading Facebook users, using Facebook's marks or any confusingly similar marks without

12  Facebook's written permission, and collecting information from Facebook users without making

13  clear that Facebook is not the one collecting the users' information.

14  **C.     Defendants' Unlawful Conduct**

15         •      **Cyber2Media and Negari**

16         37.     At the time Facebook filed its initial Complaint, Cyber2Media and Negari owned

17  or controlled the computer server associated with Internet Protocol address 72.47.204.195

18  (hereinafter the "Cyber2Media Server").

19         38.     At all relevant times, Cyber2Media and Negari were able to monitor and directly

20  control all activity on the Cyber2Media Server and, on information and belief, did in fact monitor

21  and directly control all activity on the Cyber2Media Server.

22         39.     Cyber2Media's website describes Cyber2Media's business model as acquiring,

23  managing, and developing web properties, with a core focus on building and managing niche

24  vertical websites with high-quality unique visitors from memorable domain names with direct

25  navigation and search traffic. Cyber2Media does not hold itself out to the public as a provider of

26  commercial web hosting services.

27         40.     On information and belief, during the relevant time period, the Cyber2Media

28  Server was not used to provide commercial web hosting services to the public.

-8-

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

41.     On information and belief, at the time Facebook filed its initial Complaint, the private Cyber2Media Server hosted approximately 400 domain names. A list of domain names that were hosted on the private Cyber2Media Server on or about November 1, 2010 is attached as Exhibit E.

42.     As shown in Exhibit E, the private Cyber2Media Server hosted the following typosquatter domain names that targeted Facebook's famous and distinctive mark, **FACEBOOK**: dacebook.com, eacebook.com, faccebok.com, facdbook.com, facebcook.com, facebok.com, facebokk.com, faceboko.com, facebooj.com, faceebook.com, facegbook.com, facvebook.com, fadebook.com, faxebook.com, ffacebook.com, fqacebook.com, fqcebook.com, fscebook.com, gfacebook.com, lfacebook.com, rfacebook.com (hereinafter the "Cyber2Media Facebook Domain Names").

43.     As shown in Exhibit E, in addition to the Cyber2Media Facebook Domain Names, the private Cyber2Media Server also hosted many other typosquatter domain names targeting other well-known marks. Examples include 21stcenrury.com, expiriam.com, gireco.com, harvardinternational.com, iunes.com, progressvie.com, uiversityofphoenix.com, and youtubel.com.

44.     Negari and Cyber2Media have registered, used, and trafficked in typosquatter domain names in the past and, on information and belief, continue to register, use, and traffic in typosquatter domain names.

45.     At least one typosquatter domain name registered and used by Negari and Cyber2Media has been hosted on the Cyber2Media Server.

46.     At the time Facebook filed its initial Complaint, it was not possible to determine who owned the Cyber2Media Facebook Domain Names because the owners of those domain names paid privacy-protection services to conceal the owners' identities or used false or incomplete contact information to register the domain names.

47.     On information and belief, Cyber2Media and Negari registered, owned, or trafficked in at least some and possibly all of the Cyber2Media Facebook Domain Names, directly or through entities or agents they control.

48.     When consumers mistyped the facebook.com domain name or clicked on a link that directed their browsers to the Cyber2Media Facebook Domain Names, they were immediately redirected to certain landing websites. *See* Exhibit F (representative examples). Those landing websites intentionally misappropriated Facebook's marks, infringed Facebook's rights, and were intended to and did deceive consumers into thinking that the landing websites and the commercial activities carried on at the landing websites were affiliated with Facebook.

49.     The deceptive and infringing landing websites shown in Exhibit F were identical or substantially similar to landing websites used by different Defendants in this matter.

50.     On information and belief, Cyber2Media and Negari, directly or through entities or agents they control, used the private Cyber2Media Server to knowingly and intentionally redirect consumers from the Cyber2Media Facebook Domain Names to the landing websites identified in paragraph 48 and created, operated, or intentionally selected those landing websites.

51.     On information and belief, Cyber2Media and Negari, directly or through entities or agents they control, received payment or some other commercial benefit each time a consumer visited the landing websites identified in paragraph 48, clicked on offers or advertisements on those websites, bought goods or services on those websites, and/or divulged personal information on those websites.

52.     Alternatively, on information and belief, Cyber2Media and Negari knowingly encouraged, induced, and assisted other individuals or corporations to host the Cyber2Media Facebook Domain Names on the private Cyber2Media Server, to use the private Cyber2Media Server to redirect consumers from the Cyber2Media Facebook Domain Names to deceptive and infringing landing websites, and to create, operate, or select those landing websites.

