Ryan Spear, WSBA No. 39974 (*pro hac vice*)
RSpear@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98109
Telephone: 206.359.8000
Facsimile: 206.359.9000

Brian P. Hennessy, Bar No. 226721
BHennessy@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Attorneys for Facebook, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BANANA ADS LLC, *et al.*,<br><br>Defendants. | Case No. 4:11-cv-03619-YGR (LB) (KW)<br><br>**PLAINTIFF FACEBOOK, INC.'S MOTION FOR DEFAULT JUDGMENT**<br><br>Date:       December 4, 2012<br>Time:      2:00 p.m.<br>Judge:     Hon. Yvonne Gonzalez Rogers |

<u>**NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENT**</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 2:00 p.m. on December 4, 2012, or at the earliest

practicable time thereafter on this Court's schedule, in the courtroom of the Honorable Yvonne

Gonzalez Rogers, 1301 Clay Street, Oakland, California, 94612, Plaintiff Facebook, Inc.

("Facebook") will and hereby does move for default judgment against the following 12

defendants: (1) Counter Balance Enterprises Ltd.; (2) Intercontinental Domain, Inc.;

1 | (3) Mackrooner Ltd., Inc.; (4) Newgate Services Ltd., Inc. (also known as SMTM Enterprises

2 | Ltd.); (5) Pioneer Enterprises Ltd.; (6) YourTick; (7) Paul Baker; (8) Reggie Bush; (9) Karrie-

3 | Lee Karreman; (10) Michael Navarini (doing business as Banana Ads LLC); (11) Michael

4 | Suggs (doing business as Michael Timothy Suggs, Timothy Suggs, FB Promotions/Freebie

5 | Promos, and Rabbit GoGo Media LLC); and (12) Cleanser Products.

6 |      Facebook is entitled to judgment under the Anticybersquatting Consumer Protection Act,

7 | 15 U.S.C. § 1125(d). Facebook therefore asks this Court to enter judgment against the

8 | defendants identified herein; to award Facebook the maximum amount of statutory damages; to

9 | order defendants to transfer their infringing domain names to Facebook; and to enjoin the

10 | defendants from violating Facebook's rights in the future.

11 |      This Motion is based on this Notice of Motion and Motion, the Memorandum of Points

12 | and Authorities below, the supporting Declaration of Ryan Spear, the Court's files in this action,

13 | the arguments of counsel, and any other matter the Court may properly consider.

14 |

15 | DATED:  October 29, 2012          Respectfully submitted,

16 |                      **PERKINS COIE LLP**

17 |                      By: /s/ Ryan Spear_____
                        Ryan Spear, Wash. Bar No. 39974

18 |                         (*pro hac vice*)
                        RSpear@perkinscoie.com

19 |                      Attorneys for Facebook, Inc.

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

**TABLE OF CONTENTS**

2

**Page**

3

I.      INTRODUCTION ...................................................................................................... 1

4

II.     FACTS ...................................................................................................................... 1

5

     A.      Facebook's Services ..................................................................................... 1

     B.      Facebook's Marks ......................................................................................... 1

6

     C.      Default Defendants' Schemes ....................................................................... 2

7

III.    JURISDICTION......................................................................................................... 3

8

     A.      Subject Matter Jurisdiction .......................................................................... 3

9

     B.      Personal Jurisdiction .................................................................................... 4

10

          1.      This Court has general personal jurisdiction over the Default Defendants who reside in California ........................................... 4

11

          2.      This Court has specific personal jurisdiction over the remaining Default Defendants ............................................................. 4

12

IV.     LEGAL STANDARD FOR DEFAULT JUDGMENT .............................................. 9

13

V.      FACEBOOK IS ENTITLED TO DEFAULT JUDGMENT AGAINST EACH OF THE DEFAULT DEFENDANTS ................................. 9

14

     A.      Facebook's Motion Is Procedurally Proper and All of the Discretionary Factors Favor Default Judgment ..................................... 9

15

     B.      Facebook Has Properly Pled Claims for Direct Liability Against 11 of the Default Defendants ......................................................... 11

16

17

          1.      Counter Balance Enterprises Ltd. ("Counter Balance")................................................................................................. 12

18

          2.      Intercontinental Domain Inc. ("Intercontinental").................................. 14

19

          3.      Mackrooner Ltd., Inc. ("Mackrooner").................................................... 15

20

          4.      Newgate Services Ltd., Inc. (also known as SMTM Enterprises Ltd.) ("Newgate") .................................................. 16

21

          5.      Pioneer Enterprises Ltd. ("Pioneer") ....................................................... 17

22

          6.      YourTick .................................................................................................. 18

23

          7.      Paul Baker ("Baker") ............................................................................... 19

24

          8.      Reggie Bush ("Bush")............................................................................... 20

25

          9.      Karrie-Lee Karreman ("Karreman") ........................................................ 21

26

          10.     Michael Navarini (doing business as Banana Ads LLC) ("Navarini")................................................................................ 22

27

28

1

**TABLE OF CONTENTS**
(continued)

2

Page

3
          11.    Michael Suggs (doing business as Michael Timothy
                Suggs, Timothy Suggs, FB Promotions/Freebie

4
                Promos, and Rabbit GoGo Media LLC) ("Suggs") ................................. 23

5
   C.    Facebook Has Properly Pled Claims for Contributory
         Liability Against Cleanser Products.................................................................. 25

6
VI.   FACEBOOK IS ENTITLED TO APPROPRIATE RELIEF ......................................... 29

7
   A.    Maximum Statutory Damages Are Appropriate and
         Necessary ......................................................................................................... 30

8

9
          1.    Facebook is entitled to maximum statutory damages
              against the 11 Default Defendants who directly

10
              infringed Facebook's mark ....................................................... 30

11
          2.    Facebook is entitled to maximum statutory damages
              against contributory infringer Cleanser Products..................................... 32

12
   B.    Injunctive Relief Is Also Appropriate and Necessary.......................................... 33

13
          1.    This Court should order the Default Defendants and
              their registrars to transfer all infringing domain

14
              names to Facebook..................................................................... 33

15
           2.    This Court should issue a permanent injunction
              barring the Default Defendants from infringing the

16
              FACEBOOK mark in the future .............................................. 34

17
VII.   CONCLUSION ........................................................................................................ 34

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page

3

CASES

4

*Aldabe v. Aldabe,*
  616 F.2d 1089 (9th Cir. 1980).................................................................................. 9

5

6

*Aztar Corp. v. MGM Casino,*
  No. 00-833-A, 2001 WL 939070
  (E.D. Va. April 9, 2001)........................................................................................ 31

7

8

*Ballard v. Savage,*
  65 F.3d 1495 (9th Cir. 1995).................................................................................. 7

9

10

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,*
  223 F.3d 1082 (9th Cir. 2000)................................................................................ 5

11

*Bosley Med. Inst., Inc. v. Kremer,*
  403 F.3d 672 (9th Cir. 2005)................................................................................ 10

12

13

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985).............................................................................................. 7

14

15

*Calder v. Jones,*
  465 U.S. 783 (1983).............................................................................................. 5

16

*Century 21 Real Estate Corp. v. Sandlin,*
  846 F.2d 1175 (9th Cir. 1988).............................................................................. 34

17

18

*Citigroup Inc. v. Malik,*
  No. 1:07cv1168, 2009 WL 874497
  (E.D. Va. Mar. 24, 2009) ................................................................................ 12, 33

19

20

*City of Carlsbad v. Shah,*
  No. 08cv1211 AJB, 2012 WL 424418
  (S.D. Cal. Feb. 9, 2012) ...................................................................................... 31

21

22

*Coca-Cola Co. v. Purdy,*
  382 F.3d 774 (8th Cir. 2004)......................................................................... passim

23

24

*CollegeSource, Inc. v. Academyone, Inc.,*
  653 F.3d 1066 (9th Cir. 2011)........................................................................ 5, 6, 7

25

26

*craigslist, Inc. v. Kerbel,*
  No. C-11-3309 EMC, 2012 WL 3166798
  (N.D. Cal. Aug. 2, 2012)............................................................................... passim

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*craigslist, Inc. v. Naturemarket, Inc.*,
   694 F. Supp. 2d 1039 (N.D. Cal. 2010) ................................ 6

*DSPT Int'l, Inc. v. Nahum*,
   624 F.3d 1213 (9th Cir. 2010) ......................................... passim

*eAdGear, Inc. v. Liu*,
   No. CV-11-05398 JCS, 2012 WL 2367805
   (N.D. Cal. June 21, 2012) ............................................ passim

*Eitel v. McCool*,
   782 F.2d 1470 (9th Cir. 1986) ....................................... 9, 10

*Elec. Boutique Holdings Corp. v. Zuccarini*,
   No. Civ. A. 00-4055, 2000 WL 1622760
   (E.D. Pa. Oct. 30, 2000) ............................................. 13

*Elektra Entm't Group, Inc. v. Bryant*,
   No. CW 03-6381GAF, 2004 WL 783123
   (C.D. Cal. Feb. 13, 2004) ............................................ 9

*Flentye v. Kathrein*,
   485 F. Supp. 2d 903 (N.D. Ill. 2007) ............................... 22, 23

*Ford Motor Co. v. Cross*,
   441 F. Supp. 2d 837 (E.D. Mich. 2006) .......................... 30

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) ............................. 8

*G & G Closed-Circuit Events, LLC v. Potopsky*,
   No. 1:11 CV 00140, 2012 WL 11130
   (N.D. Ohio Jan. 3, 2012) ............................................ 8

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   131 S. Ct. 2846 (2011) ............................................... 4

*GoPets Ltd. v. Hise*,
   657 F.3d 1024 (9th Cir. 2011) ....................................... 32

*Int'l Painters and Allied Trades Indus. Pension Fund v.*
   *R.W. Amrine Drywall Co., Inc.*,
   239 F. Supp. 2d 26 (D.D.C. 2002) ................................. 28

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
   304 F.3d 936 (9th Cir. 2002) ........................................ 11

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Lahoti v. Vericheck, Inc.*,
586 F.3d 1190 (9th Cir. 2009) .......................................................................................... passim

4

*Lahoti v. Vericheck, Inc.*,
708 F. Supp. 2d 1150 (W.D. Wash. 2010),

5

*aff'd*, 636 F.3d 501 (9th Cir. 2011) ....................................................................................... 31

