United States District Court
Northern District of California

FACEBOOK, INC., a Delaware corporation,

Plaintiff,

v.

BANANA ADS LLC, et al.,

Defendants.

Case No.: CV 11-03619-YGR (KAW)

REPORT AND RECOMMENDATION TO GRANT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Plaintiff Facebook, Inc. ("Facebook") moves for default judgment against defendants Counter Balance Enterprises Ltd., Intercontinental Domain Inc., Mackrooner Ltd., Inc., Newgate Services Ld., Inc. (also known as SMTM Enterprises Ltd.; hereinafter referred to as "Newgate"), Pioneer Enterprises Ltd., YourTick, Paul Baker, Reggie Bush, Karrie-Lee Kareeman, Michael Suggs (doing business as Michael Timothy Suggs, Timothy Suggs, FB Promotions/Freebie Promos, and Rabbit GoGo Media LLC; hereinafter referred to as "Suggs"), and Cleanser Products (collectively referred to as "Default Defendants") under the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d). (Pl.'s Mot. for Default J., Dkt. No. 146.)  None of these Default Defendants formally appeared in this action, nor did they respond to Facebook's complaint or motion for default judgment.[1]  Plaintiff asks the court to provide injunctive relief, order the transfer of all infringing domain names to Facebook, and to award statutory damages

---

[1] Facebook also sought default judgment against Michael Navarini (doing business as Banana Ads LLC), who appeared at the hearing on the motion. This Court recommended that default judgment against Navarini and Banana Ads not be entered pending settlement negotiations. (*See* Dkt. No. 164.) The presiding judge subsequently withdrew her referral of Navarini and Banana Ads for report and recommendation on Facebook's Motion for Default Judgment (*See* Dkt. No. 185), so this report and recommendation is limited to Facebook's claims against the remaining eleven defendants.

United States District Court
Northern District of California

pursuant to 15 U.S.C. § 1117(d).  For the reasons set forth below, the Court recommends that Plaintiff's motion be granted against all defendants.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Facebook is a free online network that helps people connect and share with their friends, family, and the world around them. (Pl.'s Mot. Default J. (Pl.'s Mot.) at 1; First Am. Compl. ("FAC"), Dkt. No. 36, ¶ 25.)  Facebook owns numerous trademarks and service marks (collectively "Facebook marks") which have been registered with the United States Patent and Trademark Office. (FAC, ¶ 29; Ex. D.)  Facebook has continuously used its marks in interstate commerce in the United States in connection with its online networking services since 2004. (FAC, ¶31.)  Facebook asserts that its marks are recognizable to users and advertisers, and are famous within the meaning of 15 U.S.C. § 1125(c). (FAC, ¶32; Pl.'s Mot. at 2.)

Each of the default defendants registered at least one Internet domain name that includes or misspells the FACEBOOK domain, *facebook.com*, (hereinafter "infringing domain names") or —in the case of Cleanser Products—owned and operated websites to which Internet users were redirected when they visited infringing domain names (hereinafter "landing websites" or "landing pages"). (FAC, Ex. A.; Decl. of Ryan Spear in Support of Pl.'s Mot. for Default J. ("Spear Decl."), Ex. A.)

Some owners of the infringing domain names worked with Cleanser Products to divert Internet users who were attempting to log-on to Facebook, but who accidentally misspelled the domain, to instead reach deceptive, typosquatting sites, which then redirected users to a landing website that looked like Facebook, but was owned by Cleanser Products. (*See* FAC, ¶¶ 15-16, 70-113, 120-136; Pl.'s Mot. at 2-3.)

Facebook filed the instant suit on July 22, 2011 alleging cybersquatting under 15 U.S.C. § 1125(d), federal trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), trademark dilution under 15 U.S.C. § 1125(c), breach of contract, and tortious interference with prospective economic advantage. (Dkt. No. 1.)  Facebook filed its First Amended Complaint on December 12, 2011 alleging the same causes of action. (Dkt. No. 36.)

United States District Court
Northern District of California

2

All defendants were served with the summons and first amended complaint or waived service.  Defendants Paul Baker and Michael Suggs both filed waivers of service. (Dkt. Nos. 7 and 56.)  Suggs filed three waivers of service, including waivers for FB Promotions and Rabbit GoGo Media LLC. (Dkt. No. 7.)  The nine remaining defendants were served on March 28, 2012 via e-mail consistent with the presiding judge's March 27, 2012 order (Dkt. No. 79) allowing service of certain defendants via email. (Decl. of Service by Alternative Means, Dkt. No. 88.)  In complying with the presiding judge's order, Facebook provided confirmations that the emails were received by the recipients. (*See* Dkt. No. 88, Exh. 1-9, 13-18, 23-28.) Despite being served, defendants never served Plaintiff with a responsive pleading.

On May 10, 2012, Facebook filed a request for entry of default against Michael Suggs. (Dkt. No. 85.) The Clerk entered the default against Suggs on May 11, 2012. (Dkt. No. 87.)

On June 19, 2012, Facebook filed requests for entry of default against Counter Balance (Dkt. No. 91), Intercontinental (Dkt. No. 97), Karrie-Lee Karreman (Dkt. No. 99), Mackrooner (Dkt. No. 101), Newgate (Dkt. No. 103), Pioneer (Dkt. No. 107), YourTick (Dkt. No. 111), and Reggie Bush (Dkt. No. 113). The Clerk entered the defaults on June 22, 2012. (Dkt. No. 122.)

On June 20, 2012, Facebook filed a request for entry of default against Cleanser Products. (Dkt. No. 117). The Clerk entered the default on June 22, 2012. (Dkt. No. 122.)

On September 14, 2012, Facebook filed a request for entry of default against Paul Baker. (Dkt. No. 133). The Clerk entered the default on September 17, 2012. (Dkt. No. 135.)

Facebook now moves for default judgment under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), against all Default Defendants.  Specifically, Facebook seeks statutory damages under 15 U.S.C. § 1117(d), orders transferring all infringing domain names to Facebook under 15 U.S.C. § 1125(d)(1)(C), and orders permanently enjoining Default Defendants from infringing on the FACEBOOK mark and/or interfering with Facebook's business in the future.

///

///

///

## II.   DEFAULT JUDGMENT

### A.  Legal Standard

Federal Rule of Civil Procedure 55(b)(2) permits a court to enter a final judgment in a case following a defendant's default. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 999 (N.D. Cal. 2001). Whether to enter a judgment lies within the court's discretion. *Id.* at 999 (citing *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986)).

Before assessing the merits of a default judgment, a court must confirm that it has subject matter jurisdiction over the case and personal jurisdiction over the parties, as well as ensure the adequacy of service on the defendant. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). If the court finds these elements satisfied, it turns to the following factors ("the *Eitel* factors") to determine whether it should grant a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (citation omitted). In this analysis, "the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true." *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (citing *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)). Nevertheless, default does not compensate for essential facts not within the pleadings and those legally insufficient to prove a claim. *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).  The Court, however, has the discretion to consider competent evidence and other papers submitted with a motion for default judgment to determine damages.  *Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1000, 1010 (N.D. Cal. 2001) (citing *TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir.1987)).

///

///

///

United States District Court
Northern District of California

**B. Subject Matter Jurisdiction**

This Court has subject matter jurisdiction over this matter because Facebook raises claims under federal law, specifically the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

**C. Personal Jurisdiction**

1. This Court has general personal jurisdiction over Defendant Reggie Bush who resides in California.

Defendant Reggie Bush resides in California. *See* FAC, Ex. A ¶ 21. Therefore, Bush is subject to this Court's general personal jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853-54 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.").

2. This Court has specific personal jurisdiction over remaining Default Defendants.

   a. *Nonresident Default Defendants are subject to specific personal jurisdiction under California's long-arm statute.*

California's long-arm statute authorizes specific personal jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause of the United States Constitution. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Thus, this Court may assert specific personal jurisdiction over nonresident defendants if three requirements are met:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

*Id.* (quotation marks and citation omitted). Facebook bears the burden of satisfying the first two requirements; the burden then shifts to the Default Defendants to present a "compelling case" that

United States District Court
Northern District of California

the exercise of jurisdiction would be unreasonable. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647

F.3d 1218, 1228 (9th Cir. 2011) (citations omitted).

        i.     Purposeful Direction

      The first requirement encompasses two distinct concepts: purposeful availment and

purposeful direction. *See Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,

433 F.3d 1199, 1206 (9th Cir. 2006). Tort claims and tort-like claims—including the ACPA

claims—are analyzed under the purposeful direction concept. *See Kerbel*, 2012 WL 3166798, at

*4. "In analyzing purposeful direction, the Court applies the 'effects' test first established by the

Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1983)." *Id*. Jurisdiction is proper under the

effects test if the defendant "(1) committed an intentional act, which was (2) expressly aimed at

the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant

knows is likely to be suffered in the forum state." *Id*. (citing *Bancroft & Masters, Inc. v. Augusta

Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). All three requirements are met here.

      First, all of the nonresident Default Defendants committed intentional acts: they purposely

registered infringing domain names and/or purposely operated deceptive websites to which users

were directed when they visited those infringing domain names. (*See* FAC, Ex. A ¶¶ 2-4, 6-9, 12,

16, 18, 21, 30, 43 (domain names owned by Default Defendants); *see also* Spear Decl. ¶ 11 & Ex.

A.)

      Second, the nonresident Default Defendants expressly aimed their conduct at this forum.