53.     If Cyber2Media and Negari did not knowingly encourage, induce, and assist other individuals to engage in the conduct described in the foregoing paragraph, Cyber2Media and Negari at least remained willfully blind to others' use of the private Cyber2Media Server for unlawful purposes.

54.     On information and belief, Negari and Cyber2Media engaged in the conduct described in this subsection with the intent to profit from the fame and goodwill associated with Facebook and Facebook's marks.

55.     Thus, Cyber2Media and Negari purposefully engaged in and/or materially contributed to typosquatter schemes similar or identical to the schemes described in subsections V.D to V.G, below.

56.     On information and belief, Cyber2Media and Negari knew of Facebook's reasonable expectations of future economic benefit from Facebook users and potential Facebook users, including potential Facebook users who attempted to visit Facebook's online location in order to become Facebook users but, by mistake or confusion, directed their browsers to one of the Cyber2Media Facebook Domain Names.

57.     Nevertheless, on information and belief, Cyber2Media and Negari intentionally engaged in the conduct described in this subsection knowing that conduct would divert Facebook users and potential users from Facebook's online location and thereby harm Facebook. As a result, Cyber2Media and Negari intentionally disrupted Facebook's relationships with its existing users and potential users, and interfered with Facebook's reasonable expectations of future economic benefit from Facebook users and potential users.

58.     Publicly available records indicate that Cyber2Media and Negari shut down the private Cyber2Media Server after they had been served with Facebook's initial Complaint.

59.     At the time Cyber2Media and Negari shut down the private Cyber2Media Server, Cyber2Media and Negari possessed or had custody and control of information related to the Cyber2Media Facebook Domain Names and the manner in which those domain names had been used to harm Facebook and deceive consumers while hosted on the private Cyber2Media Server.

60.     On information and belief, by shutting down the private Cyber2Media Server, Cyber2Media and Negari knowingly destroyed evidence relevant to Facebook's claims against Cyber2Media, Negari, and other Defendants.

- **Banana Ads and Navarini**

61.     Banana Ads and Navarini, directly or through entities or agents they control, registered, owned, and used the following domain names to engage in and/or materially contribute to typosquatter schemes identical or substantially similar to the schemes described in subsections V.D to V.G, below: wwwwfacbook.com, social2survey.info, and socialsurvey2011.info.

62.     On information and belief, Banana Ads and Navarini, directly or through entities or agents they control, also registered, owned, and used other domain names of which Facebook is not yet aware to engage in and/or materially contribute to typosquatter schemes.

63.     In addition, Banana Ads and Navarini have encouraged, induced, and assisted others to engage in typosquatter schemes by producing and distributing a video available on the Banana Ads website (the "Banana Ads Tutorial"). The Banana Ads Tutorial actively encourages viewers to create and/or operate deceptive and infringing landing websites using landing websites or landing website "templates" designed and distributed by Banana Ads and Navarini. The Banana Ads Tutorial also offers advice on how to maximize profits from the use of deceptive and infringing landing websites. On information and belief, Banana Ads and Navarini promote the Banana Ads Tutorial, their landing websites, and their landing website templates to generate profits from distribution of landing websites and landing website templates, to increase the size of their affiliate network, to increase the profitability of their affiliates' campaigns, and thereby to increase their own profits.

64.     On information and belief, Banana Ads and Navarini knowingly encouraged, assisted, and induced third parties to use their products and services to create, own, and operate landing websites that misappropriated Facebook's marks, infringed Facebook's rights, and were intended to and did deceive consumers into thinking that the landing websites and the commercial activities carried on at the landing websites were affiliated with Facebook.

65.     Alternatively, Banana Ads and Navarini remained willfully blind to others' use of their products and services for that unlawful purpose.

66.     On information and belief, Banana Ads and Navarini also create, own, and operate deceptive and infringing landing websites of their own. Those landing websites misappropriate Facebook's marks, infringe Facebook's rights, and are intended to and do deceive consumers into thinking that the landing websites and the commercial activities carried on at the landing websites are affiliated with Facebook. On information and belief, Banana Ads and Navarini receive payment or some other commercial benefit each time a consumer visits the landing websites identified in this paragraph, clicks on offers or advertisements on those websites, buys goods or services on those websites, and/or divulges personal information on those websites.

67.     On information and belief, Banana Ads and Navarini engaged in the conduct described in this subsection with the intent to profit from the fame and goodwill associated with Facebook and Facebook's marks.