6

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
194 F.3d 980 (9th Cir. 1999) ........................................................................................... 26, 28

7

8

*Louis Vuitton Malletier and Oakley, Inc. v. Veit*,
211 F. Supp. 2d 567 (E.D. Pa. 2002) .................................................................................... 31

9

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
658 F.3d 936 (9th Cir. 2011) ............................................................................................ 32, 33

10

11

*Matter of Visioneering Const.*,
661 F.2d 119 (9th Cir. 1981) .................................................................................................... 8

12

13

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
647 F.3d 1218 (9th Cir. 2011) ............................................................................................... 4, 7

14

15

*MCI Commc'ns Servs., Inc. v. Hagan*,
641 F.3d 112 (5th Cir. 2011) .................................................................................................. 24

16

*Microsoft Corp. v. Shah*,
No. C10-0653 RSM, 2011 WL 108954 (W.D. Wash. Jan. 12, 2011) .................................. 22

17

18

*Newport News Holdings Corp. v. Virtual City Vision, Inc.*,
650 F.3d 423 (4th Cir. 2011) .................................................................................................. 31

19

20

*Nissan Motor Co. v. Nissan Computer Corp.*,
89 F. Supp. 2d 1154 (C.D. Cal. 2000), *aff'd*,
246 F.3d 675 (9th Cir. 2000) ................................................................................................ 6, 7

21

22

*Panavision Int'l, L.P. v. Toeppen*,
141 F.3d 1316 (9th Cir. 1998) .................................................................................................. 4

23

24

*PepsiCo v. Triunfo-Mex, Inc.*,
189 F.R.D. 431 (C.D. Cal. 1999) ............................................................................................. 9

25

*Petroliam Nasional Berhad v. GoDaddy.com, Inc.*,
No. C 09-5939 PJH, 2012 WL 10532
(N.D. Cal. Jan. 3, 2012) ......................................................................................................... 25

26

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*,
    254 F.R.D. 568 (N.D. Cal. 2008) ......................................................................... 24

*Pinehurst, Inc. v. Wick*,
    256 F. Supp. 2d 424 (M.D.N.C. 2003) ................................................................. 33

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ............................................................................. 11

*Rio Props., Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th Cir. 2002) ............................................................................... 6

*Shields v. Zuccarini*,
    254 F.3d 476 (3d Cir. 2001) ......................................................................... passim

*Solid Host, NL v. Namecheap, Inc.*,
    652 F. Supp. 2d 1092 (C.D. Cal. 2009) ......................................................... 26, 28

*Sprint Nextel Corp. v. Thuc Ngo*,
    No. C-12-02764 CW (EDL), 2012 WL 4127296
    (N.D. Cal. Sept. 18, 2012) ..................................................................................... 9

*TeleVideo Sys., Inc. v. Heidenthal*,
    826 F.2d 915 (9th Cir. 1987) ................................................................................. 9

*Tiffany (NJ), LLC v. Dongping*,
    No. 10-61214-CIV, 2010 WL 4450451
    (S.D. Fla. 2010) ................................................................................................... 29

*Transamerica Corp. v. Moniker Online Services, LLC*,
    672 F. Supp. 2d 1353 (S.D. Fla. 2009) ......................................................... 22, 23

*Transamerica Corp. v. Moniker Online Services, LLC*,
    No. 09-60973-CIV, 2010 WL 1416979 (S.D. Fla. Apr. 7, 2010) ......................... 31

*Verizon California, Inc. v. Above.com*,
    No. CV-11-0973 ABC, 2011 WL 8472379
    (C.D. Cal. July 13, 2011) ............................................................................... 25, 29

*Verizon California Inc. v. Navigation Catalyst Sys., Inc.*,
    568 F. Supp. 2d 1088 (C.D. Cal. 2008) ........................................................ passim

*Verizon California Inc. v. Onlinenic, Inc.*,
    No. C 08-2832 ............................................................................................... 30, 31

**TABLE OF AUTHORITIES**
(continued)

Page

*Verizon California Inc. v. Onlinenic, Inc.,*
  No. C 08-2832 JF (RS), 2009 WL 2706393
  (N.D. Cal. Aug. 25, 2009) ............................................................... 30, 31

*Walters v. Shaw/Guehnemann Corp.,*
  No. C 03-04058 WHA, 2004 WL 1465721
  (N.D. Cal. Apr. 15, 2004) ............................................................... 10, 11

*Weather Underground, Inc. v. Navigation Catalyst Systems, Inc.,*
  688 F. Supp. 2d 693 (E.D. Mich. 2009)................................................. 6

*Wecosign, Inc. v. IFG Holdings, Inc.,*
  845 F. Supp. 2d 1072 (C.D. Cal. 2012) ....................................... passim

*World-Wide Volkswagen Corp. v. Woodson,*
  444 U.S. 286 (1980)..................................................................... 7, 8

*Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
  433 F.3d 1199 (9th Cir. 2006)........................................................... 5

*Zenger-Miller, Inc. v. Training Team, GmbH,*
  757 F. Supp. 1062 (N.D. Cal. 1991) ................................................. 8

STATUTES

15 U.S.C. § 1116 ............................................................................ 33

15 U.S.C. § 1117(c) ........................................................................ 32

15 U.S.C. § 1117(d) .............................................................. 29, 30, 32

15 U.S.C. § 1125.................................................................... passim

Civ. L. R. 3-2(c) ............................................................................ 8

OTHER AUTHORITIES

Fed. R. Civ. P. 55(a).................................................................. 9, 10

Fed. R. Civ. P. 55(b) .................................................................. 9, 11

Federal Rule of Evidence 408 ........................................................ 24

Ian C. Ballon, *E-Commerce and Internet Law* (2011-2012 update)........................................... 33

S. REP. NO. 106-140 ...................................................................... 31

# I.    INTRODUCTION

Defendants are typosquatters—that is, cybersquatters who use domain names that are confusingly similar to others' trademarks to divert Internet users to defendants' own websites. Defendants "monetize" diverted traffic by tricking visitors into divulging personal information, viewing advertisements, or purchasing products or services from defendants' websites.

Default has been entered against the following 12 defendants (collectively, the "Default Defendants"): (1) Counter Balance Enterprises Ltd.; (2) Intercontinental Domain, Inc.; (3) Mackrooner Ltd., Inc.; (4) Newgate Services Ltd., Inc. (also known as SMTM Enterprises Ltd.); (5) Pioneer Enterprises Ltd.; (6) YourTick; (7) Paul Baker; (8) Reggie Bush; (9) Karrie-Lee Karreman; (10) Michael Navarini (doing business as Banana Ads LLC); (11) Michael Suggs (doing business as Michael Timothy Suggs, Timothy Suggs, FB Promotions/Freebie Promos, and Rabbit GoGo Media LLC); and (12) Cleanser Products. Facebook now seeks default judgment against the Default Defendants under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

# II.    FACTS

## A.    Facebook's Services

Facebook is a free online network that helps people connect and share with their friends, family, and the world around them. Facebook develops and provides online networking services that facilitate the sharing of information through the "social graph"—the digital mapping of people's real-world social connections. *See* First Amended Complaint ("FAC") ¶ 25 (Dkt. 36). Facebook is headquartered in California and has more than 1 billion active monthly users, millions of which reside in California. *See* Declaration of Ryan Spear ("Spear Decl.") ¶ 6.

## B.    Facebook's Marks

Facebook is the owner of the entire right, title, and interest in and to a number of trademarks and service marks, including the following representative marks, applications, and registrations (collectively, "Facebook's marks"), for which Facebook owns federal applications or registrations covering a wide variety of goods and services:

MOTION FOR DEFAULT JUDGMENT
Case No. 4:11-cv-03619-YGR (LB) (KW)

1      **1.**    **FACEBOOK**

2

      Registrations: Reg. No. 3801147, 3881770

3      Pending Application: Serial Number 85147898

4

5      **2.** 

6      Registrations: Reg. No. 4102824, 4102823, 4129126

7

8      **3.** 

9      Registrations: Reg. No. 3934743

10

11      **4.**

12      Pending Applications: Serial Numbers 85020073, 85020071, 85020068,
      85020066, 85020064, 85020062, 85020058

13

14 *See* FAC ¶¶ 29-30. Facebook has used its marks in interstate commerce in the United States in

15 connection with its online networking services since 2004. *See id*. ¶ 31. Facebook's marks are

16 highly distinctive with regard to a wide variety of services, including online networking services

17 and advertising services. *See id.* ¶¶ 32, 122. Facebook's marks are also famous within the

meaning of 15 U.S.C. § 1125(c). *See id.* ¶ 33.

18

19 **C.**    **Default Defendants' Schemes**

20      Each Default Defendant registered at least one Internet domain name that includes or

21 misspells the FACEBOOK mark (hereinafter "infringing domain names") or—in the case of

22 Cleanser Products—owned and operated websites to which Internet users were redirected when

23 they visited infringing domain names (hereinafter "landing websites"). *See* FAC, Ex. A ¶¶ 2-4,

24 6-9, 12, 16, 18, 21, 30, 43 (domain names attributable to Default Defendants); *see also* Spear

25 Decl. ¶ 11 & Ex. A.  The owners of the infringing domain names and Cleanser Products worked

26 hand-in-hand to divert Internet users from Facebook's website to deceptive landing websites

27 owned by Cleanser Products. *See* FAC ¶¶ 15-16, 70-113, 120-136. For example, Default

28 Defendant Suggs registered and used the domain name <faccebookk.com>. *See id.*, Ex. A ¶ 43.

1 When users seeking Facebook's website accidentally typed http://www.faccebookk.com.com

2 into their browsers (or clicked on a link to that Internet address), they were automatically

3 redirected to this landing website owned by Cleanser Products:



*See* FAC, Ex. A ¶ 2; Spear Decl. ¶ 12 & Ex. B. That landing website, like all of Cleanser

Products' landing websites, copied Facebook's color scheme, font, and clean design elements to

trick visitors into thinking that they had arrived at a website affiliated with or approved by

Facebook.

        After luring unwary Internet users to their landing websites, Default Defendants used

pretextual surveys and dubious offers of prizes or rewards to entice visitors into disclosing

personal information, viewing advertisements, and purchasing products. *See* FAC ¶¶ 15-16, 70-

113, 120-136. The Default Defendants received payment each time users navigated to the

infringing domain names or interacted with the deceptive landing websites. *See, e.g.*, *id.* ¶ 84.