Express aiming exists where "the defendant is alleged to have engaged in wrongful conduct

targeted at a plaintiff whom the defendant knows to be a resident of the forum state."

*CollegeSource, Inc. v. Academyone, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011) (internal quotation

marks and citations omitted). Here, the Default Defendants targeted Facebook, a company they

knew to be located in California, by registering infringing domain names similar to *facebook.com,*

and using them to divert Internet users attempting to reach Facebook's website. (*See* FAC ¶¶ 15-

16, 23, 61-113, 120-36.) The Default Defendants then monetized their schemes with interactive,

commercial landing websites designed to look like Facebook's website. These landing websites

United States District Court
Northern District of California

1  were designed so that, when they were viewed in California, they displayed text specifically

2  targeting California users. (*See* Spear Decl. ¶ 13 & Ex. C.)

3      In sum, the Default Defendants made money by confusing Facebook users, including

4  users in California, and capitalizing on this confusion—some of which was based on defendants'

5  misuse of Facebook's marks, typesetting, and color scheme. This constitutes aiming their conduct

6  at Facebook and this forum. *See, e.g.*, *CollegeSource*, 653 F.3d at 1077 ("[W]e have held that the

7  'expressly aimed' prong of the purposeful direction test can be met where a plaintiff alleges that

8  the defendant individually targeted him by misusing his intellectual property on the defendant's

9  website for the purpose of competing with the plaintiff in the forum.") (citation omitted); *Rio

10  Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) ("[O]perating even a

11  passive website in conjunction with 'something more'—conduct directly targeting the forum—is

12  sufficient to confer personal jurisdiction."); *eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012

13  WL 2367805, at *7 (N.D. Cal. June 21, 2012) (express aiming found where defendant used an

14  infringing domain name to "confus[e] consumers as to the origin of Defendant's services")

15      Third, the nonresident Default Defendants knew they would cause harm in California

16  because their schemes depended on diverting users from Facebook, a company they knew to be

17  located in California. *See also craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1053

18  (N.D. Cal. 2010) ("Because Plaintiff is headquartered in California and maintains its website in

19  California, Defendants' actions directly targeted California, and Defendants knew that Plaintiff

20  would suffer the brunt of its harm in California.").

21          ii.   Arising from forum-related activities

22      This element is established if Facebook would not have been injured "but for" the

23  nonresident Default Defendants' forum-related activities. *See Ballard v. Savage*, 65 F.3d 1495,

24  1500 (9th Cir. 1995). As explained above, the nonresident Default Defendants' expressly targeted

25  Facebook and California residents, and Facebook suffered injury from those schemes in this

26  forum. *See CollegeSource*, 653 F.3d at 1079 ("We have repeatedly held that a corporation incurs

27  economic loss, for jurisdictional purposes, in the forum of its principal place of business."); 

28  *Nissan*, 89 F. Supp. 2d at 1160 ("[T]he defendant's intentional exploitation of the plaintiffs'

United States District Court
Northern District of California

7

goodwill and diversion of the plaintiffs' potential customers [via the Internet] had the effect of injuring [plaintiffs] in California. But for the [defendant's] conduct, this injury would not have occurred.").

At the hearing, Plaintiff's counsel proffered that Facebook incurs a significant cost responding to user complaints, many of which involve typosquatting and landing pages such as those operated by Default Defendants.

### iii.    Reasonableness

Because Facebook has established the first two requirements for exercising specific personal jurisdiction, the nonresident Default Defendants must present a "compelling case" that asserting jurisdiction would be unreasonable. *Mavrix*, 647 F.3d at 1228 (citations omitted). While the nonresident Default Defendants have essentially waived their opportunity to make that showing by failing to participate in this litigation, the assertion of personal jurisdiction in this instance is not unreasonable given the fact that the nonresident Default Defendants targeted Facebook, a company they knew to be located in California, as well as California residents, with elaborate typosquatting schemes. Thus, they had "fair warning" that they might be sued in California. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks and citation omitted); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (personal jurisdiction in a remote forum is reasonable if the defendant "should reasonably anticipate being haled into court there").

### D.    Venue

Venue is proper in the Northern District of California under 28 U.S.C. section 1391, as Facebook is located within the Northern District.

### E.    Analysis of the *Eitel* Factors

Since the Court has jurisdiction in this matter, this Court must turn to the *Eitel* factors to determine whether the entering of a default judgment is appropriate in this matter.

#### 1.    Prejudice to Plaintiff

Plaintiff will suffer great prejudice if the court does not enter default judgment against Defendants because Plaintiff otherwise has no means to protect itself and its trademarks and to

United States District Court
Northern District of California

collect the statutory damages to which it is entitled under the ACPA. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177. Therefore, this factor favors the entry of default judgment.

2. Merits of Plaintiff's Claims & Sufficiency of the Complaint

For ease of analysis, the merits of plaintiff's substantive claims and sufficiency of the complaint are considered together. Since Facebook is only pursuing its ACPA claims on default, the Court will restrict its analysis to that claim as to each Default Defendant.

Generally, a defendant is directly liable under the ACPA if he (1) registers, traffics in, or uses a domain name that is (2) identical or confusingly similar to a famous or distinctive mark owned by the plaintiff with (3) a bad-faith intent to profit from the mark. *See, e.g.*, *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010). In determining bad faith, courts evaluate the unique circumstances of the case; survey the nine bad-faith factors set forth in the ACPA;[2] and

---

[2] The Court may consider, but is not limited to, the following nine factors when determining bad faith:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

consider the availability of the ACPA's statutory safe-harbor defense, which protects any

defendant who "'believed and had reasonable grounds to believe that the use of the domain name

was a fair use or otherwise lawful.'" *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190,

1220 (9th Cir. 2012) (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)). The unique circumstances of the

case are "'the most important grounds for finding bad faith.'" *Lahoti v. Vericheck, Inc.*, 586 F.3d

1190, 1202 (9th Cir. 2009) (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936,

946 (9th Cir. 2002)).

      *a.   Counter Balance Enterprises Ltd. ("Counter Balance")*

      Counter Balance registered and used at least the following two domain names:

<facebobk.com> and <facemook.com>. (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 3; *see*
*also* Spear Decl. ¶ 11 & Ex. A.) Both of the infringing domain names redirected users to landing

websites owned and operated by Default Defendant Cleanser Products.

      Counter Balance's domain names are confusingly similar to Facebook's famous and

distinctive FACEBOOK mark.  Under the ACPA, the confusingly similar analysis is "narrower

than the traditional multifactor likelihood of confusion test for trademark infringement." *Coca-*
*Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004); *see also DSPT Int'l, Inc. v. Nahum*, 624

F.3d 1213, 1222 (9th Cir. 2010). The only relevant question is "whether the domain names which

[the defendant] registered . . . are identical or confusingly similar to a plaintiff's mark."  *Purdy*,

382 F.3d at 783.  Domain names may be confusingly similar to a protected mark if they

incorporate the mark or if they add, delete, or rearrange letters in the mark. *See Shields v.*
*Zuccarini*, 254 F.3d 476, 483 (3d Cir. 2001). Domain names may also be confusingly similar if

they simply add "generic terms . . . [or] a top level domain suffix" to the plaintiff's mark. *See*
*Purdy*, 382 F.3d at 784.

---

      (IX) the extent to which the mark incorporated in the person's domain name registration is
or is not distinctive and famous within the meaning of subsection (c) of this section.
15 U.S.C. § 1125(d)(1)(B)(i).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, each of Counter Balance's domain names differs from the FACEBOOK mark by a

2   single letter. Counter Balance's domain names are therefore confusingly similar under the ACPA.

3   *See, e.g.*, *Shields*, 254 F.3d at 484.

4    Counter Balance acted with a bad-faith intent to profit from the FACEBOOK mark by

5   virtue of its registration and usage of infringing domain names to divert traffic from Facebook's

6   website in an effort to deceive users and make money. *See, e.g.*, *Citigroup Inc. v. Malik*, No.

7   1:07cv1168, 2009 WL 874497, at *3 (E.D. Va. Mar. 24, 2009) (bad faith found where "defaulting

8   defendants' use of plaintiffs' Marks evidence[d] an attempt to confuse plaintiffs' customers and

9   divert consumers looking for information about plaintiffs' services to web pages represented by

10   the Infringing Domain Names"); *Verizon California Inc. v. Navigation Catalyst Sys., Inc.*, 568 F.

11   Supp. 2d 1088, 1096 (C.D. Cal. 2008) ("It is clear that [defendants'] intent was to profit from the

12   poor typing abilities of consumers trying to reach Plaintiffs' sites: what other value could there be

13   in a name like ve3rizon.com?"); *Elec. Boutique Holdings Corp. v. Zuccarini*, No. Civ. A. 00-

14   4055, 2000 WL 1622760, at *5, *8 (E.D. Pa. Oct. 30, 2000) ("[Defendant's] bad-faith intent to

15   profit from the domain misspellings is abundantly clear. [Defendant] registered the domain

16   misspellings in order to generate advertising revenue for himself, despite being aware of

17   [plaintiff's] stores and website."). The registration of typosquatting domains shows Counter

18   Balance's intent to illicitly profit from the FACEBOOK mark, as there is no value independent of

19   the infringement, as evidenced by the lack of association with any bona fide goods or services.