68.     On information and belief, Banana Ads and Navarini knew of Facebook's reasonable expectations of future economic benefit from Facebook users and potential Facebook users, including potential Facebook users who attempted to visit Facebook's online location in order to become Facebook users but, by mistake or confusion, directed their browsers to one of the typosquatter domain names or landing websites owned or operated by Banana Ads and Navarini or owned or operated by affiliates or agents of Banana Ads and Navrini.

69.     Nevertheless, on information and belief, Banana Ads and Navarini intentionally engaged in the conduct described in this subsection knowing that conduct would divert Facebook users and potential users from Facebook's online location and thereby harm Facebook. As a result, Banana Ads and Navarini intentionally disrupted Facebook's relationships with its existing users and potential users, and interfered with Facebook's reasonable expectations of future economic benefit from Facebook users and potential users.

- **The Additional Named Defendants and the Doe Defendants**

70.     The Additional Named Defendants and the Doe Defendants, directly or through entities or agents they control, registered, own or control the domain names identified in Exhibit A (Additional Named Defendants) and Exhibit B (Doe Defendants).

71.     When consumers visited the typosquatter domain names of the Additional Named Defendants and the Doe Defendants, they were immediately redirected to landing websites that intentionally misappropriated Facebook's marks, infringed Facebook's rights, and were intended to and did deceive consumers into thinking that the landing websites and the commercial activities carried on at the landing websites were affiliated with Facebook.

72.     On information and belief, the Additional Named Defendants and the Doe Defendants, directly or through entities or agents they control, knowingly and intentionally redirected consumers from their typosquatter domain names to the landing websites identified in paragraph 71 and created, operated, or intentionally selected those landing websites.

73.     On information and belief, the Additional Named Defendants and the Doe Defendants, directly or through entities or agents they control, received payment or some other commercial benefit each time a consumer visited the landing websites identified in paragraph 71, clicked on offers or advertisements on those websites, bought goods or services on those websites, and/or divulged personal information on those websites.

74.     On information and belief, the Additional Named Defendants and the Doe Defendants engaged in the conduct described in this subsection with the intent to profit from the fame and goodwill associated with Facebook and Facebook's marks.

75.     Thus, the Additional Named Defendants and the Doe Defendants purposefully engaged in and/or materially contributed to typosquatter schemes similar or identical to the schemes described in subsections V.D to V.G, below.

76.     On information and belief, the Additional Named Defendants and the Doe Defendants knew of Facebook's reasonable expectations of future economic benefit from Facebook users and potential Facebook users, including potential Facebook users who attempted to visit Facebook's online location in order to become Facebook users but, by mistake or confusion, directed their browsers to one of the typosquatter domain names of the Additional Named Defendants or the Doe Defendants.

77.     Nevertheless, on information and belief, the Additional Named Defendants and the Doe Defendants intentionally engaged in the conduct described in this subsection knowing that

1   conduct would divert Facebook users and potential users from Facebook's online location and

2   thereby harm Facebook. As a result, the Additional Named Defendants and the Doe Defendants

3   intentionally disrupted Facebook's relationships with its existing users and potential users, and

4   interfered with Facebook's reasonable expectations of future economic benefit from Facebook

5   users and potential users.

6   **D.     Common Features of Defendants' Typosquatter Schemes**

7          78.     To launch a typosquatter scheme, Defendants first purchase registration rights for

8   a typosquatter domain name.

9          79.     Next, Defendants create a typosquatter website to which a consumer is directed

10  when he types the typosquatter domain name into his web browser or clicks on a link that directs

11  his web browser to a webpage associated with the typosquatter domain name. The typosquatter

12  website captures consumers who (i) accidentally misspell Facebook's domain name or

13  (ii) mistakenly assume, because the typosquatter website's domain name is confusingly similar to

14  Facebook's domain name, that the typosquatter website is connected to or approved by Facebook.

15         80.     Usually, the typosquatter website immediately redirects consumers—without any

16  notification or explanation—to a landing website.

17         81.     The landing website typically includes advertisements, promotions, and/or offers

18  for goods and services, some of which are similar in kind and appearance to legitimate content

19  and third-party advertisements on Facebook's website.

20         82.     In many cases, the landing website is designed to confuse consumers as to the

21  source and sponsorship of the landing website and the commercial activities carried on there. For

22  example, the landing website often misappropriates one or more of Facebook's marks. It may also

23  incorporate colors and design elements from Facebook's website and misleading text or

24  pretextual "surveys" about online networking.

25         83.     Visitors to Defendants' landing websites are invited to view or click on one or

26  more of the advertisements, promotions, or offers displayed there. They are then led through a

27  chain of websites designed to lure them into divulging personal information, viewing or clicking

28  on additional advertisements, or purchasing goods and services.