## III.     JURISDICTION

**A.     Subject Matter Jurisdiction**

        This Court has subject matter jurisdiction over this matter because Facebook raises

claims under federal law. *See* FAC ¶ 20; *see also craigslist, Inc. v. Kerbel*, No. C-11-3309

EMC, 2012 WL 3166798, at *3 (N.D. Cal. Aug. 2, 2012) ("In this case, subject matter

jurisdiction is apparent as Plaintiff raises federal statutory claims.").

1

**B.      Personal Jurisdiction**

2

        **1.      This Court has general personal jurisdiction over the Default Defendants who reside in California.**

3

4

        Defendants Reggie Bush and Michael Navarini reside in California. *See* FAC, Ex. A

5

¶ 21 (Bush); FAC ¶ 14 (Navarini); *see also id.* ¶ 13 (Navarini's company and alter ego Banana

6

Ads LLC has its principal place of business in California). Thus, Bush and Navarini are subject

7

to this Court's general personal jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v.*

8

*Brown*, 131 S. Ct. 2846, 2853-54 (2011) ("For an individual, the paradigm forum for the

9

exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent

10

place, one in which the corporation is fairly regarded as at home.").

11

        **2.      This Court has specific personal jurisdiction over the remaining Default Defendants.**

12

                **a.      Nonresident Default Defendants are subject to specific personal jurisdiction under California's long-arm statute.**

13

14

        California's long-arm statute authorizes specific personal jurisdiction over nonresident

15

defendants to the full extent permitted by the Due Process Clause of the United States

16

Constitution. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Thus,

17

this Court may assert specific personal jurisdiction over nonresident defendants if three

18

requirements are met:

19

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

20

21

22

23

*Id.* (quotation marks and citation omitted). Facebook bears the burden of satisfying the first two

24

requirements; the burden then shifts to the Default Defendants to present a "compelling case"

25

that the exercise of jurisdiction would be unreasonable. *Mavrix Photo, Inc. v. Brand Techs.,*

26

*Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citations omitted).

27

28

1

### (i)    Purposeful direction

2      The first requirement encompasses two distinct concepts: purposeful availment and

3   purposeful direction. *See Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,

4   433 F.3d 1199, 1206 (9th Cir. 2006). Tort claims and tort-like claims—including ACPA

5   claims—are analyzed under the purposeful direction concept. *See Kerbel*, 2012 WL 3166798, at

6   *4. "In analyzing purposeful direction, the Court applies the 'effects' test first established by the

7   Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1983)." *Id.* Jurisdiction is proper under the

8   effects test if the defendant "(1) committed an intentional act, which was (2) expressly aimed at

9   the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant

10  knows is likely to be suffered in the forum state." *Id.* (citing *Bancroft & Masters, Inc. v.

11  Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). All three requirements are met here.

12      ***First***, all of the nonresident Default Defendants committed intentional acts: they

13  purposely registered infringing domain names *and/or* purposely operated deceptive websites to

14  which users were directed when they visited those infringing domain names. *See* FAC, Ex. A

15  ¶¶ 2-4, 6-9, 12, 16, 18, 21, 30, 43 (domain names owned by Default Defendants); *see also* Spear

16  Decl. ¶ 11 & Ex. A.

17      ***Second***, the nonresident Default Defendants expressly aimed their conduct at this forum.

18  Express aiming exists where "the defendant is alleged to have engaged in wrongful conduct

19  targeted at a plaintiff whom the defendant knows to be a resident of the forum state."

20  *CollegeSource, Inc. v. Academyone, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011) (internal

21  quotation marks and citations omitted). Here, the Default Defendants targeted Facebook, a

22  company they knew to be located in California, by registering infringing domain names and

23  using them to divert Internet users from Facebook's website. *See* FAC ¶¶ 15-16, 23, 61-113,

24  120-36. The Default Defendants then monetized their schemes with interactive, commercial

25  landing websites designed to look like Facebook's website. *See id.* They also configured their

26  landing websites so that, when they were viewed in California, they displayed text specifically

27  targeting California users. *See* Spear Decl. ¶ 13 & Ex. C (deceptive landing website stating

28

1    "California Users: Select visitors from the **San Francisco** area are invited to complete this 10

2    second questionnaire and to say 'thank you,' we'll offer you a few exclusive prizes.").

3         In sum, the Default Defendants made money by hijacking Facebook users, including

4    users in California, and capitalizing on their confusion—confusion bred by defendants' misuse

5    of Facebook's marks. Thus, the Default Defendants aimed their conduct at Facebook and this

6    forum. *See, e.g.*, *CollegeSource*, 653 F.3d at 1077 ("[W]e have held that the 'expressly aimed'

7    prong of the purposeful direction test can be met where a plaintiff alleges that the defendant

8    individually targeted him by misusing his intellectual property on the defendant's website for

9    the purpose of competing with the plaintiff in the forum.") (citation omitted); *Rio Props., Inc. v.*

10   *Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) ("[O]perating even a passive website in

11   conjunction with 'something more'—conduct directly targeting the forum—is sufficient to

12   confer personal jurisdiction."); *eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL 2367805,

13   at *7 (N.D. Cal. June 21, 2012) (express aiming found where defendant used an infringing

14   domain name to "confus[e] consumers as to the origin of Defendant's services"); *Nissan Motor*

15   *Co., Ltd. v. Nissan Computer Corp.*, 89 F. Supp. 2d 1154, 1160 (C.D. Cal. 2000) (the

16   "intentional exploitation of consumer confusion [caused by an infringing domain name] supplies

17   the 'something more' indicating that the defendant deliberately and substantially directed its

18   activity toward the forum state"), *aff'd*, 246 F.3d 675 (9th Cir. 2000); *Weather Underground,*

19   *Inc. v. Navigation Catalyst Systems, Inc.*, 688 F. Supp. 2d 693, 700 (E.D. Mich. 2009) (express

20   aiming found where defendant used "various misspellings of Plaintiff's trademarked Web site

21   addresses" to generate "profits . . . from advertisers and Internet users").

22        ***Third***, the nonresident Default Defendants knew they would cause harm in California

23   because their schemes depended on diverting users from Facebook, a company they knew to be

24   located in California. *See* FAC ¶ 23; *see also craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp.

25   2d 1039, 1053 (N.D. Cal. 2010) ("Because Plaintiff is headquartered in California and maintains

26   its website in California, Defendants' actions directly targeted California, and Defendants knew

27   that Plaintiff would suffer the brunt of its harm in California.").

28

1

### (ii)     Arising from forum-related activities

2          This element is established if Facebook would not have been injured "but for" the

3    nonresident Default Defendants' forum-related activities. *See Ballard v. Savage*, 65 F.3d 1495,

4    1500 (9th Cir. 1995). As explained above, the nonresident Default Defendants' expressly

5    targeted Facebook and California residents, and Facebook suffered injury from those schemes in

6    this forum. *See CollegeSource*, 653 F.3d at 1079 ("We have repeatedly held that a corporation

7    incurs economic loss, for jurisdictional purposes, in the forum of its principal place of

8    business."); *Nissan*, 89 F. Supp. 2d at 1160 ("[T]he defendant's intentional exploitation of the

9    plaintiffs' goodwill and diversion of the plaintiffs' potential customers [via the Internet] had the

10   effect of injuring [plaintiffs] in California. But for the [defendant's] conduct, this injury would

11   not have occurred.").

12

### (iii)    Reasonableness

13         Because Facebook has established the first two requirements for exercising specific

14   personal jurisdiction, the nonresident Default Defendants must present a "compelling case" that

15   asserting jurisdiction would be unreasonable. *Mavrix*, 647 F.3d at 1228 (citations omitted). The

16   nonresident Default Defendants waived their opportunity to make that showing by ignoring this

17   lawsuit. *See Kerbel*, 2012 WL 3166798, at *6. In any event, there is nothing unreasonable about

18   asserting personal jurisdiction here. The nonresident Default Defendants targeted California

19   residents and Facebook, a company they knew to be located in California, with elaborate

20   typosquatting schemes. *See* FAC ¶¶ 15-16, 23, 61-113, 120-36. Thus, they had "fair warning"

21   that they might be sued in California. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472

22   (1985) (internal quotation marks and citation omitted); *see also World-Wide Volkswagen*

23   *Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (personal jurisdiction in a remote forum is

24   reasonable if the defendant "should reasonably anticipate being haled into court there").

25

### b.      Nonresident Default Defendants are subject to specific personal jurisdiction because they agreed to Facebook's forum-selection clause.

26

27         In addition or alternatively, this Court may assert specific personal jurisdiction over the

28

nonresident Default Defendants because they consented to the personal jurisdiction of California's courts when registering their free Facebook accounts.

Defendants may consent to personal jurisdiction by agreeing to a forum-selection clause. *See Kerbel*, 2012 WL 3166798, at *6 (agreement to craigslist's forum-selection clause conferred personal jurisdiction). The Court "need not embark on a 'minimum contacts' analysis where the defendants have consented to California jurisdiction." *Zenger-Miller, Inc. v. Training Team, GmbH*, 757 F. Supp. 1062, 1069 (N.D. Cal. 1991).

During the registration process, all Facebook users must agree to Facebook's terms of service (also known as Facebook's Statement of Rights and Responsibilities, or "Statement") as a condition of using Facebook. *See* FAC ¶¶ 35, 181. The Statement includes the following forum-selection clause:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. . . . You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

*See* FAC, Ex. C. Facebook's forum-selection clause is binding and enforceable. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 841 (S.D.N.Y. 2012) (so holding).[1]

Facebook alleges that "each Defendant, or agents for each Defendant, agreed to the personal jurisdiction of the state and federal courts located in Santa Clara County, California, by agreeing to the forum-selection clause in Facebook's terms of service." FAC ¶ 22. On default, defendants "are considered to have admitted all of the well pleaded allegations in the complaint, including jurisdiction." *G & G Closed-Circuit Events, LLC v. Potopsky*, No. 1:11 CV 00140, 2012 WL 11130, at *1 (N.D. Ohio Jan. 3, 2012); *see also Matter of Visioneering Const.*, 661

---

[1] Facebook acknowledges that this Court is located in Alameda County. But for two reasons, this Court may still assert personal jurisdiction based on Facebook's forum-selection clause. First, Facebook filed this action in Santa Clara County, *see* Dkt. 1, but it was then transferred to Alameda County under the Northern District of California's case-assignment rules, *see* L.R. 3-2(c); General Order No. 44(D)(3). Second, the nonresident Default Defendants consented to the personal jurisdiction of the courts in Santa Clara County, and this Court may assert personal jurisdiction over defendants in Santa Clara County. Thus, the nonresident Default Defendants "should [have] reasonably anticipate[d] being haled into court" in Alameda County. *World-Wide Volkswagen*, 444 U.S. at 297.