20    Other bad-faith factors set forth in the ACPA also weigh against Counter Balance,

21   including the purposeful "diver[sion of] consumers from [Facebook's] online location to a

22   site...that could harm the goodwill represented by the [FACEBOOK] mark...for commercial

23   gain." 15 U.S.C. § 1125(d)(1)(B)(i)(V). In addition, Counter Balance's infringing domain names

24   do not consist of Counter Balance's legal name, were not used "in connection with the bona fide

25   offering of any goods or services," and Counter Balance registered multiple domain names that

26   infringed on Facebook's famous and distinctive marks. 15 U.S.C. § 1125(d)(1)(B)(i)(II), (III),

27   (VIII).

28

United States District Court
Northern District of California

1    Lastly, Counter Balance cannot invoke the ACPA's safe harbor provision, which protects

2    "parody and comment, and use by persons ignorant of another's superior right to the mark."

3    *Nahum*, 624 F.3d at 1220.  Since Counter Balance was not engaged in parody, comment, or other

4    lawful use while it willfully infringed on Facebook's marks, its actions do not qualify for safe

5    harbor.

6    For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim

7    against Counter Balance.

8       b.   *Intercontinental Domain Inc. ("Intercontinental")*

9    Intercontinental registered and used at least the following 10 domain names:

10    <eacebook.com>, <faceboko.com>, <facebooj.com>, <facvebook.com>, <fadebook.com>,

11    <faxebook.com>, <fqacebook.com>, <fqcebook.com>, <lfacebook.com>, and <rfacebook.com>.

12    (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 6; *see also* Spear Decl. ¶ 11 & Ex. A.)

13    Intercontinental's domain names are confusingly similar to Facebook's famous and

14    distinctive FACEBOOK mark because each domain name differs from the FACEBOOK mark by

15    a single letter, and two domains incorporate the correctly-spelled FACEBOOK mark.

16    Intercontinental acted with a bad-faith intent to profit from the FACEBOOK mark, by

17    registering and using infringing domain names to divert traffic from Facebook's website in an

18    effort to deceive users and make money. Those circumstances demonstrate Intercontinental's bad

19    faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith

20    factors weigh against Intercontinental for the same reasons they weigh against Counter Balance.

21    In addition, Intercontinental used the Dynamic Dolphin subscription service to conceal that it had

22    registered the infringing domains, which is further evidence of its bad faith. *See* 15 U.S.C.

23    § 1125(d)(1)(B)(i)(VII).

24    Lastly, Intercontinental cannot invoke the ACPA's safe harbor because Intercontinental

25    used the FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to

26    engage in parody, comment, or another lawful use.

27    For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim

28    against Intercontinental.

12

1

      *c.   Mackrooner Ltd., Inc. ("Mackrooner")*

2

      Mackrooner registered and used at least the following domain name: <ffacebook.com>.

3

(*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 7; *see also* Spear Decl. ¶ 11 & Ex. A.) Its

4

infringing domain name redirected users to a landing page owned and operated by Default

5

Defendant Cleanser Products.

6

      Mackrooner's domain name is confusingly similar to Facebook's famous and distinctive

7

FACEBOOK mark because it incorporates the correctly-spelled FACEBOOK mark by adding a

8

single letter.

9

      Mackrooner acted with a bad-faith intent to profit from the FACEBOOK mark, by

10

registering and using an infringing domain name to divert traffic from Facebook's website in an

11

effort to deceive users and make money. Those circumstances demonstrate Mackrooner's bad

12

faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith

13

factors weigh against Mackrooner for the same reasons they weigh against the previously

14

discussed Default Defendants.

15

      Lastly, Mackrooner cannot invoke the ACPA's safe harbor because it used the

16

FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to engage in

17

parody, comment, or another lawful use.

18

      For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim

19

against Mackrooner.

20

      *d.   Newgate Services Ltd., Inc. (also known as SMTM Enterprises Ltd.) ("Newgate")*

21

      Newgate registered and used at least the following 47 domain names: <faasbook.com>,

22

<faboock.com>, <facbnook.com>, <faceboobk.com>, <facbookl.com>, <facboox.com>,

23

<faccebuk.com>, <faceabok.com>, <facebboc.com>, <facebnbook.com>, <facebocke.com>,

24

<facebof.com>, <facebokbook.com>, <faceboobok.com>, <facebookck.com>,

25

<facebookforteens.com>, <facebookloging.com>, <facebookloin.com>, <facebooknew.com>,

26

<facebooktrucos.com>, <facebookwelcome.com>, <faceboooik.com>, <faceboooks.com>,

27

<faceebot.com>, <facesbooc.com>, <facewebook.com>, <faeccbook.com>, <faesebook.com>,

28

<faicbooc.com>, <fasceboo.com>, <faseboox.com>, <faycbok.com>, <fcaebbok.com>,

<fcfacebook.com>, <feacboo.com>, <feacbooke.com>, <fecbbok.com>, <feook.com>,

<ferabook.com>, <fescebook.com>, <ficeboock.com>, <thefacebookl.com>, <www-

facbook.com>, <wwwfacebppk.com>, <wwwfcaebook.com>, <wwwfeibook.com>, and

<wwwrfacebook.com>. (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 8; *see also* Spear Decl. ¶

11 & Ex. A.)  Four of Newgate's infringing domain names redirected users to landing pages

owned and operated by Default Defendant Cleanser Products.

Newgate's domain names are confusingly similar to Facebook's famous and distinctive

FACEBOOK mark because they either incorporate the correctly-spelled FACEBOOK mark (10

domains) or differ from the FACEBOOK mark by one or a few letters.

Newgate acted with a bad-faith intent to profit from the FACEBOOK mark, by registering

and using infringing domain names to divert traffic from Facebook's website in an effort to

deceive users and make money.  Notably, Newgate's misconduct was extensive and deliberate—it

registered and used nearly 50 infringing domain names, demonstrating Newgate's bad faith. *See,

e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096; *see also* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII)

(registration of multiple infringing domains as bad faith factor). Moreover, the remaining

statutory bad-faith factors weigh against Newgate for the same reasons they weigh against the

previously discussed Default Defendants.

Lastly, Newgate cannot invoke the ACPA's safe harbor because it used the FACEBOOK

mark to deceive users and profit from Facebook's fame, rather than to engage in parody,

comment, or another lawful use.

For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim

against Newgate.

  *e. Pioneer Enterprises Ltd. ("Pioneer")*

Pioneer registered and used at least the following nine domain names: <dacebook.com>,

<facebokook.com>, <faceboocklogin.com>, <faacebok.com>, <facebookfreezer.com>,

<facebooll.com>, <facegbook.com>, <gfacebook.com>, and <zh-facebook.com>. (*See* FAC

¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 9; *see also* Spear Decl. ¶ 11 & Ex. A.) Two of Pioneer's

infringing domain names redirected users to landing pages owned and operated by Default Defendant Cleanser Products.

Pioneer's domain names are confusingly similar to Facebook's famous and distinctive FACEBOOK mark because they either incorporate the correctly-spelled FACEBOOK mark (three domains) or differ from the FACEBOOK mark by one or a few letters.

Pioneer acted with a bad-faith intent to profit from the FACEBOOK mark, by registering and using an infringing domain name to divert traffic from Facebook's website in an effort to deceive users and make money. Those circumstances demonstrate Pioneer's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Pioneer for the same reasons they weigh against the previously discussed Default Defendants.

Lastly, Pioneer cannot invoke the ACPA's safe harbor because it used the FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to engage in parody, comment, or another lawful use.

For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim against Pioneer.

      *f.   YourTick*

YourTick registered and used at least the following domain name: <wwwfacebookde.com>. (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 16; *see also* Spear Decl. ¶ 11 & Ex. A.)

YourTick's domain name is confusingly similar to Facebook's famous and distinctive FACEBOOK mark because it simply adds a few letters to the correctly-spelled FACEBOOK mark.

YourTick acted with a bad-faith intent to profit from the FACEBOOK mark, by registering and using an infringing domain name to divert traffic from Facebook's website in an effort to deceive users and make money. Those circumstances demonstrate YourTick's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors

United States District Court
Northern District of California

15

weigh against YourTick for the same reasons they weigh against the previously discussed Default Defendants.

Lastly, YourTick cannot invoke the ACPA's safe harbor because it used the FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to engage in parody, comment, or another lawful use.

For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim against YourTick.

### g. Paul Baker ("Baker")

Baker registered and used at least the following domain name: <facebokcasino.com>. (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 18; *see also* Spear Decl. ¶ 11 & Ex. A.)

Baker's domain name is confusingly similar to Facebook's famous and distinctive FACEBOOK mark because it incorporates the FACEBOOK mark (with the deletion of a single letter) and adds a generic term ("casino").

Baker acted with a bad-faith intent to profit from the FACEBOOK mark, by registering and using an infringing domain name to divert traffic from Facebook's website in an effort to deceive users and make money. Those circumstances demonstrate Baker's bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Baker for the same reasons they weigh against the previously discussed Default Defendants.

Lastly, Baker cannot invoke the ACPA's safe harbor because he used the FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to engage in parody, comment, or another lawful use.

For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim against Baker.

### h. Reggie Bush ("Bush")

Bush registered and used at least the following three domain names: <faceboik.com>, <facebolk.com>, and <facebopk.com>. (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 21.) At

least one of Bush's infringing domain names redirected users to a landing page owned and operated by Default Defendant Cleanser Products.

Bush's domain names are confusingly similar to Facebook's famous and distinctive FACEBOOK mark because each differs from the FACEBOOK mark by a single letter.