84.     On information and belief, Defendants receive payment each time a consumer visits one of the Defendants' websites, clicks on one of the offers or advertisements on those websites, buys goods or services, and/or divulges personal information.

85.     Confusion is the essence of Defendants' schemes. Defendants rely on consumers' mistakes or confusion to generate traffic to Defendants' websites. Defendants then compound and prolong consumers' confusion by misappropriating Facebook's marks and using other deceptive tactics to suggest, falsely, that Defendants and their commercial activities are connected to Facebook.

86.     As a result, consumers impute the fame and goodwill associated with Facebook and Facebook's marks to Defendants' websites and Defendants' commercial activities. Consumers therefore linger longer on Defendants' websites, view and click on more offers and advertisements, purchase more goods and services, divulge more personal information—and increase Defendants' profits.

**E.     Example 1: Facebooki.com**

87.     The domain name facebooki.com was used in Defendants' schemes.

88.     The facebooki.com domain name incorporates the **FACEBOOK** mark, and was used by Defendants to suggest that the facebooki.com domain name and the http://www.facebooki.com website were connected to or approved by Facebook.

89.     If a consumer typed "facebooki.com" into his web browser on April 5, 2011, his browser would have been redirected immediately to an intermediate landing website, http://1939.com, and then to the landing website http://socialrewardsurvey.com/. A true and correct copy of the http://socialrewardsurvey.com/ landing website as it appeared on April 5, 2011 is attached as Exhibit G.

90.     The domain name for the http://socialrewardsurvey.com/ landing website uses the term "social"—a term commonly associated with Facebook—to suggest that the http://socialrewardsurvey.com/ landing website is connected to or approved by Facebook.

91.     At the time Exhibit G was created, the landing website http://socialrewardsurvey.com/ also used distinctive colors, fonts, and other design elements used by Facebook's website to suggest that it was connected to or approved by Facebook.

92.     The landing website http://socialrewardsurvey.com/ also used text to deceive the consumer into thinking that he had arrived at a website connected to or approved by Facebook. At the time Exhibit G was created, text on the landing website stated:

> "To mark our 6th anniversary of operation, we've decided to conduct a short survey of our users. You've been selected from the Seattle region to take part. This will only take 30 seconds of your time and will enhance user experience [sic]. Upon completion you will have the opportunity to get a Macbook Air, Apple iPhone 4, or the iPad 2."

Exhibit G (emphasis added).[1]

93.     In fact, however, Facebook had no connection to facebooki.com, http://www.facebooki.com, http://1939.com, or http://socialrewardsurvey.com/.

94.     Below the text described in paragraph 92 was a button labeled "Start Now." That button used colors and other design elements intended to mimic buttons used on Facebook's website. *See* Exhibit G.

95.     If the consumer clicked on the "Start Now" button, he was asked to answer questions about his gender and his use of online networking websites. *See* Exhibits H, I, J. By suggesting that the landing website actually pertained to online networking, the survey further suggested that the landing website was connected to or approved by Facebook.

96.     After answering the survey questions, the consumer encountered a webpage with the following text: "Thank you for your input. Participation is required for your opportunity to get an exclusive reward." Below that text were three advertisements: one titled "Macbook" (and including an image of a Macbook); one titled "iPhone 4" (and including an image of an iPhone); and one titled "iPad 2" (and including an image of an iPad). Each box included a button labeled "Select." *See* Exhibit K.

---

[1] At the time Exhibit G was created, Facebook had been in existence for seven years, not six years. But the landing website's reference to "our 6th anniversary of operation" was clearly intended to suggest a connection between the landing website and Facebook.

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

97.     The advertisements described in paragraph 96 were similar in kind and appearance to content and third-party advertisements Facebook users might encounter while using the Facebook website, which increased the likelihood of consumer confusion.

98.     The webpage displaying the advertisements described in paragraph 96 also used colors and other design elements to suggest that Facebook endorsed, approved, or was otherwise associated with Defendants' commercial activities. *See* Exhibit K.

99.     In fact, however, Facebook had no connection to the commercial activities carried on at http://socialrewardsurvey.com/.

100.    If the consumer clicked on the "Select" button in the box titled "Macbook," he encountered a webpage with the following text: "You selected the Macbook Air. Thank you for your response. Please enter your information to continue." Below this text the consumer could enter a cellular telephone number and email address, and then click on a button labeled "Validate" to submit his information. That webpage also used colors and other design elements to suggest that Facebook or an affiliate or agent of Facebook was the one requesting and collecting the information. *See* Exhibit L.