1   F.2d 119, 124 (9th Cir. 1981) ("Well pleaded allegations of the petition, including jurisdictional

2   averments, are taken as admitted on a default judgment."). Thus, Facebook's forum-selection

3   clause is an alternative basis for personal jurisdiction over the nonresident Default Defendants.

4   *See Kerbel*, 2012 WL 3166798, at *7.

5                           **IV.    LEGAL STANDARD FOR DEFAULT JUDGMENT**

6              After entry of default under Federal Rule of Civil Procedure 55(a), a federal district

7   court may enter a default judgment under Rule 55(b). "The general rule of law is that upon

8   default the factual allegations of the complaint, except those relating to the amount of damages,

9   will be taken as true." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)

10  (internal quotation marks and citation omitted). Because allegations pertaining to damages are

11  not assumed to be true, plaintiffs must provide "an evidentiary basis" for the damages requested.

12  *Sprint Nextel Corp. v. Thuc Ngo*, No. C-12-02764 CW (EDL), 2012 WL 4127296, at *3 (N.D.

13  Cal. Sept. 18, 2012). That burden is "relatively lenient." *Elektra Entm't Group, Inc. v. Bryant*,

14  No. CV 03-6381GAF (JTLX), 2004 WL 783123, at *2 (C.D. Cal. Feb. 13, 2004).

15             The "decision whether to enter a default judgment is a discretionary one." *Aldabe v.*

16  *Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In exercising that discretion, the Court must

17  consider several factors, including: (1) the possibility of prejudice to Facebook; (2) the merits of

18  Facebook's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at

19  stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the

20  defendants' default was due to excusable neglect; and (7) the strong policy favoring decisions

21  on the merits. *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Procedurally proper

22  motions for default judgment "are more often granted than denied." *PepsiCo v. Triunfo-Mex,*

23  *Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999).

24                    **V.    FACEBOOK IS ENTITLED TO DEFAULT JUDGMENT AGAINST**
                              **EACH OF THE DEFAULT DEFENDANTS**
25

26  **A.     Facebook's Motion Is Procedurally Proper and All of the Discretionary Factors**
            **Favor Default Judgment**
27

28             As an initial matter, Facebook has satisfied all of the procedural prerequisites for default

judgment. Each Default Defendant was properly served (or waived formal service) but failed to respond in a timely manner. *See* Waiver of Svc. for Paul Baker (Dkt. 56); Cert. of Svc. for Michael Navarini (Dkt. 74); Cert. of Svc. for Banana Ads LLC (Dkt. 75); Mot. for Entry of Default as to Defendant Michael Suggs (Dkt. 85); Decl. of Service by Alternative Means (Dkt. 88). Facebook therefore sought and obtained entry of default against the Default Defendants under Federal Rule of Civil Procedure 55(a). *See* Dkt. 87 (Suggs); Dkt. 122 (Cleanser Products, Counter Balance Enterprises Ltd., Mackrooner Ltd., Newgate Services Ltd., Inc/SMTM Enterprises Ltd., Pioneer Enterprises Ltd., YourTick, Karrie-Lee Karreman, Intercontinental Domain, Inc., and Reggie Bush); Dkt. 135 (Paul Baker, Michael Navarini, and Banana Ads LLC). Facebook also attempted to provide notice of the hearing on this motion to all of the Default Defendants. *See* Spear Decl. ¶ 14 & Ex. D.

In addition, all of the discretionary factors favor default judgment. *See Eitel*, 782 F.2d at 1471-72. First, Facebook would suffer severe prejudice if its motion was denied and it was left without a remedy for Default Defendants' unlawful acts. *See, e.g.*, *Walters v. Shaw/Guehnemann Corp.*, No. C 03-04058 WHA, 2004 WL 1465721, at *2 (N.D. Cal. Apr. 15, 2004) ("To deny plaintiffs' [default] motion would leave them without a remedy.").

Second, Facebook's ACPA claims plainly have merit. *See, e.g.*, *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (ACPA is violated when "a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder") (internal quotation marks and citation omitted).

Third, as explained below, Facebook's First Amended Complaint adequately alleges ACPA claims against each of the Default Defendants. Indeed, this Court has already held that Facebook's ACPA claims are well pled. *See* Dkt. 64.

Fourth, the sum of money at stake is neither unjustified nor unprecedented. Facebook seeks maximum statutory damages against each of the Default Defendants. Courts routinely grant such requests where, as here, defendants' conduct is willful and deceptive. *See, e.g.*,

1    *eAdGear*, 2012 WL 2367805, at *19 ("Defendant's willfulness and deception justify statutory

2    damages in the maximum amount of $100,000.").

3         Fifth, because the Default Defendants have not responded, "there is little to suggest that

4    there is a possibility of a dispute concerning material facts[.]" *Kerbel*, 2012 WL 3166798, at *8.

5         Sixth, Default Defendants' failure to respond cannot be chalked up to excusable neglect.

6    All of the Default Defendants were properly served, and many have corresponded with

7    Facebook. *See* Spear Decl. ¶ 15. Nevertheless, Default Defendants chose to ignore this case. *See*

8    *Walters*, 2004 WL 1465721, at *4 ("Defendants have refused to litigate this action after being

9    properly served with the summons, complaint, and notice of default. It is unlikely that the

10   default was the result of excusable neglect.").

11        Seventh, the general policy favoring decisions on the merits does not prevent default

12   judgment where, as here, defendants simply refuse to litigate. *See id.* ("Although federal policy

13   may favor decisions on the merits, Federal Rule of Civil Procedure 55(b) permits entry of

14   default judgment in situations such as this where defendants refuse to litigate.").

15   **B.    Facebook Has Properly Pled Claims for Direct Liability Against 11 of the
          Default Defendants**

16

17        A defendant is directly liable under ACPA if he (1) registers, traffics in, or uses a

18   domain name that is (2) identical or confusingly similar to a famous or distinctive mark owned

19   by the plaintiff with (3) a bad-faith intent to profit from the mark. *See, e.g.*, *DSPT Int'l, Inc. v.*

20   *Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010). In determining bad faith, courts evaluate the

21   unique circumstances of the case; survey the nine bad-faith factors set forth in ACPA; and

22   consider the availability of ACPA's statutory safe-harbor defense, which protects any defendant

23   who "'believed and had reasonable grounds to believe that the use of the domain name was a

24   fair use or otherwise lawful.'" *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1220

25   (9th Cir. 2012) (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)). The unique circumstances of the case

26   are "'the most important grounds for finding bad faith.'" *Lahoti v. Vericheck, Inc.*, 586 F.3d

27   1190, 1202 (9th Cir. 2009) (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936,

28   946 (9th Cir. 2002)).

Under those principles, Facebook has properly pled claims for direct liability against the following 11 Default Defendants.

### 1.   Counter Balance Enterprises Ltd. ("Counter Balance")

#### a.   Registers, traffics in, or uses

Counter Balance registered and used at least the following two domain names: <facebk.com> and <facemook.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 3; *see also* Spear Decl. ¶ 11 & Ex. A.

#### b.   Confusingly similar

Counter Balance's domain names are confusingly similar to Facebook's famous and distinctive FACEBOOK mark. Under ACPA, the confusingly similar analysis is "narrower than the traditional multifactor likelihood of confusion test for trademark infringement." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004). The only relevant question is "whether the domain names which [the defendant] registered . . . are identical or confusingly similar to a plaintiff's mark." *Id.* Domain names may be confusingly similar to a protected mark if they incorporate the mark or if they add, delete, or rearrange letters in the mark. *See Shields v. Zuccarini*, 254 F.3d 476, 483 (3d Cir. 2001). Domain names may also be confusingly similar if they simply add "generic terms . . . [or] a top level domain suffix" to the plaintiff's mark. *See Purdy*, 382 F.3d at 784.

Here, each of Counter Balance's domain names differs from the FACEBOOK mark by a single letter. Counter Balance's domain names are therefore confusingly similar under ACPA. *See, e.g.*, *Shields*, 254 F.3d at 484.

#### c.   Bad faith

Counter Balance acted with a bad-faith intent to profit from the FACEBOOK mark.  *See* FAC ¶¶ 74, 126. Counter Balance registered and used infringing domain names to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 3. Those unique circumstances demonstrate Counter Balance's bad faith. *See, e.g.*, *Citigroup Inc. v. Malik*, No. 1:07cv1168, 2009 WL 874497, at *3 (E.D. Va. Mar. 24, 2009) (bad

1  faith found where "defaulting defendants' use of plaintiffs' Marks evidence[d] an attempt to

2  confuse plaintiffs' customers and divert consumers looking for information about plaintiffs'

3  services to web pages represented by the Infringing Domain Names"); *Verizon California Inc. v.*

4  *Navigation Catalyst Sys., Inc.*, 568 F. Supp. 2d 1088, 1096 (C.D. Cal. 2008) ("It is clear that

5  [defendants'] intent was to profit from the poor typing abilities of consumers trying to reach

6  Plaintiffs' sites: what other value could there be in a name like ve3rizon.com?"); *Elec. Boutique*

7  *Holdings Corp. v. Zuccarini*, No. Civ. A. 00-4055, 2000 WL 1622760, at *5, *8 (E.D. Pa. Oct.

8  30, 2000) ("[Defendant's] bad-faith intent to profit from the domain misspellings is abundantly

9  clear. [Defendant] registered the domain misspellings in order to generate advertising revenue

10  for himself, despite being aware of [plaintiff's] stores and website.").