Bush acted with a bad-faith intent to profit from the FACEBOOK mark, by registering and using an infringing domain name to divert traffic from Facebook's website in an effort to deceive users and make money. Those circumstances demonstrate his bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Bush for the same reasons they weigh against the previously discussed Default Defendants.

Lastly, Bush cannot invoke the ACPA's safe harbor because he used the FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to engage in parody, comment, or another lawful use.

For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim against Bush.

> i.   *Karrie-Lee Karreman ("Karreman")*

Karreman registered and used at least the following domain name: <yourfacebooksurvey.com>. (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶ 30; *see also* Spear Decl. ¶ 11 & Ex. A.)

Karreman's domain name is confusingly similar to Facebook's famous and distinctive FACEBOOK mark because it incorporates the correctly-spelled FACEBOOK mark and adds generic terms ("your" and "survey").

Karreman acted with a bad-faith intent to profit from the FACEBOOK mark, by registering and using an infringing domain name to divert traffic from Facebook's website in an effort to deceive users and make money. Furthermore, Karreman is a serial cybersquatter who has been sued by other mark owners for virtually identical conduct. (*See* Spear Decl. ¶ 16 & Ex. E.) Those circumstances demonstrate Karreman's bad faith. *See, e.g.*, *Lahoti*, 586 F.3d at 1194 n.2 ("However, we would be remiss if we did not note Lahoti's cybersquatting activities, because they are relevant under the ACPA to whether a person acted in bad faith."); *Navigation Catalyst*,

568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Karreman for the same reasons they weigh against the previously discussed Default Defendants.

Lastly, Karreman cannot invoke the ACPA's safe harbor because she used the FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to engage in parody, comment, or another lawful use.

For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim against Karreman.

> *j.   Michael Sugg (doing business as Michael Timothy Suggs, Timothy Suggs, FB Promotions/Freebie Promos, and Rabbit GoGo Media LLC)("Suggs")*

Suggs registered and used at least the following 28 domain names: <afcbook.com>, <dfacecbook.com>, <facbeok.com>, <faccebookk.com>, <facebooich.com>, <facebooick.com>, <facebooiik.com>, <faceboom.com>, <fecabo.com>, <feceboox.com>, <fsacebok.com>, <facebooik.com>, <facebgook.com>, <faceboak.com>, <faceboop.com>, <facecbook.com>, <fbpromotions.com>, <wwwfacbeok.com>, <wwwfaccbook.com>, <wwwfacceook.com>, <wwwfaceb0ok.com>, <wwwfaceboobs.com>, <wwwfacebooi.com>, <wwwfaceboor.com>, <wwwfacecbook.com>, <wwwfacefook.com>, <wwwfacelook.com>, and <facetook.com>. (*See* FAC ¶¶ 15-16, 70-113, 120-36; *id.*, Ex. A ¶¶ 4, 12, 43; *see also* Spear Decl. ¶ 11 & Ex. A.)

In addition, Facebook asserts that in the course of informal discovery preceding settlement negotiations, Suggs informed Facebook that he registered and used the following 100 infringing domain names: <de-defacebook.com>, <facebkkk.com>, <facebpk.com>, <facelbook.com>, <facnbook.com>, <fbacebook.com>, <fcebookk.com>, <fecebool.com>, <fgacebook.com>, <facboolk.com>, <facbvook.com>, <facbeooik.com>, <fecabooik.com>, <fecacbook.com>, <fecacook.com>, <fecavook.com>, <fececbook.com>, <fevabooik.com>, <fevabook.com>, <fevecbook.com>, <facevkook.com>, <facevlook.com>, <facevooik.com>, <facevoolk.com>, <favebgook.com>, <favebo0k.com>, <faveboik.com>, <favebooi.com>, <favebooo.com>, <favegbook.com>, <favegook.com>, <faceboozk.com>, <facebxook.com>, <facebyook.com>, <facebzook.com>, <facwebooik.com>, <facebdok.com>, <facebohok.com>, <facebomok.com>, <facebovok.com>, <facegvook.com>, <favbeook.com>, <fazacebook.com>, <fgcebook.com>,

United States District Court
Northern District of California

<fmcebook.com>, <fnacebook.com>, <fpacebook.com>, <cacevook.com>, <facevoik.com>, <facevooi.com>, <fafevook.com>, <faveb0ok.com>, <faveboko.com>, <favebpok.com>, <favehook.com>, <faveobok.com>, <fvaebook.com>, <fwacebok.com>, <acebooik.com>, <afcecbook.com>, <facebiooik.com>, <facebnooik.com>, <facebo0oik.com>, <facebopoik.com>, <facebvooik.com>, <facecbgook.com>, <facecbooi.com>, <facecbooj.com>, <facecbookm.com>, <facecboom.com>, <facecbooo.com>, <facecgook.com>, <facerbooik.com>, <facevbooik.com>, <facwecbook.com>, <facxebooik.com>, <faebooik.com>, <fasebooik.com>, <fdacecbook.com>, <ffacecbook.com>, <fgacecbook.com>, <fracebooik.com>, <fracecbook.com>, <gacecbook.com>, <gfacecbook.com>, <faesbuk.com>, <fecbooc.com>, <fecbuuk.com>, <feecook.com>, <fexbok.com>, <focabok.com>, <focbook.net>, <facegbok.com>, <fdacebook.com>, <rfacebok.com>, <tacebok.com>, <afcebook.co>, <faceboojk.co>, <facewbook.co>,  and <facwebook.co>. (*See* Spear Decl. ¶ 11 & Ex. A; *id*. ¶ 18 & Ex. G.[3])

Suggs's domain names are confusingly similar to Facebook's famous and distinctive FACEBOOK mark because they either incorporate the FACEBOOK mark or differ from the FACEBOOK mark by one or a few letters.

Suggs acted with a bad-faith intent to profit from the FACEBOOK mark, by registering and using an infringing domain name to divert traffic from Facebook's website in an effort to deceive users and make money. He did so extensively and flagrantly, registering more than 130 clearly infringing domain names. Those circumstances demonstrate his bad faith. *See, e.g.*, *Navigation Catalyst*, 568 F. Supp. 2d at 1096. Moreover, the statutory bad-faith factors weigh against Suggs for the same reasons they weigh against the previously discussed Default Defendants.

///

---

[3] Suggs disclosed the infringing domain names listed in this paragraph as a condition to initiating settlement discussions with Facebook. *See* Spear Decl. ¶ 18. The information was provided before settlement negotiations began, and because there was never a dispute as to whether Suggs registered the infringing domain names, the information is not excludable under Federal Rule of Evidence 408. *See MCI Commc'ns Servs., Inc. v. Hagan*, 641 F.3d 112, 117 (5th Cir. 2011).

Lastly, Suggs cannot invoke the ACPA's safe harbor because he used the FACEBOOK mark to deceive users and profit from Facebook's fame, rather than to engage in parody, comment, or another lawful use.

For the reasons set forth above, Facebook has adequately stated a plausible ACPA claim against Suggs.

### k.   Cleanser Products

"[C]ontributory liability exists under the ACPA." *Verizon California, Inc. v. Above.com*, No. CV-11-0973 ABC, 2011 WL 8472379, at *6 (C.D. Cal. July 13, 2011); *see also Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, No. C 09-5939 PJH, 2012 WL 10532, at *10 (N.D. Cal. Jan. 3, 2012) (concluding that "a judicially-created claim of contributory cybersquatting would be valid"). "In the Ninth Circuit, one is liable for contributory trademark infringement when he has knowledge of another's infringement, and either materially contributes to or induces that infringement." *Petroliam*, 2012 WL 10532, at *10.

Facebook alleges that Default Defendant Cleanser Products materially contributed to direct infringement by providing a service—deceptive landing pages—to the owners of infringing domain names. (*See* FAC ¶¶ 1, 6, 15-16, 70-75, 81-113, 120-36; *id.*, Ex. A ¶ 2; *supra* at 2-3.)  A defendant who provides a service to a direct infringer is contributorily liable if he exercises "[d]irect control and monitoring of the instrumentality used . . . to infringe the plaintiff's mark[.]" *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984-85 (9th Cir. 1999).  To establish contributory liability under the ACPA, the plaintiff must also allege that the defendant knew or should have known that the direct infringer was acting in bad faith. That requirement is met if "exceptional circumstances" demonstrate the defendant's knowledge. *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1116 (C.D. Cal. 2009). Under those principles, Facebook has properly alleged claims for contributory liability against Default Defendant Cleanser Products.

Cleanser Products registered the following domain names: <socialrewardsurvey.com>, <socialrewardcenter.com>, <socialrewardpanel.com>, <socialsurvey2011.com>, and <social.worldrewardcenter.com>. (*See* FAC ¶¶ 15-16, 70-75; *id.*, Ex. A ¶ 2; *see also* Spear Decl.

20

¶ 11 & Ex. A). Cleanser Products then used these domains to host landing pages designed to resemble Facebook's website. (*See, e.g.*, FAC ¶¶ 81-113 (describing three typosquatting schemes using landing websites operated by Cleanser Products).)  Facebook alleges that at least 10 owners of infringing domains used these landing pages to monetize their typosquatting schemes. (Pl.'s Mot., at 26-28.)  Cleanser Products then monetized the redirected traffic from the direct infringers' domains by encouraging visitors to divulge personal information, view and click on advertisements, and purchase products on its landing websites. (*See, e.g.*, FAC ¶¶ 81-113.) Cleanser Products and the direct infringers shared the proceeds of the typosquatting schemes consummated on Cleanser Products's landing websites. *See id*. ¶¶ 1, 15, 16, 71-73, 86, 130, 133. Therefore, Cleanser Products exercised "[d]irect control and monitoring of the instrumentality used... to infringe plaintiff's mark." *Lockheed*, 194 F.3d at 984-85.