101.    The consumer encountered a substantially similar webpage if he selected the "iPhone 4" option or the "iPad 2" option. *See* Exhibits M, N.

**F.      Example 2: Faceboook.com**

102.    The domain name faceboook.com was also used in Defendants' schemes.

103.    The faceboook.com domain name is confusingly similar to Facebook's famous and distinctive mark, **FACEBOOK**, and was used by Defendants to suggest that the faceboook.com domain name and the http://www.faceboook.com website were connected to or approved by Facebook.

104.    If a consumer typed "faceboook.com" into her web browser on June 6, 2011, her browser would have been redirected immediately to an intermediate landing website, http://1939.com, and then to the landing website http://socialsurvey2011.com/. A true and correct copy of the http://socialsurvey2011.com/ landing website as it appeared on June 6, 2011 is attached as Exhibits O and P.

-18-

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

105.    The http://socialsurvey2011.com/ landing website prominently displayed the **FACEBOOK** mark in the text of the landing website to suggest that the landing website and the commercial activities carried on at the landing website were connected to or approved by Facebook. *See* Exhibit P.

106.    The http://socialsurvey2011.com/ landing website also used colors and other design elements to suggest that the landing website and the commercial activities carried on at the landing website were connected to or approved by Facebook. For example, the http://socialsurvey2011.com/ landing website prominently displayed Facebook's well-known **LIKE Icon** (a hand in the "thumbs-up" position). The landing website also incorporated distinctive shades of blue and a blue banner at the top of the webpage, both of which were intended to suggest an association with Facebook. *See* Exhibit P.

107.    In fact, however, Facebook had no connection to faceboook.com, http://www.faceboook.com, http://1939.com, or http://socialsurvey2011.com/.

**G.      Example 3: Facebobk.com**

108.    The domain name facebobk.com was also used in Defendants' schemes.

109.    The facebobk.com domain name is confusingly similar to Facebook's famous and distinctive mark, **FACEBOOK**, and was used by Defendants to suggest that the facebobk.com domain name and the http://www.facebobk.com website were connected to or approved by Facebook.

110.    If a consumer typed "facebobk.com" into his web browser on July 19, 2011, his browser would have been redirected immediately to an intermediate landing website, http://1939.com, and then to the landing website http://social.worldrewardcenter.com/. A true and correct copy of the http://social.worldrewardcenter.com/ landing website as it appeared on July 19, 2011 is attached as Exhibit Q.

111.    The http://social.worldrewardcenter.com/ landing website used colors and other design elements to suggest that the landing website and the commercial activities carried on at the landing website were connected to or approved by Facebook. For example, the http://social.worldrewardcenter.com/ landing website prominently incorporated distinctive shades

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

of blue and a blue banner at the top of the webpage, both of which were intended to suggest an association with Facebook. *See* Exhibit Q.

112.   In fact, however, Facebook had no connection to facebobk.com, http://www.facebobk.com, http://1939.com, or http://social.worldrewardcenter.com/.

113.   The http://social.worldrewardcenter.com/ landing website, as shown in Exhibit Q, was substantially similar to the landing websites created, designed, and distributed by Banana Ads, as described in paragraphs 63 to 65.

## H.   Harm to Facebook from Defendants' Conduct

114.   Defendants' typosquatter schemes infringe on Facebook's famous and distinctive marks, confuse the consuming public, diminish the goodwill associated with Facebook and its marks, injure Facebook's reputation, breach enforceable agreements between Defendants and Facebook, interfere with Facebook's business, and unjustly enrich Defendants.

115.   As a result of Defendants' typosquatter schemes, the consuming public has been and is likely to be confused with respect to whether Facebook is affiliated, connected, or associated with Defendants and Defendants' websites.

116.   In addition, the consuming public has been and is likely to be confused as to whether Facebook is the source of Defendants' offers, goods, and services, and as to whether Facebook sponsors and approves Defendants' commercial activities.

117.   Facebook's distinctive and famous marks have been diluted by blurring and diluted by tarnishment as a result of Defendants' typosquatter schemes.

118.   Facebook has suffered and continues to suffer significant harm to its reputation and goodwill, including the goodwill associated with its marks, as a result of Defendants' typosquatter schemes.

119.   Facebook has suffered substantial damages as a result of Defendants' conduct, including damages from reduced use of Facebook's website, damages to the reputation and goodwill associated with Facebook's marks, costs to investigate and combat Defendants' typosquatter schemes, and costs to respond to consumers' complaints and confusion about Defendants' typosquatter schemes.