11       The bad-faith factors set forth in ACPA also weigh against Counter Balance. For

12  example, Counter Balance purposely "divert[ed] consumers from [Facebook's] online location

13  to a site . . . that could harm the goodwill represented by the [FACEBOOK] mark . . . for

14  commercial gain." 15 U.S.C. § 1125(d)(1)(B)(i)(V); FAC ¶ 128. Moreover:

15 / 16     • Counter Balance's infringing domain names do not consist of Counter Balance's legal name, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(II);

17 / 18     • Counter Balance did not use its infringing domain names "in connection with the bona fide offering of any goods or services," *id*. § 1125(d)(1)(B)(i)(III); *see* Spear Decl. ¶¶ 7-10;

19 / 20     • Counter Balance did not make a "bona fide noncommercial or fair use of [Facebook's] mark in a site accessible under" its infringing domain names," 15 U.S.C. § 1125(d)(1)(B)(i)(IV); *see* Spear Decl. ¶¶ 7-10;

21 / 22     • Counter Balance provided false and misleading contact information when registering its domain names, failed to maintain accurate contact information, and engaged in a pattern of such conduct, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(VII); FAC ¶ 131;

23 / 24     • Counter Balance registered or acquired multiple domain names that infringed others' famous and distinctive marks, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII); FAC ¶ 132; and

25     • The FACEBOOK mark is exceedingly distinctive and famous, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(IX); FAC ¶¶ 25-34, 122.

26       Finally, Counter Balance cannot invoke ACPA's safe harbor. The safe harbor protects

27  "parody and comment, and use by persons ignorant of another's superior right to the mark."

28  *Nahum*, 624 F.3d at 1220. It is invoked "very sparingly and only in the most unusual cases."

*Lahoti*, 586 F.3d at 1203 (internal quotation marks and citation omitted). Counter Balance did not engage in parody or comment, and it infringed Facebook's mark willfully, not inadvertently. *See* FAC ¶¶ 70-77. The safe harbor is inapplicable.

In sum, Facebook has properly alleged that Counter Balance (1) registered and used at least two domain names that are (2) identical or confusingly similar to Facebook's famous and distinctive FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to judgment against Counter Balance. *See, e.g.*, *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1080 (C.D. Cal. 2012) (default judgment warranted where ACPA claims were adequately alleged).

### 2.      Intercontinental Domain Inc. ("Intercontinental")

#### a.      Registers, traffics in, or uses

Intercontinental registered and used at least the following 10 domain names: <eacebook.com>, <faceboko.com>, <facebooj.com>, <facvebook.com>, <fadebook.com>, <faxebook.com>, <fqacebook.com>, <fqcebook.com>, <lfacebook.com>,  and <rfacebook.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 6; *see also* Spear Decl. ¶ 11 & Ex. A.

#### b.      Confusingly similar

Intercontinental's domain names are confusingly similar to Facebook's famous and distinctive FACEBOOK mark because each domain name differs from the FACEBOOK mark by a single letter. *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

#### c.      Bad faith

Intercontinental acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74, 126. Intercontinental registered and used infringing domain names to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 6. Those unique circumstances demonstrate Intercontinental's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Intercontinental for the same reasons they weigh against Counter Balance. *See supra* at

13; Spear Decl. ¶¶ 7-10. Finally, Intercontinental cannot invoke ACPA's safe harbor because Intercontinental used the FACEBOOK mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

In sum, Facebook has properly alleged that Intercontinental (1) registered and used at least 10 domain names that are (2) identical or confusingly similar to Facebook's famous and distinctive FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to judgment against Intercontinental. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

### 3.   Mackrooner Ltd., Inc. ("Mackrooner")

#### a.   Registers, traffics in, or uses

Mackrooner registered and used at least the following domain name: <ffacebook.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 7; *see also* Spear Decl. ¶ 11 & Ex. A.

#### b.   Confusingly similar

Mackrooner's domain name is confusingly similar to Facebook's famous and distinctive FACEBOOK mark because it differs from the FACEBOOK mark by a single letter. *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

#### c.   Bad faith

Mackrooner acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74, 126. Mackrooner registered and used an infringing domain name to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 7. Those unique circumstances demonstrate Mackrooner's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Mackrooner for the same reasons they weigh against Counter Balance. *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, Mackrooner cannot invoke ACPA's safe harbor because Mackrooner used the FACEBOOK mark to deceive users and profit from Facebook's fame— not to engage in parody, comment, or another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

1    In sum, Facebook has properly alleged that Mackrooner (1) registered and used at least

2    one domain name that is (2) identical or confusingly similar to Facebook's famous and

3    distinctive FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is

4    entitled to judgment against Mackrooner. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

5    **4.     Newgate Services Ltd., Inc. (also known as SMTM Enterprises Ltd.) ("Newgate")**

6

7    **a.     Registers, traffics in, or uses**

8    Newgate registered and used at least the following 47 domain names: <faasbook.com>,

9    <faboock.com>, <facbnook.com>, <faceboobok.com>, <facbookl.com>, <facboox.com>,

10   <faccebuk.com>, <faceabok.com>, <facebboc.com>, <facebnbook.com>, <facebocke.com>,

11   <facebof.com>, <facebokbook.com>, <faceboobok.com>, <facebookck.com>,

12   <facebookforteens.com>, <facebookloging.com>, <facebookloin.com>, <facebooknew.com>,

13   <facebooktrucos.com>, <facebookwelcome.com>, <faceboooik.com>, <facebooks.com>,

14   <faceebot.com>, <facesbooc.com>, <facewebook.com>, <faeccbook.com>, <faesebook.com>,

15   <faicbooc.com>, <fasceboo.com>, <faseboox.com>, <faycbok.com>, <fcaebbok.com>,

16   <fcfacebook.com>, <feacboo.com>, <feacbooke.com>, <fecbbok.com>, <feook.com>,

17   <ferabook.com>, <fescebook.com>, <ficeboock.com>, <thefacebookl.com>, <www-

18   facbook.com>, <wwwfacebppk.com>, <wwwfcaebook.com>, <wwwfeibook.com>, and

19   <wwwrfacebook.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 8; *see also* Spear Decl.

20   ¶ 11 & Ex. A.

21   **b.     Confusingly similar**

22   Newgate's domain names are confusingly similar to Facebook's famous and distinctive

23   FACEBOOK mark because they either incorporate the FACEBOOK mark or differ from the

24   FACEBOOK mark by one or a few letters. *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

25   **c.     Bad faith**

26   Newgate acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC

27   ¶¶ 74, 126. Newgate registered and used infringing domain names to divert traffic from

28   Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*,

Ex. A ¶ 8. Notably, Newgate's misconduct was extensive and deliberate—it registered and used nearly 50 infringing domain names. Those unique circumstances demonstrate Newgate's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Newgate for the same reasons they weigh against Counter Balance. *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, Newgate cannot invoke ACPA's safe harbor because Newgate used the FACEBOOK mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

In sum, Facebook has properly alleged that Newgate (1) registered and used at least 47 domain names that are (2) identical or confusingly similar to Facebook's famous and distinctive FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to judgment against Newgate. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

### 5.    Pioneer Enterprises Ltd. ("Pioneer")

#### a.    Registers, traffics in, or uses

Pioneer registered and used at least the following nine domain names: <dacebook.com>, <facebokook.com>, <faceboocklogin.com>, <faacebok.com>, <facebookfreezer.com>, <facebooll.com>, <facegbook.com>, <gfacebook.com>, and <zh-facebook.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 9; *see also* Spear Decl. ¶ 11 & Ex. A.

#### a.    Confusingly similar

Pioneer's domain names are confusingly similar to Facebook's famous and distinctive FACEBOOK mark because they differ from the FACEBOOK mark by one or a few letters. *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

#### b.    Bad faith

Pioneer acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74, 126. Pioneer registered and used infringing domain names to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 9. Those unique circumstances demonstrate Pioneer's bad faith. *See, e.g.*, *Navigation*

*Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Pioneer for the same reasons they weigh against Counter Balance. *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, Pioneer cannot invoke ACPA's safe harbor because Pioneer used the FACEBOOK mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

In sum, Facebook has properly alleged that Pioneer (1) registered and used at least nine domain names that are (2) identical or confusingly similar to Facebook's famous and distinctive FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to judgment against Pioneer. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

**6.** **YourTick**

**a.** **Registers, traffics in, or uses**

YourTick registered and used at least the following domain name: <wwwfacebookde.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 16; *see also* Spear Decl. ¶ 11 & Ex. A.

**b.** **Confusingly similar**

YourTick's domain name is confusingly similar to Facebook's famous and distinctive FACEBOOK mark because it simply adds a few letters to the FACEBOOK mark. *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

**c.** **Bad faith**

YourTick acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74, 126. YourTick registered and used an infringing domain name to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 16. Those unique circumstances demonstrate YourTick's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against YourTick for the same reasons they weigh against Counter Balance. *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, YourTick cannot invoke ACPA's safe harbor because YourTick used the

FACEBOOK mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

In sum, Facebook has properly alleged that YourTick (1) registered and used at least one domain name that is (2) identical or confusingly similar to Facebook's famous and distinctive FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to judgment against YourTick. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

### 7.     Paul Baker ("Baker")

#### a.     Registers, traffics in, or uses

Baker registered and used at least the following domain name: <facebokcasino.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 18; *see also* Spear Decl. ¶ 11 & Ex. A.

#### b.     Confusingly similar

Baker's domain name is confusingly similar to Facebook's famous and distinctive FACEBOOK mark because it incorporates the FACEBOOK mark (with the deletion of a single letter) and adds a generic term ("casino"). *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

#### c.     Bad faith

Baker acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74, 126. Baker registered and used an infringing domain name to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 18. Those unique circumstances demonstrate Baker's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Baker for the same reasons they weigh against Counter Balance (except that Baker, unlike Counter Balance, did not provide false registration information). *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, Baker cannot invoke ACPA's safe harbor because Baker used the FACEBOOK mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

In sum, Facebook has properly alleged that Baker (1) registered and used at least one domain name that is (2) identical or confusingly similar to Facebook's famous and distinctive

1   FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to

2   judgment against Baker. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

3           **8.      Reggie Bush ("Bush")**

4                   **a.      Registers, traffics in, or uses**

5           Bush registered and used at least the following three domain names: <facebik.com>,

6   <facebolk.com>, and <facebopk.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 21.

7                   **b.      Confusingly similar**

8           Bush's domain names are confusingly similar to Facebook's famous and distinctive

9   FACEBOOK mark because each differs from the FACEBOOK mark by a single letter. *See*

10  *Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483; *see also* Spear Decl. ¶ 11 & Ex. A.

11                  **c.      Bad faith**

12          Bush acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74,

13  126. Bush registered and used infringing domain names to divert traffic from Facebook's

14  website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 21.