Moreover, there are several "exceptional circumstances" indicating that Cleanser Products knew that its landing websites were being used to monetize typosquatting schemes.  First, Cleanser Products knew that its landing websites received traffic redirected from infringing domain names. (*See* FAC ¶¶ 70-77.)  Second, the landing websites hosted by Cleanser Products were intentionally designed to resemble Facebook's website. The only plausible purpose for such websites is to aid and abet typosquatting schemes targeting Facebook. Third, the landing websites operated by Cleanser Products were implicated in a "widespread pattern of cybersquatting" involving at least 10 direct infringers and 60 infringing domain names. (Pl.'s Mot., at 29; *See also Above.com*, 2011 WL 8472379, at *6.) Fourth, Cleanser Products profited from the typosquatting schemes. (*See* FAC ¶¶ 70-77.)  And fifth, Cleanser Products refused to participate in this litigation, thereby preventing Facebook from learning the full extent of its illegal conduct. Taken together, it is apparent that Cleanser Products was aware of the direct infringers' bad faith intent to profit from the Facebook mark—and that Cleanser Products shared that intent. *See Above.com*, 2011 WL 8472379, at *6 (plaintiff adequately alleged contributory liability by alleging that (1) "defendants controlled and monitored the privacy and monetization services [used by direct infringers], so they were aware that those services were being used for cybersquatting"; (2) defendants "profited from the monetization service, and it is reasonable to infer that Defendants

21

were aware of and monitored these revenue streams"; and (3) defendants were implicated in a "widespread pattern of cybersquatting").

In sum, Cleanser Products provided deceptive landing websites to monetize illicit Internet traffic from infringing domain names, with full knowledge that those direct infringers with whom it collaborated were seeking to profit in bad faith from Facebook's mark. Therefore, Cleanser Products is contributorily liable under the ACPA.

3.   <u>Sum of money at stake</u>

The fourth factor focuses on the amount at issue in the action, as courts should be hesitant to enter default judgments in matters involving large sums of money. "When the money at stake in the litigation is substantial or unreasonable, default judgment is discouraged." *Bd. of Trs. v. Core Concrete Const., Inc.*, No. C 11-2532 LB, 2012 WL 380304, at *4 (N.D. Cal. Jan. 17, 2012) (citing *Eitel*, 782 F.2d at 1472). However, when "the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate." *Id.* (citations omitted). The ACPA provides for statutory damages of $1,000 to $100,000 per infringing domain name. *See* 15 U.S.C. § 1117(d). Facebook is seeking the maximum statutory damages of $100,000 per infringing domain name. (Pl.'s Mot. at 29.) This would total over $26,000,000 in damages if it were to be awarded. As the severity of the conduct of these defendants differs, the Court believes that the recommended damages outlined below are appropriately tailored to the specific misconduct of the default defendants in this case, and reasonable under *Eitel. See* discussion *infra* Part III.

4.   <u>The possibility of a dispute concerning material facts</u>

With respect to the fifth prong, Default Defendants have not participated in this action and have not made any attempt to contest any of Plaintiff's material facts or legal assertions or moved to set aside the entry of default, despite being served with all pleadings filed by Plaintiff. Theoretically, if the material facts were found to be untrue, the effect of a permanent injunction on any non-use of the Facebook marks and the transfer of the infringing domain names would be negligible, because there would be no legitimate conduct to be enjoined, and Default Defendants could move to set aside the default judgment awarding statutory damages.

5. <u>Whether default was a result of excusable neglect</u>

Nothing in the record suggests that Defendants defaulted due to excusable neglect. Plaintiff has served all Defendants with submissions relating to the case throughout the pendency of this action either by email, substituted service, or otherwise. Despite being served, Defendants have failed to participate in the litigation.

6. <u>Federal Rules preference for a decision on the merits</u>

After an examination of these facts in the aggregate, this Court finds that *Eitel* factors one through six outweigh the Federal Rules of Civil Procedure's preference for a decision on the merits. This Court therefore recommends an entry of a default judgment against all remaining Default Defendants.

### III.    DAMAGES & INJUNCTIVE RELIEF

After entry of default, well-pleaded factual allegations in the complaint are taken as true, except as to the amount of damages. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). To recover damages after securing a default judgment, a plaintiff must prove the relief it seeks through testimony or written affidavit. *Bd. of Trs. of the Boilermaker Vacation Trust v. Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005); *see Pepsico, Inc.*, 238 F. Supp. 2d at 1175 (citing *Televideo Sys., Inc.*, 826 F.2d at 917-18).

**A. Statutory damages generally pursuant to 15 U.S.C. § 1117(d)**

Plaintiff cites *eAdGear, Inc. v. Liu* in support of its request for the statutory maximum damages of $100,000 per infringing domain. *See eAdGear, Inc. v. Liu*, 2012 WL 2367805 (N.D. Cal.). *eAdGear* was an egregious case of trademark infringement and cybersquatting involving an employee of eAdGear who registered and operated a website with a virtually identical domain name (*www.eAdGear.ca*) that directly solicited Plaintiff's customers by impersonating Plaintiff's website. *Id*. at 3. Defendants' infringement went so far as to use Plaintiff's copyrighted web pages and linked directly to those pages. *Id.* at 4. Plaintiff claimed that it had lost over $800,000 in profits due to Defendants' actions. *Id.*

At the hearing in the instant case, Plaintiff's counsel asserted that the typosquatters' actions resulted in a loss of advertising revenue, as well as company time spent responding to

United States District Court
Northern District of California

United States District Court
Northern District of California

1   users' complaints concerning these websites.  Plaintiff could not articulate how much, if any,

2   profits were lost as a result of the typosquatters' activities, as Facebook collects revenue when

3   users click on advertising (referred to as "clicks").  Facebook also did not address the resources it

4   expends in responding to user complaints resulting from typosquatting.  While Facebook's failure

5   to quantify its compensatory damages makes it difficult to determine how much it was negatively

6   impacted by these activities, this is not fatal, because statutory damages are available in lieu of

7   compensatory damages. *See* 15 U.S.C. § 1117(d). The statutory damage award may not be less

8   than $1,000, and may not exceed $100,000 per infringing domain name. *Id.*

9         Facebook likens the typosquatters in this case to the Defendants in *eAdGear*.  This is not a

10   fair comparison, as the infringing activity in *eAdGear* was far more egregious than that involved

11   in this case.  First, while some of the landing websites to which users were redirected looked

12   similar to Facebook, they are noticeably different.  On the contrary, in *eAdGear* the infringing

13   domain and website appeared to be the site it was infringing upon, and even purported to sell the

14   same products.  So while the Court should not look beyond the domain name to consider the

15   content of a website in determining whether there is an ACPA violation, the content is relevant in

16   determining a "just" damages award. *See eAdGear,* WL 2367805 *13, 18; *see also Purdy,* 382 F.

17   3d at 783.

18         Second, Default Defendants were engaged in typosquatting, which, while this is one type

19   of behavior that the ACPA is designed to prevent, it is not as egregious as the cases that include

20   the correct spellings of plaintiffs' trademarked names.[4] *See, e.g., Verizon California Inc. v. Online*

21   *NIC, Verizon California Inc. v. OnlineNIC Inc.*, C 08-2832 JF (RS), 2008 WL 5352022 (N.D.

22   Cal. Dec. 19, 2008) (court ordered statutory damages at default judgment of $50,000 per

23   infringing domain against serial cybersquatter who had registered 663 domain names, including

24   *buyverizon.net, mobileverizon.net,* and *verizon-cellular.com*); *see also Anti-Defamation League v.*

25   *Boris Pribich*, 2008 WL 5119847, No. 2:07-cv-06528-ABC-LAW (C.D. Cal. September 2,

26

27

28   [4] As discussed below, the Court accounts for the use of infringing domain names containing the
correct spelling of Plaintiff's trademarked name in the calculation of damages.

2008)(infringer used ADL's trademarks, and posed as ADL, on websites furthering his anti-Semitic agenda, was ordered to pay $25,000 for each of 11 infringing domain names).

Lastly, while Default Defendants' misconduct was willful and comprises the behavior that the ACPA is designed to prevent, the Court is hesitant to apply the maximum penalty in a default setting. This does not mean, however, that the failure of Default Defendants to participate in the litigation should mean that they should be ordered to pay the minimum statutory damages.

The Court notes that Facebook, in seeking the maximum damages of $100,000 per infringing domain, made no attempt to distinguish between each defendant's conduct despite the existence of varying degrees of wrongdoing. Therefore, the Court will independently assess damages for each defendant below, taking into account each defendant's actions, including, but not limited to, the number of infringing domain names registered, whether the defendant is a serial cybersquatter, and the ACPA's other statutory factors.