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

# VI.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### CYBERSQUATTING AND CONTRIBUTORY CYBERSQUATTING
### 15 U.S.C. § 1125(d)

120.   Facebook repeats the allegations above as if fully set forth herein.

121.   Facebook owns the Facebook marks referenced in paragraph 29 above, including numerous federal trademark applications and registrations for the Facebook marks.

122.   Facebook's marks are famous and highly distinctive with regard to a variety of services, including online networking services and advertising services.

123.   The distinctive quality of Facebook's marks is of enormous value to Facebook.

124.   Facebook began using its distinctive and famous marks prior to Defendants' unauthorized and unlawful activities.

125.   Defendants have registered, trafficked in, and used typosquatter domain names that are confusingly similar to and dilutive of Facebook's marks knowing that those typosquatter domain names are confusingly similar to and dilutive of Facebook's marks.

126.   Defendants registered their typosquatter domain names with a bad-faith intent to profit from the fame and goodwill associated with Facebook and Facebook's marks.

127.   Defendants engage in the conduct described in this First Amended Complaint without Facebook's consent or authorization.

128.   Defendants intend to and do divert consumers from Facebook's online location to websites that harm the goodwill represented by Facebook's marks by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of Defendants' websites.

129.   Defendants' websites harm Facebook's reputation and the goodwill associated with Facebook's marks by causing consumers to associate Facebook with the negative qualities of Defendants' websites, including, but not limited to, the confusing and deceptive manner in which those websites generate Internet traffic, the confusing and deceptive content of those websites, the misleading nature of the commercial activities carried on at those websites, the shoddy design of

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

those websites, the unreliable functionality of those websites, and the ephemeral nature of those websites.

130.     Defendants engage in their typosquatter schemes for commercial gain.

131.     On information and belief, Defendants have provided material and misleading contact information when registering their typosquatter domain names, failed to maintain accurate contact information, and engaged in a pattern of such conduct.

132.     On information and belief, Defendants have registered or acquired domain names knowing those domain names were identical or confusingly similar to others' marks that were distinctive and famous at the time Defendants registered or acquired their domain names.

133.     On information and belief, Defendants have induced and encouraged others to engage in the same conduct or substantially similar conduct and, in addition or in the alternative, have provided services or consideration to others with knowledge or reason to know that they were engaged in such conduct.

134.     Defendants' conduct has caused irreparable and incalculable harm and injury to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

135.     Defendants' conduct constitutes a knowing and willful violation of Facebook's rights under 15 U.S.C. § 1125(d).

136.     Facebook is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, cancellation of Defendants' rights in their typosquatter domain names or transfer of those typosquatter domain names to Facebook, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

### SECOND CAUSE OF ACTION

**TRADEMARK INFRINGEMENT AND
CONTRIBUTORY TRADEMARK INFRINGEMENT
15 U.S.C. § 1114**

137.     Facebook repeats the allegations above as if fully set forth herein.

138.    Defendants and Facebook offer their services through the same channel of trade, the Internet.

139.    Defendants and Facebook offer related goods and services in the form of advertising services.

140.    In connection with their typosquatter schemes, Defendants use and display Facebook's marks, and words, terms, names, symbols, and devices that are substantially similar to Facebook's marks, in commerce, for commercial purposes, and in connection with the advertising, distribution, and sale of goods and services.

141.    Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants and their websites with Facebook.

142.    Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to whether Facebook is the source of Defendants' goods, services, and commercial activities, and as to whether Facebook approves and sponsors Defendants' goods, services, and commercial activities.

143.    Because of the likelihood of confusion caused by Defendants' conduct, any defects or faults in Defendants' websites and commercial activities injure Facebook's reputation and the fame and goodwill associated with Facebook and Facebook's marks.

144.    Defendants engage in the conduct described in this First Amended Complaint without Facebook's consent or authorization.

145.    Defendants engage in the conduct described in this First Amended Complaint with knowledge of the fame and goodwill associated with Facebook and Facebook's marks and with the intent to trade off that fame and goodwill.

146.    On information and belief, Defendants have induced and encouraged others to engage in the same conduct or substantially similar conduct and, in addition or in the alternative, have provided services or consideration to others with knowledge or reason to know that they were engaged in infringing conduct.

147.    Defendants' conduct has caused irreparable and incalculable harm and injury to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

148.    Defendants' conduct constitutes a knowing and willful violation of Facebook's rights under 15 U.S.C. § 1114.

149.    Defendants' conduct is deliberate, willful, fraudulent, and without any extenuating circumstances, and is an exceptional case within the meaning of 15 U.S.C. § 1117.