15  Those unique circumstances demonstrate Bush's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F.

16  Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Bush for the same

17  reasons they weigh against Counter Balance. *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, Bush

18  cannot invoke ACPA's safe harbor because Bush used the FACEBOOK mark to deceive users

19  and profit from Facebook's fame—not to engage in parody, comment, or another lawful use.

20  *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

21          In sum, Facebook has properly alleged that Bush (1) registered and used at least three

22  domain names that are (2) identical or confusingly similar to Facebook's famous and distinctive

23  FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to

24  judgment against Bush. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

25

26

27

28

1    **9.    Karrie-Lee Karreman ("Karreman")**

2         **a.    Registers, traffics in, or uses**

3    Karreman registered and used at least the following domain name:

4    <yourfacebooksurvey.com>. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 30; *see also* Spear

5    Decl. ¶ 11 & Ex. A.

6         **b.    Confusingly similar**

7    Karreman's domain name is confusingly similar to Facebook's famous and distinctive

8    FACEBOOK mark because it incorporates the FACEBOOK mark and adds generic terms

9    ("your" and "survey"). *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

10        **a.    Bad faith**

11   Karreman acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC

12   ¶¶ 74, 126. Karreman registered and used an infringing domain name to divert traffic from

13   Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*,

14   Ex. A ¶ 18. Furthermore, Karreman is a serial cybersquatter who has been sued by other mark

15   owners for virtually identical conduct. *See* Spear Decl. ¶ 16 & Ex. E. Those unique

16   circumstances demonstrate Karreman's bad faith. *See, e.g.*, *Lahoti*, 586 F.3d at 1194 n.2

17   ("However, we would be remiss if we did not note Lahoti's cybersquatting activities, because

18   they are relevant under the ACPA to whether a person acted in bad faith."); *Navigation Catalyst*,

19   568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Karreman for

20   the same reasons they weigh against Counter Balance. *See supra* at 13; Spear Decl. ¶¶ 7-10.

21   Finally, Karreman cannot invoke ACPA's safe harbor because Karreman used the FACEBOOK

22   mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or

23   another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

24        In sum, Facebook has properly alleged that Karreman (1) registered and used at least one

25   domain name that is (2) identical or confusingly similar to Facebook's famous and distinctive

26   FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to

27   judgment against Karreman. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

28

**10.    Michael Navarini (doing business as Banana Ads LLC) ("Navarini")[2]**

**a.    Registers, traffics in, or uses**

Navarini registered and used at least the following domain name:

<wwwfacbook.com>. *See* FAC ¶¶ 15-16, 61-62, 70-113, 120-36; *see also* Spear Decl. ¶ 11 & Ex. A.

**b.    Confusingly similar**

Navarini's domain name is confusingly similar to Facebook's famous and distinctive FACEBOOK mark because it incorporates the FACEBOOK mark (with the deletion of a single letter) and adds a few letters to the mark. *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

**c.    Bad faith**

Navarini acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74, 126. Navarini registered and used an infringing domain name to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 61, 70-113, 120-36. In addition, Navarini aided and abetted untold numbers of infringers by creating and selling landing websites designed to look like famous websites—including Facebook's website—for use in typosquatting schemes. *See* FAC ¶¶ 61-69. Navarini's efforts to teach others how to engage in typosquatting demonstrate his bad faith. *See, e.g.*, *Microsoft Corp. v. Shah*, No. C10-0653 RSM, 2011 WL 108954, at *2 (W.D. Wash. Jan. 12, 2011) (inducing direct infringement demonstrates bad faith). Moreover, the statutory bad-faith factors weigh against Navarini for the same reasons they weigh against Counter Balance (except that Navarini, unlike Counter Balance, did not provide false registration information). *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, Navarini cannot invoke ACPA's safe harbor because Navarini used the FACEBOOK

---

[2] The FAC alleges claims against both Navarini and his company Banana Ads, but this motion refers to them interchangeably because Banana Ads is merely an alter ego of Navarini. *See, e.g.*, *Transamerica Corp. v. Moniker Online Services, LLC*, 672 F. Supp. 2d 1353, 1365-1366 (S.D. Fla. 2009) ("A plaintiff can pursue a trademark infringement claim under a veil-piercing theory, and Plaintiffs can presumably do the same with an ACPA claim[.]") (citation omitted); *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 914-15 (N.D. Ill. 2007) (plaintiff stated a claim under ACPA based on alter-ego theory).

1    mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or

2    another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

3        In sum, Facebook has properly alleged that Navarini (1) registered and used at least one

4    domain name that is (2) identical or confusingly similar to Facebook's famous and distinctive

5    FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to

6    judgment against Navarini. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

7        **11.    Michael Suggs (doing business as Michael Timothy Suggs, Timothy Suggs,**
           **FB Promotions/Freebie Promos, and Rabbit GoGo Media LLC) ("Suggs")**[3]

8

9            **a.    Registers, traffics in, or uses**

10       Suggs registered and used at least the following 31 domain names: <afcbook.com>,

11   <dfacecbook.com>, <facbeok.com>, <faccebookk.com>, <facebooich.com>,

12   <facebooick.com>, <facebooiik.com>, <faceboom.com>, <fecabo.com>, <feceboox.com>,

13   <fsacebok.com>, <facebooik.com>, <facebgook.com>, <faceboak.com>, <faceboop.com>,

14   <facecbook.com>, <fbpromotions.com>, <wwwfacbeok.com>, <wwwfaccbook.com>,

15   <wwwfacceook.com>, <wwwfaceb0ok.com>, <wwwfaceboobs.com>, <wwwfacebooi.com>,

16   <wwwfaceboor.com>, <wwwfacecbook.com>, <wwwfacefook.com>, <wwwfacelook.com>,

17   <wwwfacebkook.com>, <wwwfacebnook.com>, <wwwfacebo0k.com>, and <facetook.com>.

18   *See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶¶ 4, 12, 43; *see also* Spear Decl. ¶ 11 & Ex. A.

19       In addition, in the course of informal discovery preceding settlement negotiations, Suggs

20   informed Facebook that he registered and used the following 100 infringing domain names:

21   <de-defacebook.com>, <facebkkk.com>, <facebpk.com>, <facelbook.com>, <facnbook.com>,

22   <fbacebook.com>, <fcebookk.com>, <fecebool.com>, <fgacebook.com>, <facboolk.com>,

23   <facbvook.com>, <facbeooik.com>, <fecabooik.com>, <fecacbook.com>, <fecacook.com>,

24   <fecavook.com>, <fececbook.com>, <fevabooik.com>, <fevabook.com>, <fevecbook.com>,

25       [3] The FAC alleges claims against Suggs and his companies FB Promotions/Freebie
     Promos and Rabbit GoGo Media LLC, but this motion refers to them interchangeably because
26   FB Promotions/Freebie Promos and Rabbit GoGo Media LLC are merely alter egos of Suggs.
     *See, e.g.*, *Transamerica*, 672 F. Supp. 2d at 1365-1366 ("A plaintiff can pursue a trademark
27   infringement claim under a veil-piercing theory, and Plaintiffs can presumably do the same with
     an ACPA claim[.]") (citation omitted); *Flentye*, 485 F. Supp. 2d at 914-15 (plaintiff stated a
28   claim under ACPA based on alter-ego theory).

1   <facevkook.com>, <facevlook.com>, <facevooik.com>, <facevoolk.com>, <favebgook.com>,

2   <favebo0k.com>, <faveboik.com>, <favebooi.com>, <favebooo.com>, <favegbook.com>,

3   <favegook.com>, <facebookz.com>, <facebxook.com>, <facebyook.com>, <facebzook.com>,

4   <facwebooik.com>, <facebdok.com>, <facebohok.com>, <facebomok.com>,

5   <facebovok.com>, <facegvook.com>, <favbeook.com>, <fazacebook.com>, <fgcebook.com>,

6   <fmcebook.com>, <fnacebook.com>, <fpacebook.com>, <cacevook.com>, <facevoik.com>,

7   <facevooi.com>, <fafevook.com>, <faveb0ok.com>, <faveboko.com>, <favebpok.com>,

8   <favehook.com>, <faveobok.com>, <fvaebook.com>, <fwacebok.com>, <acebooik.com>,

9   <afcecbook.com>, <facebiooik.com>, <facebnooik.com>, <facebo0oik.com>,

10  <facebopoik.com>, <facebvooik.com>, <facecbgook.com>, <facecbooi.com>,

11  <facecbooj.com>, <facecbookm.com>, <facecboom.com>, <facecbooo.com>,

12  <facecgook.com>, <facerbooik.com>, <facevbooik.com>, <facwecbook.com>,

13  <facxebooik.com>, <faebooik.com>, <fasebooik.com>, <fdacecbook.com>, <ffacecbook.com>,

14  <fgacecbook.com>, <fracebooik.com>, <fracecbook.com>, <gacecbook.com>,

15  <gfacecbook.com>, <faesbuk.com>, <fecbooc.com>, <fecbuuk.com>, <feecook.com>,

16  <fexbok.com>, <focabok.com>, <focbook.net>, <facegbok.com>, <fdacebok.com>,

17  <rfacebok.com>, <tacebok.com>, <afcebook.co>, <faceboojk.co>, <facewbook.co>,  and

18  <facwebook.co>. *See* Spear Decl. ¶ 11 & Ex. A; *id*. ¶ 18 & Ex. G.[4]

19            **b.    Confusingly similar**

20          Suggs's domain names are confusingly similar to Facebook's famous and distinctive

21  FACEBOOK mark because they either incorporate the FACEBOOK mark or differ from the

22  FACEBOOK mark by one or a few letters. *See Purdy*, 382 F.3d at 784; *Shields*, 254 F.3d at 483.

23  _____

24          [4] Suggs disclosed the infringing domain names listed in this paragraph as a condition to
    initiating settlement discussions with Facebook. *See* Spear Decl. ¶ 18. Because the information
    was provided before settlement negotiations began, and because there was never a dispute as to
25  whether Suggs registered the infringing domain names, the information is not excludable under
    Federal Rule of Evidence 408. *See MCI Commc'ns Servs., Inc. v. Hagan*, 641 F.3d 112, 117
26  (5th Cir. 2011). Plus, Facebook would have obtained the information in discovery had Suggs not
    deprived Facebook of that opportunity by defaulting. *See Phoenix Solutions Inc. v. Wells Fargo
27  Bank, N.A.*, 254 F.R.D. 568, 584 (N.D. Cal. 2008) ("[E]vidence of facts disclosed during
    compromise negotiations is not inadmissible by virtue of having been first disclosed in the
28  compromise negotiations.").

c.      **Bad faith**

Suggs acted with a bad-faith intent to profit from the FACEBOOK mark. *See* FAC ¶¶ 74, 126. Suggs registered and used infringing domain names to divert traffic from Facebook's website, deceive users, and make money. *See* FAC ¶¶ 15-16, 61, 70-113, 120-36. He did so extensively and flagrantly, registering more than 130 clearly infringing domain names. Those unique circumstances demonstrate Suggs's bad faith. *See Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Suggs for the same reasons they weigh against Counter Balance. *See supra* at 13; Spear Decl. ¶¶ 7-10. Finally, Suggs cannot invoke ACPA's safe harbor because Suggs used the FACEBOOK mark to deceive users and profit from Facebook's fame—not to engage in parody, comment, or another lawful use. *See Nahum*, 624 F.3d at 1220; *Lahoti*, 586 F.3d at 1203.