### B. Damages Formula by Defendant

While all Default Defendants acted in bad faith by intentionally diverting consumers from Facebook, their conduct differs in terms of degree of maliciousness and wrongdoing. To ensure consistency in the calculation of the recommended damages awards, the Court has devised a formula to calculate damages based on each Defendant's actions incorporating the ACPA factors, as well as other factors deemed relevant by the Court based on the circumstances of this case. *See* 15 U.S.C. § 1125(d)(1)(B)(i) (listed factors are non-exhaustive). These factors include the number of domain names registered, whether there was an attempt to conceal the registrant's identity, whether the correct spelling of Plaintiff's trademark is contained in the infringing domain names, whether an individual defendant is a serial cybersquatter, and whether internet traffic was redirected to Cleanser Products' landing websites. *Id.*

The number of infringing domain names is indicative of bad faith. The more infringing domain names a defendant registered or acquired, the more malicious the conduct. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII). For those defendants who registered between one and nine domains, the Court will assess a base statutory damages award of $5,000 per domain. Between 10 and 19 domains, the base damages award is $10,000 per domain. Between 20 and 29 domains, the base

damages award is $15,000 per domain.  Between 30 and 39 domains, the base damages award is $20,000 per domain.  Between 40 and 49 domains, the base damages award is $25,000 per domain.

The intentional redirection of internet traffic from a typosquatting domain to one of Cleanser Products' landing websites is more egregious conduct, because the landing websites were designed to deceive users into believing that they were on Facebook's official website.  The owners and operators of the domain names monetized their scheme by redirecting users to landing websites, where users were would click on their advertisements, were encouraged to divulge personal information, or purchase products.  In recognition of the egregiousness of this conduct, Defendants that engaged in this conduct will be subject to twice the amount of base damages (or "double-multiplier") for each domain that redirected users to Cleanser Products' websites.  The double-multiplier will be assessed based on the "base damages", and any additional damages per domain will be added thereafter.

Defendants who engage in repeated cybersquatting or typosquatting, referred to as "serial cybersquatting," will also be assessed a double-multiplier on the base damages per infringing domain name in recognition of their recurring bad behavior.

Typosquatting is generally regarded as less malicious than true cybersquatting, where the domain name is spelled correctly. *See, e.g., Verizon California Inc.*, 2008 WL 5352022 (infringing domains included *buyverizon.net*, *mobileverizon.net*, and *verizon-cellular.com*).  But some of the typosquatting domains incorporate the FACEBOOK mark spelled correctly, even if the entire domain name is not. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).  The Court finds that domains that contain the correctly-spelled FACEBOOK mark are more malicious than those that misspell "Facebook."  This behavior shall result in an additional $5,000 in damages per domain name, to be assessed after any applicable multipliers.

Other domain names incorporate the correctly-spelled FACEBOOK mark alongside other correctly-spelled common words, which is more akin to the conduct in the *Verizon* case. *See Verizon California Inc.*, 2008 WL 5352022.  This misconduct is even more malicious than

incorporating the FACEBOOK mark alongside misspelled words, and shall result in an additional $10,000 in damages per domain name, to be assessed after any applicable multipliers.

Another indication of malice is attempting to conceal the registrant's identity. 15 U.S.C. § 1125(d)(1)(B)(i)(VII).  This conduct shall also result in an additional $5,000 in damages per domain name, to be assessed after any applicable multipliers.

Using this damages formula, the Court recommends the imposition of statutory damages on each Default Defendant as set forth below.

      1.  <u>Counter Balance</u>

Plaintiff's FAC identifies two infringing domain names attributed to Counter Balance. Both of these redirect users to landing websites operated by Cleanser Products. (Pl.'s Mot., at 26.) Since there are only two infringing domains, the Court recommends $5,000 in damages per domain, plus a double-multiplier for redirecting to Cleanser Products' landing pages, for a total of $10,000 per domain.  Thus, the total recommended damages award is $20,000.

      2.  <u>Intercontinental</u>

Plaintiff's FAC identifies ten infringing domain names attributed to Intercontinental, none of which redirect to Cleanser Products' landing websites. Ten infringing domain names triggers a recommendation of statutory damages of $10,000 per domain.  In addition, Intercontinental utilized the Dynamic Dolphin internet service to conceal its registrant information, so the Court recommends an additional damages award of $5,000 per domain.  Intercontinental also incorporates the correctly-spelled FACEBOOK mark in two of its domains— <lfacebook.com> and <rfacebook.com>—so that is an additional damages award of $5,000 for each domain.  Thus, the total recommended damages award is $160,000.

      3.  <u>Mackrooner</u>

Plaintiff's FAC only identifies one infringing domain attributed to Mackrooner.  The <ffacebook.com> domain redirects users to a landing website operated by Cleanser Products. (Pl.'s Mot., at 27.)  Since there is only one infringing domain, the Court recommends an award of $5,000 in damages, plus the double-multiplier for redirecting to Cleanser Products' landing

website, and $5,000 for incorporating the correctly-spelled FACEBOOK mark, for a total award of $15,000.

### 4.  Newgate

Plaintiff's FAC identifies 47 infringing domain names attributed to Newgate.  Of those, four redirect users to landing websites operated by Cleanser Products. (Pl.'s Mot., at 27.)  The Court therefore recommends $25,000 in damages per domain, plus a double-multiplier for the four domains that redirect users to Cleanser Products' landing websites.  In addition, seven Newgate domains incorporate the correctly-spelled FACEBOOK mark warranting an additional damages award of $5,000 per domain. Three other domain names incorporate the correctly-spelled FACEBOOK mark alongside other correctly-spelled common words warranting an additional $10,000 per domain.  Thus, the total recommended damages award is $1,340,000.

### 5.  Pioneer

Plaintiff's Motion for Default Judgment identifies nine infringing domain names attributed to Pioneer, only eight of which are identified in the FAC. (*See* FAC, Exh. A, at 5.)  Domain <www.facebooll.com> is not in the FAC, but the similar <facebool.com> is. *Id.*  Since the alleged typosquatting domain name differs from what was alleged in the FAC, the motion does not provide sufficient support for the imposition of damages as to that domain.

As to the remaining eight domains, two redirect users to landing websites operated by Cleanser Products. (Pl.'s Mot., at 27.)  Based on the number of infringing domains, the Court recommends $5,000 in damages per domain.  In addition, the Court recommends the double-multiplier for the two domains that redirect users to Cleanser Products' landing websites.  Also, one of Pioneer's domains incorporates the correctly-spelled FACEBOOK mark alongside other correctly-spelled common words warranting an additional $10,000 in damages for that domain. Two other Pioneer domains incorporate the correctly-spelled FACEBOOK mark alongside misspelled words warranting an additional $5,000 in damages per domain.  Thus, the total recommended damages award is $70,000.

///

///

### 6. YourTick

Plaintiff's FAC only attributes one infringing domain name to YourTick.  There is no allegation that the domain redirects users to a landing page operated by Cleanser Products.  Since there is only one infringing domain, the Court recommends that $5,000 in damages be awarded for the infringing domain, plus the additional $5,000 in damages for incorporating the correctly-spelled FACEBOOK mark, for a total recommended damages award of $10,000.

### 7. Paul Baker

Plaintiff's FAC only attributes one infringing domain name to Baker. There is no allegation that the domain redirects users to a landing page operated by Cleanser Products.  Since there is only one infringing domains, the Court recommends that $5,000 in damages be awarded for the infringing domain.

### 8. Reggie Bush

Plaintiff's FAC identifies three infringing domain names attributed to Bush.  Of those, one domain redirects users to a landing page operated by Cleanser Products. (Pl.'s Mot., at 28.)  Since there are only three infringing domains, the Court recommends $5,000 in damages per domain, plus a double-multiplier for the single domain that redirects users to a Cleanser Products' landing page, for a total recommended damages award of $20,000.

### 9. Karrie-Lee Karreman

Plaintiff's FAC identified one infringing domain name attributed to Karreman.  Karreman is a serial cybersquatter who has been sued by other mark holders for virtually identical conduct.  In light of her status as a serial cybersquatter, the Court recommends that the $5,000 base damages award be doubled.  In addition, Karreman's domain name incorporates the correctly-spelled FACEBOOK mark alongside other correctly-spelled common words warranting an additional $10,000 in damages, for a total recommended damages award of $20,000.

### 10. Michael Suggs (doing business as Michael Timothy Suggs, Timothy Suggs, FB Promotions/Freebie Promos, and Rabbit GoGo Media LLC)

Plaintiff's FAC identified 28 infringing domains attributed to Suggs and his alter egos FB Promotions and Rabbit GoGo Media LLC.  (*See* FAC, Exh. A, at 6; Waivers of Service from Tim

United States District Court
Northern District of California

1   Suggs, Dkt. No. 7.)  During informal discovery, and without making a formal appearance in this

2   litigation, Suggs admitted to registering 100 additional domains, all presumably in violation of the

3   ACPA.  At the hearing, Plaintiff informed the Court that Suggs decided to break off contact

4   during settlement negotiations and, instead, declined to participate resulting in his entry of

5   default.  The Court, in recommending that default judgment be entered, declines to recommend

6   statutory damages for those domains not identified in the FAC, as the scope of relief available on

7   default judgment is generally limited to the pleadings.  This does not mean, however, that

8   Facebook does not have a right to those domains, and, in fact, the Court, in exercising its

9   discretion, recommends below that all 128 domains be transferred to Facebook.