150.    Facebook is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

### THIRD CAUSE OF ACTION

**FALSE DESIGNATION OF ORIGIN AND
CONTRIBUTORY FALSE DESIGNATION OF ORIGIN
15 U.S.C. § 1125(a)**

151.    Facebook repeats the allegations above as if fully set forth herein.

152.    Defendants and Facebook offer their services through the same channel of trade, the Internet.

153.    Defendants and Facebook offer related goods and services in the form of advertising services.

154.    In connection with their typosquatter schemes, Defendants use and display Facebook's marks, and words, terms, names, symbols, and devices that are substantially similar to Facebook's marks, in commerce, for commercial purposes, and in connection with the advertising, distribution, and sale of goods and services.

155.    Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants and their websites with Facebook.

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

156.   Defendants' typosquatter schemes are likely to cause confusion, or to cause mistake, or to deceive as to whether Facebook is the source of Defendants' goods, services, and commercial activities, and as to whether Facebook approves and sponsors Defendants' goods, services, and commercial activities.

157.   Because of the likelihood of confusion caused by Defendants' conduct, any defects or faults in Defendants' websites and commercial activities injure Facebook's reputation and the fame and goodwill associated with Facebook and Facebook's marks.

158.   Defendants engage in the conduct described in this First Amended Complaint without Facebook's consent or authorization.

159.   Defendants engage in the conduct described in this First Amended Complaint with knowledge of the fame and goodwill associated with Facebook and Facebook's marks and with the intent to trade off that fame and goodwill.

160.   On information and belief, Defendants have induced and encouraged others to engage in the same conduct or substantially similar conduct and, in addition or in the alternative, have provided services or consideration to others with knowledge or reason to know that they were engaged in infringing conduct.

161.   Defendants' conduct has caused irreparable and incalculable harm and injury to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

162.   Defendants' conduct constitutes a knowing and willful violation of Facebook's rights under 15 U.S.C. § 1125(a).

163.   Defendants' conduct is deliberate, willful, fraudulent, and without any extenuating circumstances, and is an exceptional case within the meaning of 15 U.S.C. § 1117.

164.   Facebook is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FOURTH CAUSE OF ACTION

### TRADEMARK DILUTION AND CONTRIBUTORY TRADEMARK DILUTION
### 15 U.S.C. § 1125(c)

165.    Facebook repeats the allegations above as if fully set forth herein.

166.    As a result of enormous publicity and Facebook's strong and loyal user base, Facebook's marks are widely recognized by the general public of the United States as a designation of Facebook's services, and they are famous.

167.    Facebook's marks became famous before Defendants began operating their typosquatter schemes.

168.    In connection with their typosquatter schemes, Defendants use and display Facebook's marks, and words, terms, names, symbols, and devices that are substantially similar to Facebook's marks, in commerce, for commercial purposes, and in connection with the advertising, distribution, and sale of goods and services.

169.    Defendants' conduct causes dilution by blurring of Facebook's marks within the meaning of 15 U.S.C. § 1125(c)(2)(B) because those schemes are likely to cause an association with Facebook arising from the similarity of the marks that impairs the distinctiveness of Facebook's marks and weakens the connection in the public's mind between Facebook's marks and Facebook's services.

170.    Defendants' typosquatter schemes also cause dilution by tarnishment of Facebook's marks within the meaning of 15 U.S.C. § 1125(c)(2)(C) because those schemes cause consumers to associate Facebook with the negative qualities of Defendants' websites, including, but not limited to, the confusing and deceptive manner in which those websites generate Internet traffic, the confusing and deceptive content of those websites, the misleading nature of the commercial activities carried on at those websites, the shoddy design of those websites, the unreliable functionality of those websites, and the ephemeral nature of those websites. That association harms Facebook's reputation.

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

171.    Defendants intend to create an association with Facebook's marks and to trade on the widespread recognition of Facebook's marks by using marks that are identical to or substantially similar to Facebook's marks.

172.    Defendants' unauthorized use of Facebook's marks and words, terms, and names that are substantially similar to Facebook's marks was achieved with notice and full knowledge that such use was not authorized or licensed by Facebook. On information and belief, Defendants willfully intended to harm and trade on the recognition of Facebook's marks.

173.    On information and belief, Defendants have induced and encouraged others to engage in the same conduct or substantially similar conduct and, in addition or in the alternative, have provided services or consideration to others with knowledge or reason to know that they were engaged in infringing conduct.