In sum, Facebook has properly alleged that Suggs (1) registered and used at least 131 domain names that are (2) identical or confusingly similar to Facebook's famous and distinctive FACEBOOK mark with (3) a bad-faith intent to profit from that mark. Facebook is entitled to judgment against Suggs. *See, e.g.*, *Wecosign*, 845 F. Supp. 2d at 1080.

**C.      Facebook Has Properly Pled Claims for Contributory Liability Against Cleanser Products**

"[C]ontributory liability exists under the ACPA." *Verizon California, Inc. v. Above.com*, No. CV-11-0973 ABC, 2011 WL 8472379, at *6 (C.D. Cal. July 13, 2011); *see also Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, No. C 09-5939 PJH, 2012 WL 10532, at *10 (N.D. Cal. Jan. 3, 2012) (concluding that "a judicially-created claim of contributory cybersquatting would be valid"). "In the Ninth Circuit, one is liable for contributory trademark infringement when he has knowledge of another's infringement, and either materially contributes to or induces that infringement." *Petroliam*, 2012 WL 10532, at *10.

Here, Facebook alleges that Default Defendant Cleanser Products materially contributed to direct infringement by providing a service—deceptive landing pages—to owners of infringing domain names. *See* FAC ¶¶ 1, 6, 15-16, 70-75, 81-113, 120-36; *id.*, Ex. A ¶ 2; *supra* at 2-3. A defendant who provides a service to a direct infringer is contributorily liable if he

1  exercises "[d]irect control and monitoring of the instrumentality used . . . to infringe the

2  plaintiff's mark[.]" *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984-85

3  (9th Cir. 1999). To establish contributory liability under ACPA, the plaintiff must also allege

4  that the defendant knew or should have known that the direct infringer was acting in bad faith.

5  That requirement is met if "exceptional circumstances" demonstrate the defendant's knowledge.

6  *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1116 (C.D. Cal. 2009).

7      Under those principles, Facebook has properly alleged claims for contributory liability

8  against Default Defendant Cleanser Products.

9      Cleanser Products registered the following domain names: <socialrewardsurvey.com>,

10  <socialrewardcenter.com>, <socialrewardpanel.com>, <socialsurvey2011.com>, and

11  <social.worldrewardcenter.com>. *See* FAC ¶¶ 15-16, 70-75; *id.*, Ex. A ¶ 2; *see also* Spear Decl.

12  ¶ 11 & Ex. A. Cleanser Products then used those domain names to host deceptive landing pages

13  designed to mimic Facebook's website. *See, e.g.*, FAC ¶¶ 81-113 (describing three

14  typosquatting schemes using landing websites operated by Cleanser Products). No less than 10

15  owners of infringing domain names used those landing pages to monetize their typosquatting

16  schemes. *See id*. Specifically, the following direct infringers (some of whom remain

17  unidentified) used the following infringing domain names to redirect Internet traffic to deceptive

18  landing websites owned and operated by Cleanser Products:

19

20                                  TABLE 1

| DIRECT INFRINGERS | INFRINGING DOMAIN NAMES |
|---|---|
| 1. Counter Balance Enterprises Ltd. | <facebobk.com> <facemook.com> |
| 2. Eric Jordan | <appsfaceboik.com> <appsfacebok.com> <facebllp.com> <faceboiki.com> <facebooik.com> <facebookloginfarmville.biz> <facebookloginfarmville.info> <facebookloginfarmville.net> <facebookloginfarmville.org> <facebookloginfarmville.us> |

| DIRECT INFRINGERS | INFRINGING DOMAIN NAMES |
|---|---|
| | <facecbook.info><br><fdacebook.info><br><fscenook.com><br><newfaceboik.com><br><newfacebooik.com><br><wwfacebool.com><br><wwfaceboook.com><br><wwwfacehook.com><br><wwwfavenook.com><br><wwwvacebook.com> |
| 3.  Jerry Hui | <facebobook.com> |
| 4.  John Souza | <facebookmarketingforresults.com> |
| 5.  June Kimchi | <facevook.com><br><faecbook.com> |
| 6.  Mackrooner Ltd. Inc. | <ffacebook.com> |
| 7.  Michael Suggs (doing business as FB Promotions/Freebie Promos, and Rabbit GoGo Media LLC) | <afcbook.com><br><de-defacebook.com><br><fbacebook.com><br><fecabo.com><br><fsacebok.com><br><facebgook.com><br><faceboak.com><br><faceboop.com><br><facecbook.com><br><fbpromotions.com><br><wwwfacbeok.com><br><wwwfaccbook.com><br><wwwfacceook.com><br><wwwfaceb0ok.com><br><wwwfaceboobs.com><br><wwwfacebooi.com><br><wwwfaceboor.com><br><wwwfacecbook.com><br><wwwfacefook.com><br><wwwfacelook.com><br><facetook.com> |
| 8.  Newgate Services Ltd. Inc. (also known as SMTM Enterprises Ltd.) | <faboock.com><br><facebokbook.com><br><fcaebbok.com><br><wwwrfacebook.com> |
| 9.  Pioneer Enterprises Ltd. | <facebokook.com><br><faceboocklogin.com> |

| DIRECT INFRINGERS | INFRINGING DOMAIN NAMES |
|---|---|
| | <facebool.com> |
| 10. Reggie Bush | <faceboik.com> |
| 11. Doe Defendants | <facerbook.com><br><wwwfacebkook.com><br><wwwfacebnook.com><br><wwwfacebo0k.com> |

*See* Spear Decl. ¶ 17 & Ex. F (screenshots of deceptive landing websites provided to direct infringers by Cleanser Products). Cleanser Products, in turn, monetized the illicit traffic from the direct infringers' domain names by luring visitors into divulging personal information, viewing and clicking on advertisements, and purchasing products on its deceptive landing websites. *See, e.g.*, FAC ¶¶ 81-113. Cleanser Products and the direct infringers shared the proceeds of the typosquatting schemes consummated on Cleanser Products's landing websites. *See id.* ¶¶ 1, 15, 16, 71-73, 86, 130, 133.

As the owner of the deceptive landing websites, Cleanser Products directly controlled and monitored the landing websites. *See id.* ¶¶ 15-16, 70-72; *id.*, Ex. A ¶ 2. Thus, Cleanser Products exercised "[d]irect control and monitoring of the instrumentality used . . . to infringe [Facebook's] plaintiff's mark." *Lockheed*, 194 F.3d at 984-85. Similarly, in *Solid Host*, the Court found that one defendant's "ability to monitor and control the instrumentality used by [another defendant] to engage in cybersquatting satisfies the direct control and monitoring requirement necessary to plead a contributory liability claim." 652 F. Supp. 2d at 1116.

Furthermore, there are several "exceptional circumstances" indicating that Cleanser Products knew that its landing websites were being used to monetize typosquatting schemes. First, Cleanser Products knew that its landing websites received traffic redirected from infringing domain names. *See* FAC ¶¶ 70-77. Second, the landing websites hosted by Cleanser Products were intentionally designed to resemble Facebook's website. The only plausible purpose for such websites is to aid and abet typosquatting schemes targeting Facebook. *See, e.g.*, *Int'l Painters and Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co., Inc.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (movant for default judgment is entitled to all reasonable

inferences). Third, the landing websites operated by Cleanser Products were implicated in a "widespread pattern of cybersquatting" involving at least 10 direct infringers and 60 infringing domain names. *Above.com*, 2011 WL 8472379, at *6. Fourth, Cleanser Products profited from the typosquatting schemes. *See* FAC ¶¶ 70-77. And fifth, Cleanser Products refused to participate in this litigation, thereby preventing Facebook from learning the full extent of its parasitic conduct. Those "exceptional circumstances," taken together, make clear that Cleanser Products was aware of the direct infringers' bad faith intent to profit from the FACEBOOK mark—and that Cleanser Products shared that intent. *See Above.com*, 2011 WL 8472379, at *6 (plaintiff adequately alleged contributory liability by alleging that (1) "defendants controlled and monitored the privacy and monetization services [used by direct infringers], so they were aware that those services were being used for cybersquatting"; (2) defendants "profited from the monetization service, and it is reasonable to infer that Defendants were aware of and monitored these revenue streams"; and (3) defendants were implicated in a "widespread pattern of cybersquatting").

In sum, Cleanser Products provided deceptive landing websites to monetize illicit Internet traffic from infringing domain names, knowing all along that the direct infringers with whom it collaborated were seeking to profit in bad faith from Facebook's famous FACEBOOK mark. Thus, Cleanser Products is contributorily liable under ACPA.

## VI.    FACEBOOK IS ENTITLED TO APPROPRIATE RELIEF

"If the admitted facts in the Complaint establish liability, then the Court must determine appropriate damages." *Tiffany (NJ), LLC v. Dongping*, No. 10-61214-CIV, 2010 WL 4450451, at *3 (S.D. Fla. Oct. 29, 2010). Here, Facebook respectfully requests that the Court award the following relief: (1) maximum statutory damages under 15 U.S.C. § 1117(d); (2) orders requiring transfer of all infringing domain names to Facebook under 15 U.S.C. § 1125(d)(1)(C); and (3) orders permanently enjoining the Default Defendants from infringing the FACEBOOK and/or interfering with Facebook's business in the future. Facebook's First Amended Complaint

1   seeks all three forms of relief, *see* FAC § VII, and all three forms of relief are appropriate and

2   necessary to protect Facebook's rights and deter further unlawful conduct.