10          As to the ACPA factors, of the 28 domains, 19 redirect Internet traffic to Cleanser

11   Products' landing websites.  In addition, one of Suggs' alter egos is called FB Promotions, with

12   the "FB" presumably used to mislead users to believe that there is a legitimate connection with

13   Facebook.

14          Facebook's Motion for Default Judgment contains three domains that were not originally

15   attributed to Suggs and should not be included in any damages award.  Domains

16   <wwwfacebkook.com>, <wwwfacebnook.com>, and <wwwfacebo0k.com> are not attributed to

17   Suggs in either the First Amended Complaint or the chart in Plaintiff's Motion for Default

18   Judgment. (*See generally* FAC, Exh. A; Pl.'s Mot., at 28). As a result, the Court cannot order the

19   transfer of domains from unknown individuals, and so no damages will be assessed against Suggs

20   for those domains, nor will they be ordered transferred, as ownership has not been established.

21          In light of these factors, this Court recommends that Suggs be ordered to pay $15,000 in

22   damages for each of the originally identified 28 infringing domains.  In addition, the Court

23   recommends that the double-multiplier be applied for the 19 domains that redirect users to

24   Cleanser Products.  Thus, the total recommended damages award is $705,000.

25          11. Cleanser Products

26          Plaintiffs seek $100,000 in damages for each of at least 60 infringing domain names that

27   redirected traffic from typosquatter domains to landing pages operated by Cleanser Products.

28   (Pl.'s Mot., at 29.)  These five landing pages were used by at least 10 direct infringers. *Id.*  The

number of typosquatting domains that redirect users to Cleanser Products' landing pages, however, is not in the FAC.  Given the sheer number of domains and the fact that almost half of the redirecting domains are attributed to parties who have either been terminated from this case, are Doe Defendants, or are not otherwise involved in this case, the Court limits the scope of relief to those allegations in the FAC, which contained only the five landing pages and referenced three typosquatting domains that redirected users to Cleanser Products' landing pages. (*See* FAC, Exh. A, at 2.)

Cleanser Products' participation in the elaborate typosquatting scheme, wherein other infringers redirected Internet traffic to Cleanser Products' landing websites, is particularly egregious.  For that reason, and the reasons stated above finding that Cleanser Products was contributorily liable in the infringement of the other typosquatting defendants, the Court recommends that $80,000 in statutory damages be awarded for each of the five landing pages in recognition of the severity of its misconduct.  In addition, the Court recommends that $10,000 in damages be awarded for each of the three typosquatting domains identified in the FAC that redirected traffic to its landing pages, for a total damages award of $430,000.

## C.  Transfer of all infringing domain names to Facebook under 15 U.S.C. § 1125(d)(1)(C)

Plaintiff has provided evidence showing that Default Defendants registered their infringing domains and created landing pages in bad faith. The Court, therefore, finds it reasonable to transfer virtually all infringing domains included in Plaintiff's Motion for Default Judgment, including those identified by Suggs during informal discovery, to Facebook. *See infra* Part IV.

## D.  Permanent injunction against Default Defendants from future infringement

Plaintiff seeks to permanently enjoin Default Defendants from infringing on Facebook's marks in the future.  Injunctive relief is authorized under 15 U.S.C. § 1116(a) to prevent violations under the ACPA. Generally, "injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175,

31

1180 (9th Cir. 1988).  In light of Defendants' potentially ongoing violations of the ACPA, the

Court believes that permanent injunctive relief is appropriate with respect to any domain name

that is identical or confusingly similar to Facebook's marks. *See Verizon California Inc. v. Online*

*NIC, Verizon California Inc. v. OnlineNIC Inc.*, C 08-2832 JF (RS), 2008 WL 5352022 (N.D.

Cal. Dec. 19, 2008)(citation omitted).

## IV.    CONCLUSION

For the reasons set forth above, and for good cause shown, this Court recommends that

Plaintiff's Motion for Default Judgment be GRANTED, and that the district court award Plaintiff

Facebook, Inc. statutory damages as set forth below.

**A.  Typosquatting Defendants (all Default Defendants except Cleanser Products)**

Defendant Counter Balance Enterprises Ltd. shall pay total statutory damages in the

amount of $20,000. Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages

represents $10,000 for each of the following domain names registered and used by defendant

Counter Balance Enterprises Ltd., both of which redirected users to Cleanser Products' landing

websites: <facebobk.com> and <facemook.com>.

Defendant Intercontinental Domain Inc. shall pay total statutory damages in the amount of

$160,000. Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages represents

$15,000 for each of the following domain names registered and used by defendant

Intercontinental Domain Inc.: <eacebook.com>, <faceboko.com>, <facebooj.com>,

<facvebook.com>, <fadebook.com>, <faxebook.com>, <fqacebook.com>, and <fqcebook.com>;

and $20,000 each for those domains that incorporated the correctly-spelled FACEBOOK mark:

<lfacebook.com>  and <rfacebook.com> .

Defendant Mackrooner Ltd., Inc. shall pay total statutory damages in the amount of

$15,000. Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages represents

$15,000 for the following domain name registered and used by defendant Mackrooner Ltd., Inc.,

which redirected users to a landing page operated by Cleanser Products, and incorporated the

correctly-spelled FACEBOOK mark: <ffacebook.com>.

United States District Court
Northern District of California

1    Defendant Newgate shall pay total statutory damages in the amount of $1,340,000.

2    Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages represents $25,000 for the

3    following domain names registered and used by defendant Newgate: <faasbook.com>,

4    <facbnook.com>, <faceboobok.com>, <facbookl.com>, <facboox.com>, <faccebuk.com>,

5    <faceabok.com>, <facebboc.com>, <facebnbook.com>, <facebocke.com>, <facebof.com>,

6    <faceboobok.com>, <faceboooik.com>, <faceboooks.com>, <faceebot.com>, <facesbooc.com>,

7    <facewebook.com>, <faeccbook.com>, <faesebook.com>, <faicbooc.com>, <fasceboo.com>,

8    <faseboox.com>, <faycbok.com>, <fcfacebook.com>, <feacboo.com>, <feacbooke.com>,

9    <fecbbok.com>, <feook.com>, <ferabook.com>, <fescebook.com>, <ficeboock.com>, <www-

10   facbook.com>, <wwwfacebppk.com>, <wwwfcaebook.com>, and <wwwfeibook.com>; $30,000

11   for each of the following domain names that incorporated the correctly-spelled FACEBOOK

12   mark: <facebookck.com>, <facebookforteens.com>, <facebookloging.com>,

13   <facebooktrucos.com>, and <thefacebookl.com>; $35,000 for each of the following domain

14   names that incorporated the correctly-spelled FACEBOOK mark alongside other correctly-spelled

15   common words: <facebookloin.com>, <facebooknew.com>, and <facebookwelcome.com>;

16   $50,000 for each of the following domain names that redirected users to landing websites

17   operated by Cleanser Products: <faboock.com>, <facebokbook.com>, and <fcaebbok.com>; and

18   $55,000 for the following domain that both redirected users to a landing website operated by

19   Cleanser Products and incorporated the correctly-spelled FACEBOOK mark:

20   <wwwrfacebook.com>.

21       Defendant Pioneer Enterprises Ltd. shall pay total statutory damages in the amount of

22   $70,000. Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages represents

23   $5,000 for the following domain names registered and used by defendant Pioneer Enterprises

24   Ltd.: <dacebook.com>, <faacebok.com>, and <facegbook.com>; $10,000 for each of the

25   following domain names that incorporated the correctly-spelled FACEBOOK mark:

26   <gfacebook.com>, and <zh-facebook.com>; $10,000 for each of the following domain names that

27   redirected users to landing websites operated by Cleanser Products: <facebokook.com> and

28   <faceboocklogin.com>; and $15,000 for the following domain name that incorporated the

33

1    correctly-spelled FACEBOOK mark alongside a correctly-spelled common word:

2    <facebookfreezer.com>.

3          Defendant YourTick shall pay total statutory damages in the amount of $10,000. Pursuant

4    to 15 U.S.C. § 1117(d), the total amount of statutory damages represents $10,000 for the

5    following domain name registered and used by defendant YourTick, which also incorporated the

6    correctly-spelled FACEBOOK mark: <wwwfacebookde.com>.

7          Defendant Paul Baker shall pay total statutory damages in the amount of $5,000. Pursuant

8    to 15 U.S.C. § 1117(d), the total amount of statutory damages represents $5,000 for the following

9    domain name registered and used by defendant Paul Baker: <facebokcasino.com>.

10         Defendant Reggie Bush shall pay total statutory damages in the amount of $20,000.

11   Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages represents $5,000 for the

12   following domain names registered and used by defendant Reggie Bush: <facebolk.com> and

13   <facebopk.com>; and $10,000 for the following domain name that also redirected users to a

14   landing website operated by Cleanser Products: <faceboik.com> .

15         Defendant Karrie-Lee Karreman shall pay total statutory damages in the amount of

16   $20,000. Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages represents

17   $5,000 for the following domain name registered and used by defendant Karrie-Lee Karreman,

18   which is subject to the double-multiplier based on her status as a serial cybersquatter, plus an

19   additional $10,000 for incorporating the correctly-spelled FACEBOOK mark alongside other

20   correctly-spelled common words: <yourfacebooksurvey.com>.