174.    Defendants' conduct has caused irreparable and incalculable harm and injury to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

175.    Defendants' conduct constitutes a knowing and willful violation of Facebook's rights under 15 U.S.C. § 1125(c).

176.    Defendants' conduct is deliberate, willful, fraudulent, and without any extenuating circumstances, and is an exceptional case within the meaning of 15 U.S.C. § 1117.

177.    Facebook is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

### FIFTH CAUSE OF ACTION

**BREACH OF CONTRACT**
**(AGAINST DEFENDANTS WHO ARE ALSO FACEBOOK USERS)**

178.    Facebook repeats the allegations above as if fully set forth herein.

179.    Use of Facebook's website and services is governed by Facebook's Statement.

180.    At all relevant times, users and others who interact with Facebook have been required to agree to and abide by Facebook's Statement in order to access Facebook's website and services.

181.    On information and belief, Defendants or Defendants' agents agreed to Facebook's Statement. Facebook's Statement is therefore binding on Defendants.

182.    Certain terms and conditions in Facebook's Statement extend to conduct beyond Facebook's website.  For example, Facebook's Statement provides that "[y]ou will not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Wall and 32665), or any confusingly similar marks, without our written permission." *See* Exhibit C.

183.    Facebook has performed all conditions, covenants, and promises required of it in accordance with its Statement.

184.    In connection with Defendants' typosquatter schemes, Defendants have knowingly, willfully, repeatedly, and systematically breached Facebook's Statement.

185.    Defendants' breaches include, but are not limited to, misleading Facebook users, using Facebook's marks or confusingly similar marks without Facebook's written permission, improperly collecting information from Facebook users, and registering, using, and otherwise trafficking in typosquatter domain names.

186.    Defendants' breaches of Facebook's Statement directly and proximately caused and continue to cause Facebook to suffer substantial damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

187.    Facebook repeats the allegations above as if fully set forth herein.

188.    Facebook intends and is likely to derive future economic benefit from Facebook users and potential Facebook users.

189.    On information and belief, Defendants knew of Facebook's reasonable expectations of future economic benefit from Facebook users and potential Facebook users.

FIRST AMENDED COMPLAINT
Case No. 4:11-cv-03619-PJH

190.    Absent Defendants' intentional diverting of Facebook users and potential users from Facebook's online location, it is reasonably certain that more consumers would have used Facebook's website and Facebook would have thereby gained an economic benefit.

191.    The conduct by which Defendants interfered with Facebook's prospective economic advantage is independently wrongful, as described in this First Amended Complaint.

192.    Defendants' conduct proximately caused Facebook to suffer substantial damages in an amount to be proven at trial.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Facebook prays for the following relief:

A.    For injunctive relief, as follows:

1.    An order permanently enjoining and restraining all Defendants from engaging in any infringing acts involving Facebook's marks;

2.    An order permanently enjoining and restraining all Defendants from engaging in any unlawful, misleading, deceptive, or malicious activities directed at or relating to the Facebook network, Facebook users, or potential Facebook users;

3.    An order permanently enjoining and restraining all Defendants from engaging in any activity that violates Facebook's Statement; and

4.    An order permanently enjoining and restraining all Defendants from interfering in any way with Facebook's business.

B.    An order cancelling the registrations for Defendants' typosquatter domain names or transferring ownership of Defendants' typosquatter domain names to Facebook.

C.    An order requiring Defendants to account for, hold in constructive trust, pay over to Facebook, and disgorge all profits derived from their unlawful conduct.

D.    An award to Facebook of damages, including, but not limited to, compensatory damages, statutory damages (including up to $100,000 for each infringing domain name), aggravated and/or treble damages, and punitive damages, in an amount to be proven at trial.

E.    An award to Facebook of reasonable costs, including attorneys' fees.

1          F.       An award to Facebook of pre- and post-judgment interest.

2          G.       An award to Facebook of other relief as this Court may deem just and proper.

3

4    DATED:  December 12, 2011                    **PERKINS COIE** LLP

5

6                                                 By: s/ Ryan Spear
                                                     Ryan Spear (Wash. Bar No. 39974
7                                                    (pro hac vice)

8                                                 Attorneys for Plaintiff
                                                  FACEBOOK, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **JURY DEMAND**

2          Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff Facebook, Inc. demands a trial

3    by jury as to all issues so triable in this action.

4

5

    DATED:  December 12, 2011               **PERKINS COIE** LLP

6

7                                           By: s/ Ryan Spear
                                                Ryan Spear (Wash. Bar No. 39974
8                                               (pro hac vice)

9                                           Attorneys for Plaintiff
                                            FACEBOOK, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28