3   **A.      Maximum Statutory Damages Are Appropriate and Necessary**

4          Default Defendants' schemes injured Facebook and Facebook's users. *See* FAC ¶¶ 114-

5   19. Although Default Defendants' refusal to appear hampered Facebook's ability to document

6   the full extent of their misconduct, the record developed solely through Facebook's

7   investigatory efforts is more than adequate to support an award of statutory damages against

8   each of the Default Defendants.

9          Under ACPA, a plaintiff may elect to seek statutory damages of $1,000 to $100,000 per

10  unlawful domain name. *See* 15 U.S.C. § 1117(d) ("In a case involving a violation of section

11  1125(d)(1) of this title, the plaintiff may elect . . . to recover . . . an award of statutory damages

12  in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court

13  considers just."). "Judges have broad discretion in assigning statutory damages within these

14  limits." *eAdGear*, 2012 WL 2367805, at *18. To determine an appropriate award, "courts

15  generally consider a number of factors . . . , including the egregiousness or willfulness of the

16  defendant's cybersquatting, the defendant's use of false contact information to conceal its

17  infringing activities, the defendant's status as a 'serial' cybersquatter . . . and other behavior by

18  the defendant evidencing an attitude of contempt towards the court or the proceedings." *Verizon*

19  *California Inc. v. Onlinenic, Inc.*, No. C 08-2832 JF (RS), 2009 WL 2706393, at *3 (N.D. Cal.

20  Aug. 25, 2009). A plaintiff "is entitled to recover enhanced statutory damages even where its

21  actual damages are nominal or non-existent." *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837,

22  852 (E.D. Mich. 2006).

23          **1.      Facebook is entitled to maximum statutory damages against the 11 Default**
            **Defendants who directly infringed Facebook's mark.**
24

25          Each of the 11 Default Defendants discussed in Section V.B purposely registered and

26  used at least one domain name that infringes the FACEBOOK mark. *See supra* at 12-25.

27  Because the direct infringers failed to defend this suit, "their infringement and other actions are

28  deemed willful." *eAdGear*, 2012 WL 2367805, at *19. But even without that automatic

1    inference, the "willfulness" and "egregiousness" of the direct infringers' conduct would be

2    undeniable. *Onlinenic, Inc.*, 2009 WL 2706393, at *3; *see also* FAC ¶¶ 81-113 (describing

3    typical typosquatting schemes perpetrated by the direct infringers). Plus, the fact that the direct

4    infringers simply ignored this case reflects "an attitude of contempt towards the court or the

5    proceedings," *Onlinenic, Inc.*, 2009 WL 2706393, at *3, and suggests that they will engage in

6    the same misconduct in the future. A substantial award of statutory damages is therefore

7    necessary to deter the Default Defendants from violating the rights of Facebook and other mark

8    holders. *See Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 442 (4th

9    Cir. 2011) (ACPA's statutory damages provision does "not merely compel[ ] restitution of profit

10   and reparation for injury but also is designed to discourage wrongful conduct.") (internal

11   quotation marks and citation omitted); S. REP. NO. 106-140, 1999 WL 594571, at *8 (1999) (the

12   imposition of "statutory damages in cybersquatting cases [serves] both to deter wrongful

13   conduct and to provide adequate remedies for trademark owners").

14          Because the direct infringers intentionally injured Facebook and deceived users, and

15   because an award of statutory damages is necessary to deter future misconduct, Facebook asks

16   that the Court award the maximum amount of statutory damages against the direct infringers:

17   $100,000 per infringing domain name. *See, e.g.*, *City of Carlsbad v. Shah*, 850 F. Supp. 2d

18   1087, 1108 (S.D. Cal. 2012) (awarding maximum statutory damages under ACPA); *Lahoti v.*

19   *Vericheck, Inc.*, 708 F. Supp. 2d 1150, 1170 (W.D. Wash. 2010), *aff'd*, 636 F.3d 501 (9th Cir.

20   2011) (same); *Transamerica Corp. v. Moniker Online Services, LLC*, No. 09-60973-CIV, 2010

21   WL 1416979, at *4 (S.D. Fla. Apr. 7, 2010) (same); *Louis Vuitton Malletier and Oakley, Inc. v.*

22   *Veit*, 211 F. Supp. 2d 567, 585 (E.D. Pa. 2002) (same); *Aztar Corp. v. MGM Casino*, No. 00-

23   833-A, 2001 WL 939070, at *6 (E.D. Va. April 9, 2001) (same). Proposed Orders 1-11 specify

24   the amount of statutory damages Facebook seeks against each of the direct infringers.

25

26

27

28

1

2.      **Facebook is entitled to maximum statutory damages against contributory infringer Cleanser Products.**

2

3      Because it materially contributed to the typosquatting schemes of at least 10 direct

4      infringers, *see supra* tbl. 1, Facebook also seeks maximum statutory damages against Cleanser

5      Products.

6      The courts have not directly addressed whether ACPA authorizes an award of statutory

7      damages against a contributory infringer. *See* 15 U.S.C. § 1117(d) (authorizing statutory

8      damages "[i]n a case involving a violation of" ACPA). But the Ninth Circuit has squarely held

9      that 15 U.S.C. § 1117(c)—which authorizes statutory damages "[i]n a case involving the use of

10     a counterfeit mark"—does permit an award of statutory damages against contributory infringers.

11     *See Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 944-45 (9th Cir. 2011)

12     ("At bottom, Appellants urge us to hold that a defendant may avoid the consequences of

13     contributory liability (i.e., statutory damages) simply by claiming that the infringing acts (the

14     unauthorized uses) were committed by others. But holding a defendant liable for the

15     unauthorized acts of another is a primary purpose of the doctrine of contributory trademark

16     liability."). Because the language and structure of § 1117(c) and § 1117(d) are virtually

17     identical, and because courts have repeatedly held that contributory liability exists under ACPA,

18     this Court should hold that ACPA authorizes statutory damages against contributory

19     cybersquatters like Cleanser Products. *See, e.g.*, *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1029 (9th

20     Cir. 2011) (courts interpreting ACPA "begin with the text" of the statute).

21     Cleanser Products knowingly provided an essential service to several direct infringers:

22     deceptive landing websites used to monetize illicit Internet traffic. Cleanser Products is

23     therefore just as culpable as the direct infringers with whom it conspired (and with whom it

24     profited). Thus, as set forth in Proposed Order 12, Facebook asks that the Court award the

25     maximum amount of statutory damages against Cleanser Products: $100,000 per infringing

26     domain name that redirected Internet traffic to the deceptive landing websites operated by

27     Cleanser Products.[5]

28     _____

[5] Under the reasoning of *Akanoc*, Cleanser Products is jointly and severally liable with
the direct infringers who directed Internet traffic to its deceptive landing websites. *See Akanoc,*

**B.     Injunctive Relief Is Also Appropriate and Necessary**

 **1. This Court should order the Default Defendants and their registrars to transfer all infringing domain names to Facebook.**

 Facebook also seeks an order requiring the Default Defendants (and their domain name registrars) to transfer the Default Defendants' infringing domain names to Facebook.

 In any proceeding under ACPA, "a court may order the forfeiture or cancellation of [a] domain name or the transfer of [a] domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). A transfer order is necessary and appropriate here. Unless the Court orders the transfer of the Default Defendants' infringing domain names, it is all but certain that those domain names will be used to target Facebook and Facebook users in the future. *See Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 432-33 (M.D.N.C. 2003) (ordering transfer of infringing domain names in part because defendants had "persisted in their unlawful activity of registering domain names similar to protected marks" despite earlier "adverse rulings").

 Facebook also asks that the Court order both the Default Defendants *and* the registrars of the Default Defendants' domain names to comply with the order. In cases like this, registrants often ignore transfer orders. Thus, courts have concluded that orders directed to both registrants and registrars are the most appropriate and effective means of ensuring that transfers are effectuated in a timely manner. *See, e.g.*, *eAdGear*, 2012 WL 2367805, at *17 ("This Court has specifically addressed the issue of enforcing its order on a third party . . . and has concluded that under 15 U.S.C. § 1116, the Court is authorized to issue such an order against a third party because it is necessary to effectuate the purposes of the injunction."); *Malik*, 2009 WL 874497, at *1 ("It is further ORDERED that Verisign, as the registrar, is directed to transfer registration of [infringing domain names] to plaintiffs, pursuant to 15 U.S.C. § 1125(d)(1)(C)."). Proposed

---

658 F.3d at 947 (Lanham Act permits one award of statutory damages for contributory trademark infringement against joint tortfeasors); Ian C. Ballon, *E-Commerce and Internet Law* § 6.16[2][E] (2011-2012 update) ("The *Akanoc* court's restriction on multiple awards in multiple defendant cases likely would be applied in the Ninth Circuit to statutory damage awards under the Anti-Cybersquatting Consumer Protection Act which employs language similar to that construed in *Akanoc*, in authorizing statutory damage awards under the ACPA.").

Orders 1-11 specify the infringing domain names that the direct infringers and their registrars should be ordered to transfer to Facebook.

**2.     This Court should issue a permanent injunction barring the Default Defendants from infringing the FACEBOOK mark in the future.**

Lastly, Facebook asks that the Court permanently enjoin the Default Defendants from infringing the FACEBOOK mark and interfering with Facebook's business in the future. Courts routinely enter such orders in ACPA cases, and there is no question that permanent injunctive relief is appropriate here. *See, e.g.*, *eAdGear*, 2012 WL 2367805, at **15-17; *Kerbel*, 2012 WL 3166798, at **15-16. Facebook is entitled to judgment against each of the Default Defendants for the reasons explained above, and Facebook will be irreparably harmed in the absence of a permanent injunction. *See* FAC ¶¶ 114-19; *id.* ¶ 134; *see also Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."). Thus, Facebook respectfully requests that the Court issue the injunctions set forth in Proposed Orders 1-12.

**VII.   CONCLUSION**

For the foregoing reasons and as set forth in the attached Proposed Orders, Facebook asks that the Court grant its motion for default judgment, award statutory damages against the Default Defendants, order the transfer to Facebook of all infringing domain names, and permanently enjoin the Default Defendants.

DATED: October 29, 2012                      **PERKINS COIE** LLP

                                            By: /s/ Ryan Spear
                                               Ryan Spear, WSBA No. 39974
                                               (*pro hac vice*)
                                               RSpear@perkinscoie.com

                                            Attorneys for Facebook, Inc.