21         Defendant Michael Suggs (doing business as Michael Timothy Suggs, Timothy Suggs, FB

22   Promotions/Freebie Promos, and Rabbit GoGo Media LLC) shall pay total statutory damages in

23   the amount of $705,000. Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages

24   represents $15,000 for the following domain names registered and used by defendant Suggs:

25   <dfacecbook.com>, <facbeok.com>, <facceebookk.com>, <facebooich.com>, <facebooick.com>,

26   <facebooiik.com>, <faceboom.com>, <feceboox.com>, and <facebooik.com>; and $30,000 in

27   statutory damages for the following 19 domain names that redirected users to landing websites

28   operated by Cleanser Products: <afcbook.com>, <fecabo.com>, <fsacebook.com>,

United States District Court
Northern District of California

1  &lt;facebgook.com&gt;, &lt;facebook.com&gt;, &lt;faceboop.com&gt;, &lt;facecbook.com&gt;, &lt;fbpromotions.com&gt;,

2  &lt;wwwfacbeok.com&gt;, &lt;wwwfaccbook.com&gt;, &lt;wwwfacceook.com&gt;, &lt;wwwfaceb0ok.com&gt;,

3  &lt;wwwfaceboobs.com&gt;, &lt;wwwfacebooi.com&gt;, &lt;wwwfaceboor.com&gt;, &lt;wwwfacecbook.com&gt;,

4  &lt;wwwfacefook.com&gt;, &lt;wwwfacelook.com&gt;, and &lt;facetook.com&gt;.

5       In addition, all typosquatting Defendants named above shall, pursuant to 15 U.S.C. §

6  1125(d)(1)(C), transfer to Facebook all rights to the infringing domain names—including those

7  infringing  domain names disclosed by Suggs prior to settlement negotiations[5]—within 21 days of

8  Facebook sending by email and overnight mail a copy of this Order to each defendant.  In the

9  event that the infringing domain names are not transferred to Facebook within the above time

10  period, the current domain name registrar(s) for the infringing domain names shall transfer the

11  infringing domain names to Facebook within 21 days of Facebook sending by email and

12  overnight mail a copy of this Order to the current domain name registrar(s).

13       It is further recommended that all typosquatting defendants, and their agents, servants,

14  employees, attorneys, affiliates, distributors, successors, assigns, and any other persons acting in

15  concert or in participation with each typosquatting defendant are now and forever enjoined from:

16

17  [5] &lt;de-defacebook.com&gt;, &lt;facebkkk.com&gt;, &lt;facebpk.com&gt;, &lt;facelbook.com&gt;, &lt;facnbook.com&gt;,
&lt;fbacebook.com&gt;, &lt;fcebookk.com&gt;, &lt;fecebool.com&gt;, &lt;fgacebook.com&gt;, &lt;facboolk.com&gt;,

18  &lt;facbvook.com&gt;, &lt;facbeooik.com&gt;, &lt;fecabooik.com&gt;, &lt;fecacbook.com&gt;, &lt;fecacook.com&gt;,
&lt;fecavook.com&gt;, &lt;fececbook.com&gt;, &lt;fevabooik.com&gt;, &lt;fevabook.com&gt;, &lt;fevecbook.com&gt;,

19  &lt;facevkook.com&gt;, &lt;facevlook.com&gt;, &lt;facevooik.com&gt;, &lt;facevoolk.com&gt;, &lt;favebgook.com&gt;,
&lt;favebo0k.com&gt;, &lt;faveboik.com&gt;, &lt;favebooi.com&gt;, &lt;favebooo.com&gt;, &lt;favgbook.com&gt;,

20  &lt;favegook.com&gt;, &lt;faceboozk.com&gt;, &lt;facebxook.com&gt;, &lt;facebyook.com&gt;, &lt;facebzook.com&gt;,
&lt;facwebooik.com&gt;, &lt;facebdok.com&gt;, &lt;facebohok.com&gt;, &lt;facebomok.com&gt;, &lt;facebovok.com&gt;,

21  &lt;facegvook.com&gt;, &lt;favbeook.com&gt;, &lt;fazacebook.com&gt;, &lt;fgcebook.com&gt;, &lt;fmcebook.com&gt;,
&lt;fnacebook.com&gt;, &lt;fpacebook.com&gt;, &lt;cacevook.com&gt;, &lt;facevoik.com&gt;, &lt;facevooi.com&gt;,

22  &lt;fafevook.com&gt;, &lt;faveb0ok.com&gt;, &lt;faveboko.com&gt;, &lt;favebpok.com&gt;, &lt;favehook.com&gt;,
&lt;faveobok.com&gt;, &lt;fvaebook.com&gt;, &lt;fwacebok.com&gt;, &lt;acebooik.com&gt;, &lt;afcecbook.com&gt;,

23  &lt;facebiooik.com&gt;, &lt;facebnooik.com&gt;, &lt;facebo0oik.com&gt;, &lt;facebopoik.com&gt;,
&lt;facebvooik.com&gt;, &lt;facecbgook.com&gt;, &lt;facecbooi.com&gt;, &lt;facecbooj.com&gt;,

24  &lt;facecbookm.com&gt;, &lt;facecboom.com&gt;, &lt;facecbooo.com&gt;, &lt;facecgook.com&gt;,
&lt;facerbooik.com&gt;, &lt;facevbooik.com&gt;, &lt;facwecbook.com&gt;, &lt;facxebooik.com&gt;, &lt;faebooik.com&gt;,

25  &lt;fasebooik.com&gt;, &lt;fdacecbook.com&gt;, &lt;ffacecbook.com&gt;, &lt;fgacecbook.com&gt;,
&lt;fracebooik.com&gt;, &lt;fracecbook.com&gt;, &lt;gacecbook.com&gt;, &lt;gfacecbook.com&gt;, &lt;faesbuk.com&gt;,

26  &lt;fecbooc.com&gt;, &lt;fecbuuk.com&gt;, &lt;feecook.com&gt;, &lt;fexbok.com&gt;, &lt;focabok.com&gt;,
&lt;focbook.net&gt;, &lt;facegbok.com&gt;, &lt;fdacebok.com&gt;, &lt;rfacebok.com&gt;, &lt;tacebok.com&gt;,

27  &lt;afcebook.co&gt;, &lt;faceboojk.co&gt;, &lt;facewbook.co&gt;,  and &lt;facwebook.co&gt;.

28

1.      Registering, using, trafficking in, or benefiting from Internet domain names that incorporate the FACEBOOK mark or incorporate words, numbers, or symbols that, collectively or in isolation, are confusingly similar to the FACEBOOK mark; and

2.      Knowingly providing services to any person or entity who registers, uses, traffics in, or benefits from Internet domain names that incorporate the FACEBOOK mark or incorporate words, numbers, or symbols that, collectively or in isolation, are confusingly similar to the FACEBOOK mark; and

3.      Using the FACEBOOK mark or any confusingly similar marks in advertisements or otherwise in commerce in any manner likely to confuse consumers as to the association, affiliation, endorsement, or sponsorship of Facebook; and

4.      Engaging in any infringing acts involving the FACEBOOK mark or other Facebook marks; and

5.      Engaging in any unlawful, misleading, deceptive, or malicious activities directed at or relating to Facebook's website, Facebook's services, Facebook users, or potential Facebook users; and

6.      Inducing, encouraging, causing, materially contributing to, or aiding and abetting any other person or entity to do the acts described in (1) to (5), above.

**B.  Cleanser Products**

Defendant Cleanser Products shall pay total statutory damages in the amount of $430,000. Pursuant to 15 U.S.C. § 1117(d), the total amount of statutory damages represents $80,000 for each of the five deceptive landing websites owned and operated by Cleanser Products, which benefitted from typosquatting domains that redirected Internet traffic: <socialrewardsurvey.com>, <socialrewardcenter.com>, <socialrewardpanel.com>, <socialsurvey2011.com>, and <social.worldrewardcenter.com>; and $10,000 for each of the three domain names identified in the First Amended Complaint that redirected users to Cleanser Products landing websites.

It is further recommended that defendant Cleanser Products and its agents, servants, employees, attorneys, affiliates, distributors, successors, assigns, and any other persons acting in concert or in participation with defendant Cleanser Products are now and forever enjoined from:

1.      Registering, using, trafficking in, or benefiting from Internet domain names that incorporate the FACEBOOK mark or incorporate words, numbers, or symbols that, collectively or in isolation, are confusingly similar to the FACEBOOK mark; and

2.      Knowingly providing services to any person or entity who registers, uses, traffics in, or benefits from Internet domain names that incorporate the FACEBOOK mark or incorporate words, numbers, or symbols that, collectively or in isolation, are confusingly similar to the FACEBOOK mark; and

3.      Using the FACEBOOK mark or any confusingly similar marks in advertisements or otherwise in commerce in any manner likely to confuse consumers as to the association, affiliation, endorsement, or sponsorship of Facebook; and

4.      Engaging in any infringing acts involving the FACEBOOK mark or other Facebook marks; and

5.      Engaging in any unlawful, misleading, deceptive, or malicious activities directed at or relating to Facebook's website, Facebook's services, Facebook users, or potential Facebook users; and

6.      Inducing, encouraging, causing, materially contributing to, or aiding and abetting any other person or entity to do the acts described in (1) to (5), above.

Any party may file objections to this report and recommendation with the District Judge within 14 days of being served with a copy. *See* 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b); N.D. Civil L.R. 72-3.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *IBEW Local 595 Trust Funds v. ACS Controls Corp.*, No. C-10-5568, 2011 WL 1496056, at *3 (N.D. Cal. Apr. 20, 2011).

IT IS SO RECOMMENDED.

Dated: April 30, 2013

KANDIS A. WESTMORE
United States Magistrate Judge